2 to crt



26 pm
4/16/02

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DORI L. BEARD** | : **NO.: 1:CV-01-0374** |
| **Plaintiff** | : |
| | : |
| **v.** | : Judge Caldwell |
| | : |
| **PENNSYLVANIA STATE UNIVERSITY,** | : |
| **PENN STATE HARRISBURG, CAPITOL** | : |
| **COLLEGE, LEONARD J. SUPENSKI, and** | : |
| **DOROTHY GUY, in their individual capacity,** | : |
| **Defendants** | : **JURY TRIAL DEMANDED** |

### PLAINTIFF'S SUMMARY JUDGMENT EXHIBITS

A.   Declaration of Dori Beard

B.   Deposition of Kevin Stoehr

C.   Deposition of Robert Maney

D.   Appendix of miscellaneous documents



FILED
APR 1 5 2002
PER RB
HARRISBURG, PA  DEPUTY CLERK

Andrew J. Ostrowski, Esquire
I.D. No. 66420
4311 North Sixth Street
Harrisburg, PA 17110
(717) 221-9500
Attorney for Defendant

Dated: April 15, 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DORI L. BEARD             : NO.: 1:CV-01-0374
    Plaintiff                :
                               :
      v.                     : Judge Caldwell
                               :
PENNSYLVANIA STATE UNIVERSITY,   :
PENN STATE HARRISBURG, CAPITOL   :
COLLEGE, LEONARD J. SUPENSKI, and   :
DOROTHY GUY, in their individual capacity,   :
    Defendants            : JURY TRIAL DEMANDED

## DECLARATION OF DORI L. BEARD

1.     I am the Plaintiff herein.

2.     I have reviewed the Response to Defendant's Statement of Undisputed Material Facts and

state that I have personal knowledge of the facts that are admitted with qualification and

denied and that those qualifications and denials are true and correct.

3.     On or around January 30, 1997, I advised Dorothy Guy that I wanted to reinstate a previously

withdrawn complaint of discrimination and would be initiating further proceedings due to a

pattern of retaliatory harassment that I had been experiencing particularly after Leonard

Supenski changed past policy and practice concerning the consideration of seniority in matters

of scheduling.

4.     After Phil Negrete left the Penn State Police, I was the most senior officer by several years.

Phil Negrete never had a problem with seniority-based scheduling.

5.  A February 5, 1997 letter from my attorney to Supenski, attached to Plaintiff's Summary Judgment Exhibits, truly and accurately summarizes the facts that existed concerning the matter of leave based upon seniority.

6.  I was interrogated by Supenski, with Guy present, on February 8, 1997. I did not feel that I was free to leave during that interrogation and Supenski was hostile and threatening during the interrogation. I was accused of unlawful actions and threatened with possible prosecution. The interrogation was tape recorded, and, after requesting copies of the tapes for several months during this litigation, we finally received a copy, but, when I listened to the tape, I determined it was altered because it did not match the transcript.

7.  After October 15, 1997, I was ready, willing and able to return to my position, without restrictions, consistent with the recommendation of Dr. Hostetter, and, through my attorney, asked several times that I be returned to my position after that date, but I was never returned to my position.

8.  After October 15, 1997, I was not out of work due to any medical reason and was able to perform my job. The only reason I did not return to work was that Penn State never took any action to return me to the position that I was ready, willing and able to return to.

9.  The only condition placed upon my return to work was that I be released to return without restrictions, with the concurrence of Penn State's physician. Dr. Hostetter, a physician paid by Penn State to evaluate me, released me to return to work without restrictions, and I thereafter sought to be returned to my position, and nobody ever told me or my attorney that I needed to do anything else in order to be able to return to my position.

10.     I filed a complaint of discrimination with the PHRC in February 1997, No. E-82231D (Beard Exhibit 29). The investigation of that complaint continued from 1997 through 2000. During the investigation of that complaint, the investigator specifically investigated issues regarding the change in seniority practices by Penn State, the February 8, 1997 interrogation that caused me to have a nervous breakdown, the harassment that continued after February 8, 1997, and Penn State's failure to reinstate me to my position after I was released without restriction by Dr. Hostetter on October 15, 1997. I have reviewed the PHRC file received in response to a subpoena issues by my attorney in this case, and it contains the October 15, 1997 report from Dr. Hostetter (Beard Exhibit 15) as well as correspondence dated July 27, 2000 from attorney Gismondi addressing the issue of reinstating me to my previous position. A copy is attached to Plaintiff's Summary Judgment Exhibits.

11.     Supenski testified during my worker's compensation proceeding that he was well aware of my history of discrimination complaints against my employer. Excerpts from his testimony are attached to Plaintiff's Summary Judgment Exhibits.

12.     On August 24, 1999 I sent a certified letter requesting that I be reinstated to my position, and received a return receipt dated August 27, 1999. These documents are attached to Plaintiff's Summary Judgment Exhibits. Clearly, my letter did not "cross in the mail" with Penn State's August 30, 1999 letter terminating my employment.

13.     Anthony Kuklinski does not have a bachelor's degree, but has remained employed by Penn State.

14.     Defendants' Summary Judgment Motion is premised upon the problem that I had while I was

employed by Penn State - i.e., that whenever I made a complaint of improper or unlawful

conduct, rather than looking into the conduct and doing something about it, they simply

looked to me as the problem.

I hereby declare, under penalty of perjury, that the foregoing is true and correct and based

upon my personal knowledge.

Dated: 4/11/02                              *Dori L. Beard*
                                            Dori L. Beard

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DORI L. BEARD                         :    1 CV: 01-0374
        Plaintiff                     :
v.                                    :
PENNSYLVANIA STATE                    :
UNIVERSITY HARRISBURG,                :
LEONARD SUPENSKI, and                 :
DOROTHY GUY, in their                 :
Individual capacity                   :
        Defendants                    :

PROCEEDINGS:   VIDEO DEPOSITION OF
               KEVIN STOEHER

DATE:          January 30, 2002

APPEARANCES:

    For the Plaintiff      Andrew Ostrowski, Esquire
                           4311 North 6th Street
                           Harrisburg, PA

    For the Defense        Janine Gismondi, Esquire
                           McQuaide, Blasko LLP
                           811 University Drive
                           State College, PA 16801

---

1   VIDEO OPERATOR:    Good morning ladies
2   and gentlemen please be advised the Audio and Video
3   is in operating my name is Crystal M. Lyde L-Y-D-E.
4   My address is 4310 Hillsdale Road, Harrisburg, Pa
5   17112. I've been contracted by P.R. Video Inc. to be
6   the operator for this deposition. The case is in the
7   United States District Court for the Middle District of
8   Pennsylvania. The caption is Dori Beard vs. Penn
9   State University et al. 1:CV-01-0374 the date is
10  January 30, 2002 the time is 9:35 a.m. the deposition
11  is being held at the law office of Andrew J. Ostrowski,
12  4311 N. 6th Street, Harrisburg, PA 17110. The video
13  deposition is being taken on behalf of the plaintiff
14  Dori Beard and is also being done stenografically. The
15  witnesses' name is Kevin Stoeher. Would you raise
16  your right hand please? State your name please?
17      WITNESS:    Yes.
18      OPERATOR:    Will you state your name for the
19  record and spell it please?
20  WITNESS:    Kevin J. Stoeher.
21      OPERATOR:    Do you swear to tell the truth
22  the whole truth so help you God?
23      WITNESS:    I do.
24      OPERATOR:    Thank you. May I have a sound
25  check around the room please?

---

1   GUY:    Dorothy Guy.
2   GISMONDI:    Janine Gismondi.
3   COURT REPORTER:    Donna Richards.
4   OSTROWSKI:    Andy Ostrowski.
5   BEARD:    Dori Beard.
6   OPERATOR:    Okay, usual stipulations.
7   OSTROWSKI:    Yes.
8   GISMONDI:    Yes.
9   OPERATOR:    Thank you.
10  OSTROWSKI:    Mr. Stoeher my name is Andy
11  Ostrowski I was just introduced here just a few
12  minutes ago. You understand that you were brought
13  here today to give a deposition in the lawsuit that Dori
14  Beard has brought against Penn State University,
15  Dorothy Guy, and Glenn Supinski.
16      A:    Yes I do.
17      Q:    And have you given a deposition before?
18      A:    No I don't believe so.
19      Q:    Okay have you had a chance to review with
20  counsel with what the ground rules are in this
21  deposition.
22      A:    Yes.
23      Q:    Essentially just to fill you in by way of
24  background Dori Beard she's a former police officer
25  with Penn State University. You're aware of that. And

---

1   I called you in here to ask you questions about what
2   you Mae know or Mae not know about matters that
3   you Mae know that we believe may be relevant to her
4   case. It's going to be a question and answer session
5   and when I ask you a question I would ask that you
6   respond verbally. And also when I ask you a question I
7   want you to be sure that you heard and understood the
8   question and if I ask you a question and I can do
9   anything before you answer if it's not clear to you and
10  you want me to clarify I would be happy to do so.
11  Okay.
12      A:    Okay.
13      Q:    You are currently with Penn State
14  University?
15      A:    Yes I am.
16      Q:    And whats your position.
17  A:    Director of Safety and Police Services for
18  Capitol College, which is both campus' Harrisburg
19  and Schuylkill.
20      Q:    How long have you been in that position?
21      A:    I started with Penn State June 7, 1997.
22      Q:    Run through your employment history
23  prior to June 1997?
24      A:    For the previous twenty years almost
25  twenty years I was employed with the Mt. Lebanon



Police Department which is a suburb of Pittsburgh. I was hire there April 6, 1978, just about nine months after I graduated from Duquesne University. So I was with Mt. Lebanon for almost 20 years, rose up the ranks the last 7 years I was there as Deputy Chief of Police. Mt. Lebanon police department has about 45 officers, 35,000.00 people in the community. That sort of thing.

Q:   The time that you left Mt. Lebanon what was the ratio of male and female police officers.

A:   I believe we had 2-3 female police officers.

Q:   Out of the 45.

A:   At that time there was 42. When I left there was actually 42 and I think 2. I think 2 female officers.

Q:   Were you involved in the hiring of those two female officers?

A:   I was involved with one.

Q:   When was she hired?

A:   I don't recall, I would say may be the late 80's

Q:   Other then those two female police officers, how many other female police officers had been employed with the Mt. Lebanon police department?

A:   I think besides those two just one more. Yes.

Q:   Why did she leave?

A:   I have no idea. She was hired before I was. I think she took another job. I think with the FBI if I recall.

Q:   Why did you leave?

A:   Career advancement, the opportunity to teach regularly undergraduate criminal justice. Those sorts of things.

Q:   Did you currently teach undergraduate at the Capitol College?

A:   Yes I do.

Q:   And have you been teaching through your entire tenure?

A:   I started teaching at Duquesne University in 1990. I taught there for about 7 years again undergraduate criminal justice. I believe I started to teach for about after a year I was at Penn State at both campus the Harrisburg campus and also the Schuylkill Campus.

Q:   And do you get paid for the teaching and for you're –

A:   Yes the teaching is in addition to my salary position.

Q:   Is the salary at Penn State for your salary position is it better than it was at Mt. Lebanon?

4

5

A:   No. I wouldn't say its better I would say it's equal. If you look at strictly compensation. If you don't count benefits. Dollar for dollars it's probably about the same. Maybe a little less at Penn State.

Q:   Okay. And have you taught in each of the semesters since you've been here?

A:   Pretty much for the last two years, the Fall and the Spring semester.

Q:   Okay.

A:   I'm scheduled to teach a summer course that's the first time I've done that.

Q:   But you've taught in each Fall and Spring?

A:   I believe so in the last couple years anyway.

Q:   And you said you are Director of Police Services for both the Schuylkill and Harrisburg?

A:   That's correct.

Q:   And how long has that been your assignment?

A:   Obviously with Penn State/Harrisburg since day one. Schuylkill I took over the operation over there, I want to say January of 1999 or 2000. I'm not. One or the other its been the last two or three years.

Q:   I'd like to try to narrow it to focus on that because I think it's an important time frame. So is there anything that you can look to to determine that?

A:   Well that was when John Leathers was here, which would have been right before he left?

Q:   John Leathers was?

A:   He was the interim Dean in Provose. So am trying to think when he was.

Q:   I don't know if I have any documents to help you.

A:   No. I guess it was 2000. I think he left somewhere in 2000 – 2001. I believe it would have been 2000. I believe that's when it occurred.

Q:   And just as a general ground rule, during the deposition your counsel can instruct you as she wishes I don't mind if you have questions that you want to ask me to clarify.

A:   Sure. Thank you.

Q:   So unless you think of anything throughout the deposition that makes you believe other wise I'm gonna go forward assuming it was 2000.

A:   Right.

Q:   So then from June of 97 through 1999 your assignment was Director of Police. You call it Director of Safety Police.

1   A:   Safety and Police.

2   Q:   For the Harrisburg Capital  College.

3   A:   Yes.

4   Q:   In addition to your – is that adjuck

5   position?

6   A:   Yes part time.

7   Q:   I'm going to give you a document and

8   mark it as deposition exhibit 73. And I attached the

9   two from separate documents that I pulled out. On the

10  first page of the document the only thing I'm

11  interested in is the list of names there, and I'll ask you

12  is that the entire list of full time police officer who

13  were employed by or at the Harrisburg Capital College

14  when you took over?

15  A:   Yes I believe so as of this is dated July 7.

16  Q:   Right and you took over sometime in June.

17  A:   June 7 it was a Saturday. My first day in

18  the office was June 9.

19  Q:   Was Mr. Farin in his position when you

20  took over?

21  A:   No I believe he was gone.

22  Q:   Okay. And the total count including

23  yourself 7 full time police officers.

24  A:   Yes including myself.

25  Q:   And what is the current count now?

8

1   A:   Police officers positions. The same.

2   Q:   Did you prepare that document?

3   A:   I believe we did  yes- my office.

4   Q:   Who prepared that?

5   A:   Vera Mae Piccolo.

6   Q:   Did she prepare that at your instructions?

7   A:   Yes.

8   Q:   Was that prepared for this case?

9   A:   Yes. For some proceeding yes.

10  Q:   I don't know when present is as reflected

11  on there so lets. Is Jennifer Allshouse presently

12  employed?

13  A:   Yes.

14  Q:   And all these officers listed down the left-

15  hand side is this all for Harrisburg Capitol College?

16  A:   On the left side, yes.

17  Q:   Okay.

18  A:   Except for the second from the bottom.

19  Arlon Schools. He's up at Schuylkill office. He is

20  now; he was hired at State Harrisburg initially.

21  Q:   As an end date of August 13, 1997 he was

22  at Harrisburg Capitol College.

23  A:   Yes.

24  Q:   Did he at that point transfer?

25  A:   Yes he did.

9

1   Q:   And this didn't include you obviously?

2   A:   No.

3   Q:   And did this go through the present - on the

4   end date are those individuals employed there?

5   A:   Yes they are.

6   Q:   Mr. Farin there?

7   A:   No he wasn't.

8   Q:   He was not there. Do you know who was

9   there prior to his position?

10  A:   I probably couldn't tell you who exactly,

11  after I started my first hires were made in January of

12  1998. And they included the 3 officers we hired at that

13  time was Marlene Garonzi, Shaun Pugh, and James

14  Hayes. They were all hired right that first, you can see

15  January 5, you can see it says January 5 – James

16  Hayes and Arlon Schools, and  Marlene Garonzi were

17  hired of 98, and Shaun Pugh was hired a week later on

18  June 12, 1998.

19  Q:   Was there a period of time perhaps in the

20  fall of 97 when you were understaffed.

21  A:   Yes.

22  Q:   And you made 3 hires in January 98.

23  A:   Yes.

24  Q:   Mr. Garonzi, Mr. Hayes and Mr. Pugh.

25  A:   Yes.

1   Q:   So you were filling positions then vacated

2   by Mr. Marchesani, Mr. Schools, and what was the

3   third position Ms. Beards?

4   A:   Yes. Mr. Farin's position was still vacate.

5   Q:   Okay. Farin wasn't there. So when you got

6   there you had. What was the status of Ms. Beard's

7   position during that time?

8   GISMONDI:   Meaning the fall of 97?

9   Q:   The Fall of – yes in the Fall of 97?

10  A:   She was as far as  I know was not working

11  but was still listed as an officer.

12  Q:   Okay.

13  A:   The position was still listed with her name

14  on it.

15  Q:   Okay. When Mr. Marchesani went did he

16  go to the Schuylkill do you know?

17  A:   No. I really couldn't tell you where he

18  went. I know he had applied at other places. I think in

19  the Philadelphia area if I'm not mistaken. I couldn't

20  tell you exactly where.

21  Q:   Okay. So as of August 13, 1997 at the end

22  of August 1997 you had 3 - let me ask you this. As of

23  August 31, 1997 who were the full time officers that

24  were employed at the Harrisburg Capitol College?

25  A:   At Penn State Harrisburg?

Q: Yes. I'm sorry.

A: At that point Matt Hathaway, Anthony Kuklinski were the two officers that were working and Dori Beards position as I said before was still on the books but she wasn't working at that time.

Q: So you think they were positions that were held by Mr. Farin, Mr. Marchesani and Mr. Schools?

A: Yes.

Q: And were those three positions filled in January of 1998 is that correct?

A: That would be fair to say, we did have three of those positions vacate and we did hire three officers.

Q: And after you hired those three officers in January lets go to January 31, 1998 your staff was Marchesani, James Hayes, Shaun Pugh and who were the other officers?

A: As of January 31.

Q: Yes. Were Mr. Hathaway and Mr. Kuklinski still there?

A: Kuklinski was and Hathaway – I don't see his name on this second sheet here. And it should be on there.

Q: It should be on there?

12

Q: And do you know from January 98 until October of 98. Was Mr. Kuklinski departed?

A: And where talking the Fall of 98?

Q: The Fall of 98.

A: No he was still there.

Q: Okay. As of October of 1998 you had Frank Divonzo, you had Ryan Morris, Shaun Pugh.

A: Shaun Pugh was gone.

Q: I'm sorry I read the wrong name. Dan Tingle.

A: Right Dan Tingle.

Q: Tony Kuklinski anybody else.

A: James Hayes. How many is that?

Q: That's five. Is that right?

A: Let's see October of 98. Divonzo.

Q: Let me put Dori Beard is there to.

A: Hayes, Morris, Segal. I believe that's correct.

Q: You had five present full-time officers.

A: Yes.

Q: And Dori Beard's vacate position.

A: Yes and Dori Beard's position.

Q: The next action is September 14, 1999 right you hired Jennifer Allshouse?

A: Can I just take a step back.

A: He was working on – as I said when I got there. So his name should be on there not Hathaway.

Q: Okay.

GISMONDI:   If I can interject just to clarify this second page, list only officers hired after February 8, 1997.

WITNESS:   Right. Then he wouldn't be on there. That's my fault then. If I recall he resigned his position early in 98. Sometime in January of 98. So I'm not sure of the exact date, so when you say January 31 of 98 he Mae already had been done in effect it would have been the three officers that had been just hired along with Tony Kuklinski.

Q: Okay. Well let's say as of January 12, 1998 do you know if he was still there?

A: I don't know the exact date. It was I believe it was shortly after the New Year sometime in January of 1998.

Q: Lets say as of January 31, 1998 you only had 4 full time positions filled.

A: Yes.

Q: And then your next employment actions were three positions in October of 1998 correct? I see Mr. Devonso, Mr. Morris and Mr. Tingle.

A: Yes.

13

Q: Yes sure.

A: Just in October of 19 of 1998 we have Tony Kuklinski, Frank Divonzo, Marty Marchesani. James Hayes, Brian Morris and Dan Tingle so that's six not counting Dori Beard is that correct?

OSTROWSKI: Yes.

Q: Right and not counting you.

A: Yes and not counting myself. I just wanted to clarify that.

Q: Did you have your full compliment of six full time officer positions filled.

A: As of October 19, 1998 yes.

Q: Okay. Well what was the status of Dori Beard's position at that time?

A: Well that is a good question. The position at that point in 98 . I was instructed to fill her position?

Q: Who instructed you to fill her position?

A: I think maybe through Human Resources, or University Park or whatever because we had this open position since I got there in June of 97.

Q: And when was the discussions related made to fill her position?

A: I don't know if there were discussions but it was just felt that why don't we fill the position then go from there.

Q: Okay.

A: Because we had been under-staffed for so long.

Q: Try to tell me as much as you can about all the discussions you had related to filling that position?

A: I don't think.

GISMONDI: Object to the form of the question. He just said he didn't know if there was discussions.

OSTROWSKI: Okay I'm sorry.

A: I wouldn't call it discussions I would say at that point the decision was made that University Park or wherever that we should go and fill that position at that time.

Q: How was that decision communicated to you?

A: I don't know a phone call probably.

Q: You don't recall from who.

A: Not specifically I'm not sure if it was Dave Stoma was still there at the time. As of July 1, 1997 University Park over saw are police operations. So Tom Harmon and I Mae have had a conversation but I don't recall exactly what the decision was made to hire these three officers in October. To fill six positions. To

16

actually have six full time officers on duty something that we hadn't had since I got there in June of 97.

Q: Do you know anything about there being term position that was created. A term position?

A: I recall something around those lines. And that Mae have something to do with Ms. Beard's position I don't know. Again, that's – My main object was to get six officers hired. To have six officers working and from operational stand point. From Human Resource stand point if they create a position while things are ongoing? I'm not really that involved with that, but I vaguely recall something about a fixed term position but I really again I wasn't really involved in that.

Q: Okay. As of October 19, 1998 looking at the list of officers Divonzo, Morris, Tingle, Kuklinski and Hayes. Do you know if any of those individuals were occupying that would be the term position?

A: I believe there was Frank Divonzo but I could be wrong. He was the last person hired. And I believe something involved in that it might even be a cop's grant that was up at University Park at that time, but I believe it Mae have been Divonzo.

17

Q: Okay. Whats your responsibility for -, which relates to safety police services department at the Capitol College?

A: Including Schuylkill. Or just at the Harrisburg Campus?

Q: Unless I ask otherwise lets try to keep it confined to the period 1997 to 1999 which would be just Harrisburg Campus.

A: Yes. Well I administer the budget, approve purchases, training, those sorts of things, salaries are set I mean at that particular time, they were set at University Park. In the budget I would formulate a budget just with things I thought we needed operationally items, one time purchases, new vehicles that sort of thing.

Q: And was there ever a fixed term position built into your budget for the Harrisburg Capitol College?

A: Again I believe there was but that was mostly handled at University Park because all of our salary lines were up there because of the re-organization. So actually all of that was up at University Park Campus.

Q: And you said because of the re-organizational what are you referring to?

A: Just as of July 1, 1997.

Q: Whats reflected on the first page.

A: Well like I said the following positions will be transferred to UP effective July 1, and that was my intermediate supervisor at that point was Tom Harmon. And the fill time police officer salaries were up there. It was really an attempt to integrate Penn State Harrisburg with University Park police. I think it was done fairly successfully.

Q: Okay. Back up a little. Did you review these documents before you came here today in the past two months?

A: Some.

Q: Like what did you look at?

A: I think I just looked at some MPOETC stuff. Actually in that last two months, probably not a whole lot. Maybe some lists of who was working when, but there really wasn't a whole lot that I scoured or looked over all these different documents.

Q: Did you look at e-mails, communications regarding Dori Beard in this case.

A: Probably a lot of different females. There are still a lot of things that were there when I arrived.

Q: The only reason I'm asking this is I'm trying to understand how fresh it is in your mind.

1   A:   Frankly I had a lot of other things to do as
2   opposed to devote all my time to trying to study this
3   but from time to time I have looked at different things
4   but I won't say I really study all the paperwork that is
5   there.
6   Q:   Okay. Since the time you were aware that
7   you were called for a deposition have you reviewed
8   documents?
9   A:   Some. Again.
10   Q:   More then what you told me already?
11   A:   Not particularly. I guess part of this a lot
12   that occurred is before my arrival and you know so I
13   have looked at some things but again not a whole lot I
14   wouldn't say a whole lot.
15   Q:   What did you look at the MPTOEC stuff
16   that you looked at.
17   A:   Oh just concerning separation from
18   service, hiring people in fact I had a couple part-time
19   officers I Mae be hiring I don't know. So I was
20   looking at those sort of things what I needed to do.
21   Q:   Did you look at it at all for the purposes of
22   Dori Beard's case.
23   A:   Well I was looking specifically at
24   certifying an officer and decertifying an officer. And
25   what the standards were, what standards were what's

20

1   listed on the changes status forms. And that's what
2   you use to hire people to or anything else as far as the
3   States concerned.
4   Q:   Okay. Were you looking at that thinking of
5   Dori Beard's situation and why?
6   A:   Yes I believe there was I scene a document
7   saying she had been I don't' know de-certified I don't
8   know suspended whatever. I wanted to make sure
9   what the form said. Along with I had a couple hirings
10   part time officer that I Mae be sending that form in to
11   hire them.
12   Q:   Okay. Here's a document you had
13   previously marked it Exhibit 29. Did you look at that
14   particularly document in connection with this matter?
15   A: I didn't.
16   GISMONDI:   Excuse me for one minute can I
17   see this document.
18   OSTROWSKI:   Yes.
19   GISMONDI:   You don't have to make a copy
20   Andy.
21   I'm sorry what's the date of that?
22   A:   April 9, 1997.
23   Q:   Have you seen that document before?
24   A:   I believe I have yes.

21

1   Q:   And  the cover letter is a letter by Anthony
2   Kuklinski but you were talking about a form for a
3   change of status is that the form, which you were
4   referring?
5   A:   Not specifically this but a change of status
6   form, the current forms are differently then this.
7   Q:   How are they different?
8   A:   I think they list – there set up differently
9   they Mae have a couple different bullets here as for
10   what this form is used for. They change.
11   Q:   Were you looking at that in order to
12   evaluate whether what Anthony Kuklinski or Leonard
13   Supinski did relating to Dori Beard was proper?
14   A:   Well yes I would say so, I would say I
15   looked at it to say what it said.
16   Q:   Okay. And in reviewing that form do you
17   find that the action taken by officer Kuklinski was
18   proper in accordance with the standards under
19   MPOETC.
20   GISMONDI:   Again I'm going to object to the
21   record that your asking him to make a legal
22   determination but given that you can go ahead and ask
23   the question.
24   A:   I don't know there is a box that says other.
25   Q:   Okay.

1   A:   Looking at that or even the current form
2   doesn't really explain what other is.
3   Q:   Okay.
4   A:   So I don't know.
5   Q:   So maybe a gray area you think?
6   A:   Well there isn't a specific bullet for
7   something like this.
8   Q:   When you say something like this what do
9   you mean?
10   A:   Well like it says here what he alleges you
11   know police powers have been suspended until a full
12   medical and psychological evaluation or a completed -
13   I don't' know it does say other. I guess it's not listed
14   here there making allowances for other things.
15   Q:   Okay. Have you ever seen  - others
16   described by what Mr. Kuklinski has indicated?
17   A:   No I haven't.
18   Q:   Have you ever heard of that?
19   A:   No I can't say I have.
20   Q:   Have you personally prepared those types
21   of forms before?
22   A:   Yes.
23   Q:   And for what reasons have you prepared
24   those forms for?



A: Hiring officers, possibly like I said lost or damaged card. Separation from department I think I've done that.

Q: Do you know if officers for the human society are covered by the MPOETC?

A: I couldn't tell you.

Q: Okay.

A: I wouldn't think so but I couldn't be sure. I don't know.

Q: Again requirements as to who is authorize to complete a form in this nature? I mean the signature line and the bottom agency head; do you know how the agency head is determined?

A: No I think that's up to each agency, on that.

Q: Okay. How did you find out about the position that Penn State Human Services Director position?

A: I believe it was in the Chronicle Higher Education. It's a journal, academia that list different, along with articles it lists openings.

Q: And when did you find out about that position?

A: I want to say February of 97 after the first of the year.

24

Q: And tell me how you went about getting this position at Penn State?

A: Just like any other process I believe I sent in a resume, heard back from the University.

Q: In relation when you first heard of the position how long was it before you sent you resume in shortly thereafter?

A: Probably within two or three weeks something like that. They got back to me to come on campus for an interview. Which I did.

Q: How long after you sent your resume in did you hear back from them?

A: Maybe four- five weeks, maybe something like that.

Q: Perhaps in March.

A: March or early April, I heard back I think it was to set up an interview to go on campus and interview before different committees and things they had set up and I believe that was April.

Q: When you heard back from the University who did you hear from?

A: I don't know. I couldn't tell you.

Q: Dr. South or Dorothy Guy?

A: I would assume it was one of those two. I couldn't tell you if that was going through Human

25

A: Resources and Ms. Guy had signed a letter or whatever or if it was Dr. South's office. I don't recall.

Q: When was the first time you came in for an interview?

A: In 97 I'd say April, early April.

Q: Where did you go Harrisburg?

A: Harrisburg.

Q: And with whom did you meet?

A: You know I can't recall if I had one or two rounds of interviews. But I do recall the one time I was there was fairly extensive the day was planned out maybe a day in half meeting with different groups, students, faculty staff, I know I met with Dr. South. I think I had a session with Human Resources and -.

Q: And your saying there were two times?

A: I'm not positive I definitely recall the one time I was up there I don't know if there was something else or not. I can't recall. But what I do remember is that it was fairly extensive meeting place to place every hour every half-hour was accounted for. Different committees I know I meant in the gallery lounge there's an open forum and I had to speak to whomever was there so it was that sort of thing.

Q: Okay and do you know when you were notified that you were selected for that position?

A: I believe in mid Mae – I had to go up to University Park for medical examinations. I don't recall about a Psychological examination but I do believe I had a psychological examination up there to, MBPI on the computer it was a computer generated thing. But I had to past the Psychological and medical standards to be certified through the MPOEC.

Q: Okay. And MBPI standard.

A: Right Minnesota body basic personally inventory.

But that's a fairly standard physiological examination.

Q: And you said that was around mid Mae?

A: Yes for some reason the 19th or 20th something like that is sticking in my mind.

Q: As of that time have you meant any Penn State Harrisburg Police officers?

A: I don't believe I had at during that time in 97.

Q: Okay. When you went to University Park you'd say that mid Mae 97?

A: Yes.

Q: Physically and Physiological and you had an offer of employment?



A:    Conditionally I believe. Pending successful completion of the medical and physiological examines.

Q:    What happened after the medical and physiological examines?

A:    Once I was informed that I had passed them I believe I had turned my resignation into Mt. Lebanon police department and to come up with a start date that was convenient to everyone. And as I said previously that was June 7, 97.

Q:    And prior to that time had you ever North Lebanon.

A:    Mt. Lebanon.

Q:    I'm sorry Mt. Lebanon police department had they been notified at all that you were they aware that you had been looking?

A:    Yes. But I do want to mention that that was prior to 97 I had also applied for the position in 95.

Q:    For the same position.

A:    There was an opening in 95 went through a similar process was offered the position but decided to decline at that time.

Q:    Okay. Do you know if that's when Mr. Supinski took the position?

A:    I believe so.

28

A:    I did yes.

Q:    Okay.

A:    I would have had to pay something for housing unit in Meade. But since I had a sister-in-law up here in Lower Paxton is was just easier.

Q:    Whats Meade?

A:    Meade is the old base housing which consists of duplex homes, ranch style homes which is on the Harrisburg campus?

Q:    Is that Meet?

A:    M-E-A-D-E nickname for Meade whereever. Meade Heights was that housing unit.

Q:    And you would have had to pay for it?

A:    Right I would have had to pay for it, and as it turns out I had a relative up here.

Q:    And then I guess between June and August you looked for housing moved your family up here?

A:    Yes. Right.

Q:    How did you go about – was their an orientation program set up for you for Penn State Harrisburg position?

A:    Well I wouldn't say there was a formal orientation period I certainly Human Resources we talked about benefits and I believe I had thirty days, or the end of the month of June or 30 days from when I

Q:    It was pretty much the same process that you went through.

A:    Yes.

Q:    Why did you decline?

A:    At that point I didn't complete the medical or psychological examines I declined prior to that happening. But it was just a combination of salary requirements, personal issues and my family. I had second thoughts about moving all the normal things that you go through I think.

Q:    And did you interview with the same people was everything the same the second time?

A:    I don't really recall to much, I think some of the people must have been the same. I couldn't tell you who because it was a space of a couple years I guess.

Q:    Okay. And after you did relocate from Mt. Lebanon back in Harrisburg when did you do that.

A:    In 97. We move up in August 6, 1997.

Q:    So prior to that time what was your housing arrangements.

A:    I was staying with my sister-in-law in Lower Paxton

Q:    Do you have any facilities on campus available to you?

29

was hired or whatever to make a decision about health care, pension and all those things. And I really just tried to meet with all the different departments and talk about things and set up interviews or whatever just trying there really wasn't a training period per se I had to hit the ground running.

Q:    And how did you go about getting yourself actuated to the actual job and your staff and the needs of the position?

A:    Well I think mostly you observe and see and try to review things that had been done, and things that haven't been done. It's a long process, you don't do something usually quickly at least I don't.

Q:    Okay. Have you ever meant Lance Supinski?

A:    Yes I have.

Q:    When did you meet Mr. Supinski?

A: I believe I ever meant him once he was in Harrisburg it might had something to do with some litigation that Mrs. Beard had going on. I actually did meet him one time.

Q:    And did he come out to the campus?

A:    I really don't know where we met. It was either there or downtown somewhere.

A: Conditionally I believe. Pending successful completion of the medical and physiological examines.

Q: What happened after the medical and physiological examines?

A: Once I was informed that I had passed them I believe I had turned my resignation into Mt. Lebanon police department and to come up with a start date that was convenient to everyone. And as I said previously that was June 7, 97.

Q: And prior to that time had you ever North Lebanon.

A: Mt. Lebanon.

Q: I'm sorry Mt. Lebanon police department had they been notified at all that you were they aware that you had been looking?

A: Yes. But I do want to mention that that was prior to 97 I had also applied for the position in 95.

Q: For the same position.

A: There was an opening in 95 went through a similar process was offered the position but decided to decline at that time.

Q: Okay. Do you know if that's when Mr. Supinski took the position?

A: I believe so.

28

---

A: I believe in mid Mae – I had to go up to University Park for medical examinations. I don't recall about a Psychological examination but I do believe I had a psychological examination up there to, MBPI on the computer it was a computer generated thing. But I had to past the Psychological and medical standards to be certified through the MPOEC.

Q: Okay. And MBPI standard.

A: Right Minnesota body basic personally inventory.

But that's a fairly standard physiological examination.

Q: And you said that was around mid Mae?

A: Yes for some reason the 19th and 20th something like that is sticking in my mind.

Q: As of that time have you meant any Penn State Harrisburg Police officers?

A: I don't believe I had at during that time in 97.

Q: Okay. When you went to University Park you'd say that mid Mae 97?

A: Yes.

Q: Physically and Physiological and you had an offer of employment?

27

---

Q: Maybe at a Workers Compensation Hearing?

A: I couldn't tell you it could have been. And it was very brief, actually we might have had lunch. Now that I come to think about it. I think it was downtown and we had lunch at the Arches restaurant. I think that's coming back to me alittle but I think that was the only time that we actually really met.

Q: Okay. And you met him downtown for something related to Dori Beard?

A: I believe so, I believe that Mrs. Guy was also there. When we had lunch.

Q: Do you know how long you actually became employed by Penn State when that meeting was?

A: I would say I couldn't tell you, it was probably a couple years after I was hired but.

Q: Not within the first few months right?

A: I don't believe so, but if you gave me a date I probably couldn't tell you if it was right or wrong?

Q: Okay

A: I believe it was nice out. It wasn't snowing.

GISMONDI:   Was it in January.

---

A: That's true. It could have been yesterday. I don't believe it was in Winter. I think it was .

Q: And prior to that basic meeting have you ever before spoken with him?

A: There might have been one phone call, he might have called I don't know - talk to Vera Mae, or to talk to Tony Kuklinski, or whatever and I think I talked to him briefly and to say hello and if there was anything he needed for him to give me a call etc.

Q: Did he talk about Dori Beard at all?

A: No.

Q: And when you started at Penn State in June of 1997 when did you have all the personnel files available to you?

A: Yes.

Q: What about - was some investigation files pertaining to Dori Beard were they there?

A: Sure.

Q: And did you review those?

A: Yeah I looked through those.

Q: When did you first look?

A: I couldn't tell you, it wasn't the first week that I was there. And there was a whole lot to do; eventually it may have been some time that first year. Again it would be just me seeing what was in the

1 office and the files just along with looking at different
2 files I did look at the personnel investigation side of it.
3  Q:  What was in the personnel investigation
4 files? Let me ask you specifically were there audio
5 tapes in this file?
6  A:  In some yes.
7  Q:  How many audio tapes?
8  A:  It varied depending on what case it was. I
9 think one case it was. I think in one case there might
10 have been 10. Another one there might have been 2 or
11 3. Some didn't have any I think there was 4 or 5. I
12 think 4 related to Ms. Beard.
13  Q:  Okay.      Four cases or four files?
14  A:  Four files.
15  Q:  When was the first time you heard Dori
16 Beards name?
17  A:  I couldn't tell you the first time, I'm sure it
18 probably had something to do with conversations
19 hiring officers or staffing or personnel because that
20 was a major issue for me, trying to get the department
21 up to staff.
22  Q:  When you started in June of 97 did you
23 have a staff meeting to introduce yourself?

34

1  A:  Well it didn't take much when we had a
2 couple officers so that I really have to do too much.
3 There wasn't a formal meeting per se.
4  Q:  You only had Hathaway and Kuklinski?
5  A:  Yes. And at that time Henri Marchesani
6 and Arlon Schools and it didn't take to long.
7  VIDEO OPERATOR: It's now 10:29 a.m. well
8 take a short break.
9  VIDEO OPERATOR: It's now 10:38 a.m. where
10 now back on video.
11  Q:  Did you have a full staff meeting?
12  A:  Right.
13  Q:  You knew there was a position an Officer
14 Beard who was out?
15  A:  I don't believe I did. I mean I recall much
16 about that at all prior to me taking the position.
17  Q:  When did you first learn of the status of
18 that position was?
19  A:  I would say early on, again hiring was
20 important it was imperative that we get staffing up to
21 speed so I would think very early on we would want to
22 address those issues.
23  Q:  Okay. How did you go about addressing
24 those issues?
25  A:  Of hiring.

35

1  Q:  What can you first recall talking about
2 relating to Dori Beard's position?
3  A:  Just that her position status was
4 undergoing, there was I'm not sure if there was any
5 litigation at that point. She was off on medical issue or
6 whatever, and the gist of it was,  when I made my
7 initial hirings that was a position that I didn't know if I
8 was going to be able to fill or not. I didn't know what
9 the outcome was going to be something like that.
10  Q:  So you did understand that it was medical?
11  A:  Yes I knew there was some medical issues
12 or medical leave whatever.
13  Q:  Okay. And did you talk to Tony Kuklinski
14 about Officer Beard?
15  A:  Not particularly no. I don't think I sat down
16 with anybody to talk about the Beards situation per se.
17  Q:  What did you understand as to what the
18 duration of her leave was, did you have an
19 understanding?
20  A:  Well I don't think anybody had a clear
21 understanding of how long it was going to be at that
22 point again this was June you know July of 97. I don't
23 think there was an answer to the question at that point
24 as to when she Mae come back, or if she was coming
25 back or whatever was going on.

1  Q:  Were you aware of any conditions of her
2 coming back?
3  A:  I believe I was and either through
4 correspondence, but I knew there was either a medical
5 examination, or things had to be fulfill for her to come
6 back.
7  Q:  When did you first understand that?
8  A:  I couldn't tell you a date again I think it
9 was just part of hiring officers at some point as far as I
10 was concerned her position was in limbo there for
11 awhile until. I believe we did  - I believe she did come
12 into the office sometime in that first summer. And I
13 think she was picking up mail -- there was something
14 she was in the office and I had never meant her before
15 and I think at that point she may have either said am I
16 coming back or whatever and I think I had instructed
17 her to send whatever documentation was necessary, or
18 however the University was handling that you know. I
19 would have to go with Human Resources, University
20 Park whoever. Obviously I'm gonna go with guidance
21 of people that do know the situation.
22  Q:  I'm sorry for flipping through documents I
23 am listening to you, I'm trying to keep things moving
24 along here.
25  A:  Okay

1    Q:    You said you did have a conversation with
2    Dori Beard about her return to work?
3    A:    I think she brought it up if I recall.
4    Q:    And when do you recall that happening
5    was that during your initial month or so.
6    A:    I think so.
7    Q:    And she came into the office and she
8    approached you and introduced herself.
9    A:    I think so again I recall maybe she was
10   picking up mail or something or whatever and I
11   happen to be there and we introduced ourselves and
12   that's when she asked about that.
13   Q:    Okay. And prior to that time where you
14   aware of Dori Beard that she was a police officer at
15   Penn State?
16   A:    Oh yes I had know she was a police officer
17   there and was on leave whatever.
18   Q:    The documents that we had produced and
19   marked as Exhibit 20, your free to read the whole
20   thing it's the Hostetter letter. Your free to read the
21   whole thing I'm not going to ask you about the whole
22   thing. Look at the second to last page of that - the
23   second paragraph I think.
24   A:    Okay.
25   Q:    Have you seen that document before?

38

1    A:    A I couldn't say for sure I don't recall
2    reading this. I just couldn't be sure.
3    Q:    Were you aware at around October of 97 of
4    the existence of a letter from Psychiatrist related to
5    Dori Beard's ability to return to her position?
6    A:    Around this time October 15th, you know
7    again I didn't have a whole lot to do with this. It was
8    mostly between Human Resources or University Park
9    or who was handling this. I don't want to say I was left
10   in the dark but there was things going on that I wasn't
11   privy to. Again I'm not sure if I seen this or not, I
12   don't know if I saw this at that time when it was
13   written, Maybe if this was in a file or something I
14   might had found it, or seen it. That's the best I can do.
15   Q:    You don't recall. Here's a document
16   marked as Exhibit 62, let's take a look.
17   GISMONDI:    One second Andy.
18   Q:    Okay, do you recall having seen that
19   document before?
20   A:    I'm sure I did.
21   Q:    Your KVS.
22   A;    Yes.
23   Q:    That's you. You don't have a specific
24   recollection?
25   A:    No.

39

1    Q:    Do you know if at or around that time if
2    you had any discussions relating to that position or
3    that e-mail?
4    A:    I don't' recall any specific discussion about
5    this again it's sort a between Dave Stoma and Peggy I
6    guess up at Risk Management I guess that's who there
7    referring to.
8    Q:    If someone would have asked you at that
9    time what the status of Dori Beard's position what
10   would you have said?
11   A:    I probably would have. She's on some sort
12   of leave; medical leave something along those lines.
13   Q:    Okay. And you see at the bottom of that e-
14   mail.
15   A:    Yes.
16   Q:    He says something to the effect that were
17   anxious to get her back to her position.
18   A:    Right.
19   Q:    Did you have any discussions with Mr.
20   Stoma about getting Dori Beard back to her position?
21   A:    I believe so, and I believe we may have had
22   a meeting up at University Park I don't know if it was
23   just the Dori Beard issue or some other issues or
24   whatever I'm sure I talked about it. Again as much as I

1    could. Being that this was three months that I had been
2    there.
3    Q:    Was it after that date before that date?
4    A:    I don't know the exact date I do recall
5    doing to a meeting with Dr. South. I'm not sure if we
6    drove up together, I think we drove up together. And
7    talking about I believe it was this issue maybe some
8    other things again the reorganization had gone into
9    effect a couple months earlier. So it may had been
10   other topics like that.
11   Q:    Okay.
12   A:    I think we met up there.
13   Q:    You mean Dr. South and Mr. Harmon
14   anybody else?
15   A:    I'm not sure if Harmon there. I think
16   Dave Strong was there, Bob Maney I don't' know.
17   Peggy       was there I think I don't know maybe Joe
18   Phillips was there. It was that sort of a group.
19   Q:    Do you know why after October 15, 1997
20   Dori Beard was never returned to her position?
21   A:    I don't know the specifics I was trying to
22   run the police department. I was working with what I
23   had and trying to get things there was a lot of things
24   that needed to be done. This was sorta out there. Again
25   there was just believe me one way or another I wanted

1 to solve this problems as much as anybody, because it
2 would make my job alittle easier to get people hired
3 and get things on track and things like that.
4    Q:    Were you aware of what Dori Beard's
5 medical condition was?
6    A:    I don't you know I don't know how much I
7 was aware. I knew that February 8th they had this
8 meeting she had some problems there. If it was
9 medical or psychological both I don't know. I knew
10 February 8, 1997 interviews were taking place and that
11 sort of thing. Her condition stemmed from that or
12 previous conditions I know that. That was the last day
13 she was on campus or working or in the department or
14 whatever.
15    Q:    When did you first become aware of the
16 nature of her condition.
17    A:    It may had been some time that Summer I
18 mean certainly why we meant in the fall. I had some
19 idea of what was going on – but you know as far as the
20 outcome, any kind of distances between pyshritrist or
21 medical people or I pretty much left it at that. I didn't
22 have much to say I was mostly listening.
23    Q:    What was the status of the investigations
24 relating to Dori Beard when you took over?

42

1    A:    I don't at this point however I've never
2 been in a situation like this if Ms. Beard came back to
3 work as a police officer then I think we need to do
4 something we have these things out there. I think the
5 thought was I'm just assuming that because it
6 happened the way it did Mr. Beard wasn't able to
7 finish the interviews or whatever that is was never
8 concluded there was never an outcome. At least I
9 don't' believe there was. I don't know again I wasn't
10 involved with it I don't know if Chief Supinski felt
11 differently but I don't know if there was ever an
12 outcome. Looking threw them I don't see an outcome
13 but maybe I'm mistaken. I don't' think its uncommon
14 if you have a personnel investigation on and a person
15 leaves lets say through resignation or whatever many
16 times the investigation is just ended at that point. In a
17 situation like this I'm not familiar with something like
18 this.
19    Q:    Are you aware of at least one of the
20 investigations Supinski had submitted documents to
21 the PSP police crime lab for evaluation?
22    A:    I believe so.
23    Q:    This was a criminal investigation?
24    A:    Well I wouldn't say that – as far as I knew
25 I guess I should say I'm not familiar with all the ins

1    A:    ...don't think there was really any outcome.
2 February 28th interviews were on going I don't know if
3 any of them came to conclusion. I'm not sure if after
4 February 8th anything was done with them. I didn't do
5 anything with them I mean so.
6    Q:    Why didn't you do anything with them?
7    A:    Well I think there was a whole lot of – was
8 she coming back, what were the conditions, I wasn't
9 involved with the investigations at all. I think they
10 were just left the way they were on that date.
11    Q:    Did you ever deliberate whether you were
12 going to do anything with them?
13    A:    I never gave it any thought, but it was a
14 loose end that I mean we have these investigation that
15 are suspended - unfounded. It never really runned the
16 course, so I think possible at some point they need to
17 be addressed. I wasn't trying to look to far ahead until
18 I actually had knew what the situation was and what
19 we were going to have to deal with and that sort of
20 thing.
21    Q:    And at no time from then to now have you
22 done any thing further with them?
23    A:    That's correct.
24    Q:    Do you have any questions of me?

43

1 and outs. I would say sending something to a crime lab
2 doesn't necessarily mean it's a criminal investigation,
3 although maybe that was the intent. I don't know.
4    Q:    Do you know he was investigating her for
5 burglary?
6    A:    There was I recall there's was something of
7 one of the personnel investigations about, getting to a
8 desk or something along those lines. I don't know.
9    Q:    Back to the filling of the position what
10 discussions throughout your tenure have you had
11 regarding returning Dori Beard to her position? Before
12 I ask you that let me. There's one more thing I want to
13 ask you about the investigation issue. Are you aware
14 of there being an investigation of some unauthorized
15 photo copy use?
16    A:    I believe so, I don't recall. I don't know the
17 specifics personnel investigation solely on that, but I
18 know there's something about the copying machine.
19    Q:    Who have you spoken to about that?
20    A:    Probably Vera Mae, just that there was
21 something, maybe there is a file on it again I haven't
22 looked at it in awhile but her personnel investigation
23 on that. Something about Ms. Beard used the or an
24 allegation that she used the copying machine when she



1  shouldn't have. That she still had a code to get into
2  the machine.
3      Q:    Did you ever speak to Kuklinski about
4  that?
5      A:    I don't recall its possible but again I wasn't
6  that consume with a lot of that stuff going on. I had a
7  whole lot of other things to do. So I didn't want to
8  take a whole lot of my time with at that point when I
9  had a lot other things to do. I don't feel I talked a
10  whole lot about Ms. Beard situation to anybody, but I
11  think in passing there was comments made but again I
12  didn't really spend a whole lot of time on it.
13      Q:    Okay. And one other thing I believe there
14  was a point at which you contacted Dori Beard
15  regarding some equipment that she still had?
16      A:    Yes.
17      Q:    How did that come about?
18      A:    Maybe just in passing, Vera Mae may have
19  said that she may still have uniforms or equipment of
20  whatever. And she came up with a list of items that
21  Ms. Beard may still have.
22      Q:    She being Vera Mae.
23      A:    Yes. So I called Dori to set up if I could
24  stop at her house and show her the list and pick up
25  anything that she had. She lives in Hummelstown it's

46

1  on my way home. I didn't want to bother her to make
2  a special trip when I could easily stop and do that. So I
3  think we talked on the phone and set up a time I know
4  it was after five or sometime on my way home. I
5  showed her the list of what I was given of what Vera
6  Mae or we looked through the files of what Dori still
7  had she looked at the list there was some stuff she had
8  and some stuff she didn't. And I recall just taking a
9  box of items - uniforms I don't know if there was any
10  leather equipment but there was some stuff.
11      Q:    Did -
12      A:    I wouldn't know. I would only be guessing.
13  I don't know.
14      Q:    And at that point what was your state of
15  mind as to Dori Beard's employment status with Penn
16  State?
17      A:    Well I think if I'm taking her equipment
18  I'm assuming she's no longer with the department.
19      Q:    Okay. Back to the filing of her position.
20  What communications were you involved in with
21  regard to getting Dori Beard back in her position?
22      GISMONDI:    Let me just interject here and
23  note for the record that I would advise and instruct the
24  witness not to discuss any conversation that took place
25  in his presence of counsel. You refer to a meeting that

47

1  you believe Joe Phillips was present at so anything
2  that we discussed with counsel would be privileged.
3  But outside of that you can go ahead and answer the
4  question.
5      A:    Okay. Could you repeat the questions
6  please?
7      Q:    I think it was a pretty open ended - any
8  communications in which you were involved in
9  getting Dori Beard returned to her position?
10      A:    I know I had sent Dori a letter I think after
11  our conversation that first summer that I was there
12  about getting documentation and whatever it said,
13  what was necessary pretty much what Human
14  Resources had told me to send her. Again coming in
15  sort of cold I didn't feel real comfortable with carrying
16  the ball with any of this. I'm not aware of historically
17  what happened so and that's pretty much been my
18  position all along. Decisions were made by people that
19  knew more than I did about the situation, about
20  University policy. About - whatever so I mean I'm
21  sure I had meetings and I think just in talking with
22  people my position has been even though Ms. Beard is
23  the only person left in the department right now is
24  Vera Mae that she's ever worked with. But I'm not
25  sure if Ms. Beard coming back is good for anybody in

1  this situation. I think in my personal belief from Ms.
2  Beard for Vera Mae or the Department or I don't know
3  if its' good for anybody again I wasn't making those
4  decisions.
5      Q:    Let's get back to the letter that you sent
6  Ms. Beard. I might take a break in a couple minutes
7  and I'm just trying to pull that out. You said that that
8  something that was pretty much dictated and drafted
9  for you?
10      A:    Yes I believe. I don't know if it was Bob
11  Maney office obviously I'm consulting with Mrs. Guy
12  and the University Park about the situation specially
13  when its two months after I arrived.
14      Q:    So sometime in August 1997 you wrote
15  that if I recall.
16      A:    Okay.
17      GISMONDI:    I think it might be July, we can
18  get the letter and see when it is.
19      Q:    And then so at that time why don't I take
20  five minutes and get that letter.
21      VIDEO OPERATOR: 11:04 a.m. where taking a
22  break.
23      VIDEO OPERATOR: 11:24 a.m. where back on
24  video.



Q: Okay. I didn't find the document I was looking for. I'm gonna give a document that's marked as 74. I think we used it as an Exhibit in Dori Beard's deposition. Take a moment and just read that. Have you read through some of that?

A: Yes.

Q: Have you seen that document before?

A: Yes I believe I have.

Q: Do you know when you first saw that document?

A: I couldn't tell you I would imagine somewhat in the fall of 97. Or September I don't know. But I have seen it. Around that time.

Q: Okay. Do you know how you received a copy of that?

A: No I don't.

Q: Who did you discuss that document with?

GISMONDI: Objection to the form of the question. You can go ahead and answer it.

Q: If you discussed it with anyone.

A: I don't recall specifically discussing it with anyone. However I'm sure I probably discussed it with the relevant persons Mrs. Guy, possibly Tom Harmon or Dave Stoemer. I mean you know I'm sure we had talked about it.

50

person to also have a fire arm now. So I think it was just issues like that. I personally had some concerns with, when I looked at this letter.

Q: Okay. IS there any particular reason that you think that somebody whose taking anti-depressant medication may or may not be suited to handle things in the right way?

A: I think from a professional standpoint I could never be totally sure that this persons still on medication. I think there's issues there how do I know if they're taking their medication. And just the fact you do have a firearm you may be asked to use it in the course of your duties that's a concern I have. I really can't control that.

Q: Okay. Was that just something that you had thought of or was that discussed?

A: No I'm sure I brought it up. Again re-reading this I do have some issues that I don't think a department for our size are difficult to deal with it.

Q: Okay. And then the next document I have I would like you to read is Exhibit 75 and I'll give you a change to review that.

Have you seen that document before?

A: I believe I have.

Q: Did you recall when you first saw?

Q: Did you talk about returning Dori Beard to her position in the context of this document?

A: I think we talked about the document. Obviously this is concerning her return to work.

Q: Do you know if there was a decision not to return her to work at that point?

A: I don't know if the decision was made at that time, I mean reading I think I had some reservations about Dr. Howard's assessment.

Q: What did you have reservations about?

A: From a personal operational professional standpoint. I think she says in that one paragraph recommending that there's a part-time transition period two weeks following that period schedule to be limited to eight hour day shifts. I think that's difficult to do in a small department when if you guarantee that somebody's going to only work an eight-hour shift I can't do that. You know if somebody calls off or is sick or whatever and does not show up I think I perceive that as a problem. Also, the at this point in time the department had just been armed with firearms, and I believe it was the date of this letter I think it was August 18, 97. So that was another issue I had we have a person taking anti-depressant medications I think that's a concern to have that

51

A: I don't.

Q: Do you know if it was at or around this time or sometime?

A: I would think it was around this time. But I'm not certain of the date, but I'm sure it was around this time.

Q: So is it fair to say at this time between August 1997 when you got the letter from Dr. Howard and September 1997 one of your reservations was that Dori Beard's ability or competency to handle a weapon, a firearm?

A: From an operational standpoint I don't think I had issues concerning her being trained in the firearm I think anybody can be trained in the firearm. It's just like anything else repetition and good training and that kind of thing. And coaching its more because of the medication issue, personally I'm not comfortable having somebody on antidepressant medication carrying a firearm. And that would be my feeling regarding anybody. I think that's a real issue me being Chief of Police having to deal with. Again the medication Mae control that or I don't' know how if we could ever be sure the medication was ever being taken or there are definitely issue with that.

Q:   Okay. When you were with Mt. Lebanon Police do you know if any some of those 40 some officers were on any anti-depressant medications?

A:   I don't know I don't recall anyone.

Q:   Was there a screening process in place to determine whether people were on any anti-depressant medications?

A:   Not specifically no.

Q:   Okay. And to back up the time when you went to Dori Beard's house when you went to retrieve her equipment whatever she had. I think you said at that time your state of mind was that show was effectively no longer with the -?

A:   I think again it's difficult I don't remember the exact date but I'm sure that part of the issue was she hasn't work. I didn't perceive her working in the near future. It's time for us to get whatever she still had.

Q:   Did you kind of bring her employment to a conclusion?

A:   Well I think we can always re-issue equipment if something was to change.

Q:   Right.

A:   But you know having somebody that hasn't work as a police officer for lets say a couple years, I

54

not a very big box, a card board box. I know I had a list and I probably still have it. Just some things that we thought put together that might be in her possession. And I presented that with Dori and she pretty much I think scratched out some things and gave me some things she did have and that was that.

Q:   Why was there a need at this time to retrieve the radio and chargers that she may have?

A:   For one thing I needed the radios if we had any out there, I didn't have an unlimited supply of those sorts of things. And so I think that was a lot of driving force was I needed the equipment. And as it says here, the main concern was the radio and the charger at that point and time that's all we had.

Q:   Okay. And why copy Dorothy Guy on this letter?

A:   I think her and Mr. Harmon just needed to be aware of my actions if that impacted anything else that I wasn't aware of that they were. Just to keep everybody abreast of any dealing I had with her or Dori had with me.

Q:   And there was some – small letter up in the right hand corner I can't tell what it says. I don't know if you'd have any better luck?

A:   I think it says file. I'm not sure.

wish I could recall the exact dates having uniforms, or radio, or leather equipment or whatever there's no good purpose for that person to be in control of that. If things were to change you can easily re-issue stuff.

Q:   Okay. Take a look at exhibit 77 it would be the one under that one.

A:   Okay.

Q:   Does that refresh your recollection as to what the time-frame was for you requesting her to return her equipment?

A:   I'm not sure if this is the same thing?

Q:   Okay.

A:   You know I'm. I don't recall me going to her house in October of 97. I think it was later then that. I think this was later then that. I think Vera Mae had mentioned to me some how that she may have a portable radio and a charger. And that's specifically what this letter deals with. But I don't think I visited her home regarding this per se. I seem to recall that it was later on, but I'm not even sure of the outcome of this right now.

Q:   Do you recall when you went to her house, what did you actually retrieve?

A:   I think uniforms, their might had been some leather gear, and I'm not sure there was a box

55

GISMONDI:   Left hand corner.

A:   Looks like F I L E. and I think.

Q:   Is that your writing?

A:   That's not my writing.

Q:   Okay. And then back to the other issues returning Dori to work. I think its under the right there, is that the hospital letter. The paragraph second to the end the second paragraph it says return with restrictions second from the top.

A:   At the present time?

Q:   Yes. I think it says even including carrying a weapon.

A:   Without restrictions including being able to carrying weapons.

Q:   Did you ever communication to anybody that you would like to see her have clearance for carrying a weapon. Her being Dori Beard?

A:   Well I probably – I think that would be since she was in the time period she was no longer with the department there. We did have that change. And I think you said it was August 18 so this was an issue, certainly the job somewhat has changed because we now carry firearms on a normal basis.



Q:   Do you have any medial basis that you do not agree with the conclusion reached by Dr. Hostetter?

A:   A medical basis?

Q:   Yes.

A:   I'm not a doctor so I don't have any medical thoughts along those lines.

Q:   Is there anything more, I think your testimony was you don't recall having seen.

A:   I may have.

Q:   Let's assume that you did see that around that time. And weather or not that's the case, if it's not the case it's not the case. Is there anything more that you would have needed in order to satisfy your concern about Dori Beard carrying a weapon posing some risk?

GISMONDI:   Object to the form of the question but you can go ahead and answer it.

A: Well I probably would still have some concerns.

Q:   Why?

A:   You would with anyone regardless what a Psyristrist says or whatever.  I don't think its very good police policy to have people on anti-depressant

58

A:   As I said I have concerns. For all I know theirs different grades of medication. I'm not an expert but operationally it is a concern.

Q:   Okay. And because of that concern. Did you at that time regard Dori Beard as limited in her ability to work as a police officer because she was on anti-depressant medications and suffered from depression?

A:   Could you repeat that question?

Q:   Yes.

COURT REPORTER:     Did you at that time regard Dori Beard as limited in her ability to work as a police officer because she was on anti-depressant medications and suffered from depression?

A:   I think.

Q:   All let you explain. Is there any reason why you don't say yes or no to that question? I'm asking did you or did you not?

A:   Well I think it was a concern. I'm not sure when you talk about limited are we talking about, is she able to do other things in an unarmed status that could be. But I think as a police administrator it is obviously a big concern of mine, how much of a concern or how much of a limitation that probably changes from case to case.

medications carrying firearms. And that may be a personal bias but I would have an issue with that.

Q:   What do you perceive to be the limitations on an individual on anti-depressants medications as to there major life activities?

COURT REPORTER:     Sorry can you say the question again?

Q:   What do you perceive to be the limitations on an person on anti-depressant medications as to any of there major life activities?

GISMONDI:   Objection to the form of the question. You can answer that. Go ahead and answer that.

A:   Major life activities I'm not really sure there is any? I'm really not concern with that. I'm concerned with somebody that has depression problem taking an anti-depressant medicine carrying a firearm and performing as a police officer. As far as anything else that's not my business. It is a concern of mine when they're acting as a police officer.

Q:   Okay. So a person on anti-depressant medication suffering from depression  in your mind would be regarded to as limited in their ability to work as a police officer?

59

Q:   Understood. But just that fact that her being on medication and having depression caused you that concern?

A:   Yes. Yes it did.

Q:   Okay. Was that a reason or factor in your decision not to return her to her police officer position?

GISMONDI:   Objection to the form of the question? You can go ahead and answer if your able.

Q:   Before you answer I liked to know the objection to that question?

GISMONDI:   I think he testified five different times in effect that he wasn't in the drivers seat so I object to the question because you're asking him about his decision? I think he's made it very plain in his testimony that that's not the way it happened.

OSTROWSKI:   Okay. Move on the another question.

Q:   Was the fact that Dori Beard took medication and suffered from depression a factor in her not being returned to her position as a police officer in or around October 1997 with Penn State?

A:   As I have stated I wasn't in a position to make that decision I can tell you as I have it was a

concern of mine which I voiced, now the decision
making process after that I wasn't involved.

Q:    Who did you voice that too?

A:    I would think Mr. Stoemer, Mr. Harmon
possibly Mrs. Guy. People that certainly had more
knowledge of the whole situation and properly more
decision-making powers then I do in that particular
instance.

Q:    Okay. In document I think 76 take a
moment to review that.  I'm gonna have you read the
first paragraph, although your free to read the whole
thing.

A:    Okay.

Q:    Have you ever seen that document before?

A:    I'm not sure if I have ever seen this
document.

Q:    Why as of January 7, 1998 had Ms. Beard
not returned to her position?

A:    Again that was a decision that I didn't
make. I don't know. Obviously the attorneys are
conversing back and forth there's different issues out
there that I really didn't have a whole lot to do with.

Q:    Do you know between the document
context of this, it's a one long e-mail somewhere to

62

a meeting up at University Park with Dr. Stiles and Joe
Phillips and Peggy Janowitz and Joe Stoemer I think.
But aside from that why I don't know.

Q:    What did you know in and around the
period of time that in early 1998 about Dori Beards
past suit cases -  charges of discrimination against
Penn State were you aware that she had made these
charges?

A:    Yes.

Q:    How did you become aware of that?

A:    Probably in passing somebody mentioning
something that there were other cases or incidents
whatever. Again I wasn't that interested in the past if
there had been other things there was other things for
me to do. But I was aware there was other issues or
cases out there that sort of thing.

Q:    Where you aware of the status of any of
those cases?

A:    Not particularly. I mean I know there was
Human Relations or Workers Comp -- I really was not
a whole lot up-to-date with where they were at, many
times it seemed like they were going on for long
periods of time. As I said there was a lot of other
things to do so I was aware that there was issues out
there and how they were going to be handled or

Mr. Stoemer. That's it October 17, 1997 e-mail from
Dave Stoemer to Peggy Janowitz?

A:    I believe so.

Q:    Carbon copy to you correct?

A:    Yes.

Q:    Talking about being anxious to return Dori
Beard to her position. Correct.

A:    Anxious to get her back or the position
filled, which I think, is two different things.

Q:    Okay tell me how there two different
things?

A:    Well if she comes back obviously the
positions filled. So I take it if she doesn't come back
then we – at least that's the way I read it. We have to
get the position filled one way or the other.

Q:    Okay. Are there any facts that you're aware
of, facts being communications, decisions, meetings,
and discussions between October 17, 1997 and
January 7, 1998 that can explain why Dori Beard
wasn't returned to her position?

GISMONDI:    Objection to the form of the
question. You can answer the question you can answer
if your able to.

A:    I wasn't involved in any of the discussions
as I answered before. Sometime in the fall I did attend

63

settled, I wasn't involved it that decision making
process.

Q:    Here's a document that we had marked as
Exhibit 63.

A:    Okay.

Q:    Have you seen that document before?

A:    Yes.

Q:    Do you know whose handwriting is at the
top of that document?

A:    I don't know.

Q:    And that purports to be a letter of a
conditioned offer to leave - and on the second page of
that is that your signature?

A:    Yes it is.

Q:    Now that has some change or through the
text of that document there's apparent changes that
ended in marks of sorts, did that letter go out to -
December 5, 1997?

A:    A letter did go out to her I believe after
these revisions were made.

Q:    Okay.

A:    I'm not sure if it was the 5th or the 6th but
she did receive the letter.

Q:    Okay. How long did the interview process
go on for that position?



A: I don't know. Probably at least a couple months. I'm trying to think when we actually advertised in the newspaper.

Q: That was gonna be my next question. Do you no if you did advertise in the news paper for that?

A: I believe we do that all the time. I wouldn't think that this was any different. So I would be surprise if we didn't but I think we did.

Q: Okay. And at that time.

VIDEO OPERATOR: I'm going to change videos.

OSTROWSKI: Okay.

VIDEO OPERATOR: It's 11:54 a.m. it's the end of tape 1 of the deposition. 11:55 a.m. this is tape 2 of the deposition of Mr. Stoeher. Thank you.

Q: Okay. Did you interview Ms. Garonzi?

A: Yes.

Q: Did you do other interviews around that time?

A: With other candidates?

Q: Yes.

A: Yes.

Q: For other positions?

A: No. For police service officer. For other police service officers but not other positions.

66

Q: Okay. When you say for other positions were there more than one advertised positions out there at the time?

A: No I believe it said just police service officers.

Q: Officers.

A: Yes.

Q: You were interviewing at that time for more than one position.

A: Yes.

Q: And I think then in January you hired 3 officers?

A: That's correct.

Q: Was that all part of the same process?

A: Yes it was.

Q: Here's a document marked as Exhibit 66.

A: Okay.

Q: Is this a document you've seen before?

A: Yes.

Q: That's your e-mail in the center of the page?

A: Yes.

Q: You sent that to Dr. South June 9, 1999. Was that in response to whats at the bottom of the page?

67

A: Yes it was.

Q: And what had evolved about her job during her absence?

A: As we discussed before the firearms issue was fairly a major one that the department goes through, not carrying firearms to carrying firearms. That was a significant change. I think what the officers were asked to do had certainly increased, that we were much more pro active, much more involved then what I perceived in the past. Pretty much a react situation - with all the hires things had changed to requiring to have a 4-year college degree. Which was a standard of University Park had and we had accepted as of July 1, 1997. So the qualifications for the position had changed and increased or got alittle bit tougher. So I think those things had happened.

Q: Did the fact that Ms. Beard didn't have a four year bachelor degree did that have any impact of any deliberations that your aware of from 1997 up until 1999 regarding returning her to her position?

A: I'm not sure that was a key component I don't know. I don't recall that.

Q: Okay Was it discussed -

GISMONDI: Let him finish his answer. Please. Did you finish your answer?

A: Yes I did. Thank you.

Q: You said it wasn't a key component, was it ever discussed at all?

A: Well at this point I'm not sure what Ms. Beards status was, as I said for new hires people we had hired that was a requirement. From July 1, 97. So I don't know where she fits in that situation.

Q: Okay.

A: But it was something that had changed since she was employed.

Q: Okay. Well that had changed as of the time you sent her a letter telling her what she needed to do to come back to work?

A: Yes.

Q: Mark that document as Exhibit 78. Ask you to identify that when your comfortable when you have read through it.

A: Okay.

Q: What if that document.

A: It's a job description dated September 9, 1999 for police service officer position.

Q: And the date inside the box under the title police services officer theirs a date 8-22-97 do you know what the significance of that date is?

A:   I would assume that's when this went into effect I'm not in Human Resources so I can't be certain.

Q:   Is it fair to said that at least form August 22, 1997 till September 9, 1999 that that job description remained exactly as is on that form?

A:   I believe so.

Q:   And was that the job description that was in place when you sent your letter to Dori Beard telling her what she needed to do to come back to work back in 97?

A:   I believe my letter was sent prior to this date.

Q:   Understood. Do you know of any changes on the job description from the time you sent your letter to Dori Beard until August 27, 1997?

A:   I wouldn't know that.

Q:   And the bachelor degree requirement that was something that existed at the time you sent your letter to her?

A:   I believe that a four-year degree was a requirement.

Q:   Okay.

A:   And as of 97 that was a requirement at University Park I believe had and now that we were

70

prior to the two years prior to this April 97 till June of 99 I think Kuklinski and also Vera Mae made it known if Dori Beard came back to work that it may not be the best situation.

Q:   Why is that, what more did they say about it?

A:   I just think personality wise and maybe not the best situation for those two but also for Ms. Beard. That there is also of issues a lot of litigation obviously you can understand its not always welcome to work next to somebody that sued you, and I think that was one of there concerns.

Q:   So because in part because of her past.

A:   I don't know exactly why but let me say it was clear that they would not welcome if they had to work with Ms. Beard again. And she may not welcome that either.

Q:   Okay. Did you understand that Dori Beard wanted to come back to work did you have an understanding to that issue?

A:   Well I think I wasn't sure from the one correspondence or actually the one time we had a brief when she asked me about it that one summer I was there in 97, which led to my sending her a letter saying hey this is what need to be done. But aside from that I

following their guidelines and pretty much a part of their department, that those would have to apply.

Q:   Back to, underneath that 55.

A;   66.

Q:   Yes e-mail you wrote. I'm sorry. Thank you. Why did you address the issue of returning to her position or returning to the department?

A:   Why did I address that?

Q:   Yes.

A:   I was asked to. In the paragraph the initial e-mail we would also appreciate your recommendation as to an appropriate action to take. That's why I responded that way.

Q:   Okay. And who were the employees as of June 1999 that had been there since April 97?

A:   I believe it would have been Vera Mae Piccolo, Anthony Kuklinski and that might be it.

Q:   When was it that Kuklinski left?

A:   I believe he left in January of 2000.

Q:   Okay. Did you discuss in or around June of 99 did you discuss the return of Dori Beard's position with Vera Mae Piccolo?

A:   I don't believe that particular date I don 't think I really talked to anybody in reference to my answer. At that time June of 99 probably off and on

71

hadn't had any opportunities to discuss that with her she never called me further about that. I don't know.

Q:   Did you receive communications from any source indicating that Dori Beard didn't wasn't to return to her position?

A:   I don't believe so.

Q:   And had Ms. Piccolo and Mr. Kuklinski expressly stated they didn't want her to return to her position?

A:   I don't think they said that I think they said they would be uncomfortable, that it would be that's probably the best way of could put it. And again probably for obvious reasons I think that is a normal reaction people would have. But there was never an ultimatum that they were going to quit or anything like that.

Q:   Okay. Do you know why in June of 1999 Dori Beard's employment status became an issue again?

A:   I really couldn't tell you for certain, again this had been dragging on for years at this point and frankly I didn't concern myself with it I was doing other things.

Q:When James Hays left his position.

A:   Can I interrupt.

Q:    Sure.

A: I believe it had something to do with some time frame running out. I don't know if it was sick leave or I thought there was some either some leave period had ended or was ending and I think something like that I think that it's what brought this with them asking with my response.

Q:    Now James Hayes when he left his full-time position he went part-time is that correct?

A:    Yes. I kepted him on the part-time lists.

Q:    Did he get another police job?

A:    Yes he did.

Q:    With who?

A:    He's working at last I knew maybe I should qualify when he left out he was working taking a position with Mahanoy City up in Schuylkill County I believe he is still with them.

Q:    And do you know how long before he went to Mahanoy City police department that you were aware he was going to be there?

A:    I couldn't give you an exact time frame when was his last date.

GISMONDI:    Which exhibit is that?

A:    73. We have here his end date was July 8, 1999. And I believe it was probably a month or six

74

weeks prior to that he came into my office and he was gonna take another position which basically was where he was from, he grew up there. But I do recall he gave at least a two weeks notice we worked out the schedule that sort of thing he didn't wasn't to leave us in a lurch, so I would say a month to six weeks maybe.

Q:    Okay. And at that time when you got notice of his intentions to leave that position did you begin efforts to –

A:    I don't think immediately but –

Q:    But you did know that was a position that you wanted filled.

A:    Sure definitely.

Q:    So based on your testimony of your e-mail exhibit 56 June 7 and June 9, 1999 that was probably around or after the time that Mr. Hayes was leaving his position correct?

A:    It was certainty around the time. I couldn't say if this was before Jim told me he was leaving or after but he did leave his last day was July 8 and I know he did give us 2 weeks it certainly was in that time period.

Q:    After your June 9, 1999 e-mail and Exhibit 56 what next were you involved with or did you discuss regarding Dori Beards employment?

75

A:    I don't think much of anything.

Q:    Okay. Document marked as Exhibit 79. Have you seen this document? There in no particular order, have you seen all of these pages of this document before?

A:    I believe so.

Q:    Now the first  - and I don't know that may be Dori's writing on there on the first page – 7-26-99.

A:    That's mine.

Q:    That's your.

A:    Yes.

Q:    And then the second page of that has a deadline of July 20, 1999 was that a deadline for the posting, or deadline -- what do you understand that to be?

A:    I understand that to be an internal posting.

Q:    Between June 9, 1999 and July 20, 1999 did you have any communications with anybody regarding Dori Beards status of her employment with Penn State?

A:    Between June 9th?

Q:    June 9th the date of your e-mail and July 20th the date of the posting deadline.

A:    I don't recall. I couldn't tell you.

VIDEO OPERATOR: Thank you.

Q:    Now under the requirement section on the second page on the second page says it requires a bachelor degree in a related field or equivalent what does equivalent mean?

A:    To be it's a non related field. A related field you know could be administrative justice criminal justice those sorts of things I take that as equifiliant maybe something that is a 4 years degree not specifically a law enforcement field.

Q:    And then the third page of the document. Whose Bobby Misher?

A:    I am not sure, I think I may have talked to this person but I believe human resources up in University Park.

Q:    Do you understand that University documents are secure I guess his or hers –  Do you know if Bobby is a male or female?

A:    I couldn't tell you but I believe I have had a conversation with –

GISMONDI:    Him. Sorry.

A:    Him - and you know at this time or of something,  but that was the only time. And I know John Rideout.

Q:    Okay. And do you – so at the top it says Kevin. Whose Kevin?



A:    I assume that is me, I don't know whose hand writing that is, but I was probably forwarded this since it dealt with the selection process.

Q:    And the bottom of the corner 8-3-99 do you know whose hand writing that is?

A:    No.

Q:    And the following page is that your handwriting on that page?

A:    No it's not. It's not mine.

Q:    It says you were sending up two resumes for a vacate position. Do you know what two resumes you were sending up?

A:    I couldn't be certain right now, looking at the hand writing the announcement says the top three and another is the bottom two. I would assume Edward Pouch because he was a part-time officer at that time with us. And I don't know about Jennifer Allshouse, but looking at this I would assume.

Q:    Was Mr. Pouch a part-time officer when you started?

A:    No.

Q:    Because his leave is not on there after February 8' 1997.

A:    I think in 96 he had been a part-time officer, and then he left to work at Easton police

78

department, maybe for three years and then left there and then came back and asked at some point to be on part-time which we did but he wasn't with us that long.

Q:    JXR3 is that Mr. Rideout now?

A:    Yes it is.

Q:    And again you said that's not your handwriting?

A:    Not my handwriting.

Q:    Do you understand these names Gelgot, Kotz, Nagle, Pouch, and Allshouse have been applicants who had responded for the position in July early August 1999?

A:    The top one is spelled wrong. It's actually Gelgot.

Q:    So its should be GELGOT.

A:    Yes it should.

Q:    And do you know when there's no indication of any date on this page, do you know when this was?

A:    I don't know. Obviously we were in the process.

Q:    The following page have you seen this before?

A:    Yes.

79

Q:    Do you know why Dori Beard's name appears where it appears on that page?

A:    That's I assume the attached materials he was talking about they were hers.

Q:    And the Kevin up in the right hand corner?

A:    I believe that's referring to me I didn't write that?

Q:    You received a copy of that?

A:    I believe so.

Q:    And then the following two pages.

A:    Yes.

Q:    Have you seen those before?

A:    Yes I did.

Q:    Do you know if those were attached to the August 6, 1999 memorandum from Bobby Misher?

A:    I believe that they were - I think I received these?

Q:    And at this time had you conducted any interviews for the position?

A:    I don't believe so I would have to look at the chronological order. But I don't believe we had pretty soon after the advertisement stuff.

Q:    Okay. What did you do with the letter and resume from Dori Beard?

80

A:    I'm not sure I did anything with it, I put it with the other ones.  You know I probably talked to John about it, John Rideout.

Q:    Do you have any specific recollection of what you discussed?

A:    I think we just discussed qualifications. John was handling the process at this point through University.

Q:    Okay. Did you understand at this point that Ms. Beard was interested in working with Penn State and the police services?

A:    I certainly inferred that from her sending her application in.

Q:    Okay. Did you have any discussion about her returning her to her position at this point?

A:    I don't believe we talked about I was under the assumption that she was no longer University employee that she was re-applying for this position.

Q:    Okay. Do you know why you had assumed that just based on the fact that she submitted this or was there more?

A:    Basically it had been the two years that I had been there that she hadn't work as a police service officer for me. And her applying for this is regardless of where the litigation was or whatever was happening



1  when I saw this I assume to that she thought she was
2  no longer University employee and that she re-applied
3  for a new position, not new position but not filling her
4  old position. This was because Jim Hayes had left.
5      Q:    And at the top of her letter there's
6  handwriting 2647180 is that you're handwriting?
7      A:    No.
8      Q:    Do you know what that interprets?
9      A:    No I don't.
10     Q:    The docket marked as Exhibit 74.
11  Have you seen each page of this document?
12     A:    I believe I have.
13     Q:    Do you remember when you first saw
14  the August 24, 1999 letter from Dori Beard?
15     A:    I couldn't tell you.  I assume it was
16  around the time she sent it.
17     Q:    Okay.  Did you ever see the August
18  30, 1999 letter?
19     A:    I may have, and if I saw it I would let
20  you know one way or the other, I don't recall it off
21  hand.
22     Q:    Okay. How did you receive a  copy of
23  the first page of that exhibit?
24     A:    I don't recall I don't know if, it
25  obviously John Rideout sent me copies of his letter

82

1  from October 1 and September 13 and I don't know if
2  possible he included that with them or if it was faxed
3  down.
4      Q:    And what did you do after you
5  received this?
6      A:    There wasn't much for me to do this
7  was being handled by employment compensation up at
8  University Park.
9      Q:    The second paragraph of her letter, as
10  per your request I was cleared to return to work as of
11  this date I have not been contacted by any state
12  employee I am requesting to return to my position as a
13  police service officer at Penn State Harrisburg. Did
14  you discuss at least that subject with anybody?
15     A:    Probably, I'm sure this was discussed as
16  the selection process was on going. It could have been
17  Ms. Guy or John Rideout  just as to where we were at,
18  we had resumes and applications and that sort of thing
19  and setting up interviews.
20     Q:    Then the second page September 13, 1999
21  letter you were (cc) on that, did you receive a copy of
22  that?
23     A:    Yes.
24     Q:    From August 24, 1999 until September 13,
25  1999 what communications did you have with Mr.

83

1  Rideout and Mr. Harmon relative to Dori's August 24,
2  1999 letter?
3      A:    Pretty much the August 30 letter was the
4  termination notice so to speak and that was pretty
5  much it, we were going to continue with the selection
6  process. And any of Ms. Beard's concerns were going
7  to be addressed by John Rideout or Human Resources
8  at University Park.
9      Q:    Okay. Do you know if Mr. Rideout
10  was lying to Dori Beard when he said your August 24,
11  1999 letter and his August 30, 1999 letter crossed in
12  the mail?
13     A:    No I have no way of knowing,
14     Q:    And then it says on the second page
15  of the letter and then we are still in the process of
16  reviewing the other matter mentioned in your August
17  24, 1999 letter and will get back to you. Was there a
18  process of reviewing those matter?
19     A:    You know if there was, it didn't
20  include me.
21     Q:    Okay.
22     A:    I don't know what exactly the other
23  matters John – there numerous things there again I
24  really wasn't much I had to do with it.

84

1      Q:    Is there any reason that Dori Beard
2  couldn't return to her position today?
3      GISMONDI:    Objection to the form of
4  the question.
5      Q:    That you're aware of?
6      A:    Well I don't know. I mean the
7  medication issues that we talked about before.  The
8  bachelor degree requirement I mean if were talking
9  about a new employee, a new hire then we do have
10  things in place that I'm not sure she meets
11  qualifications for.  And that has been consistent since
12  July 1, 1997 that was a pre-requisite. So along those
13  lines yes.
14     Q:    Are there any current vacancies in the
15  police services?
16     A:    No there isn't.
17     Q:    When was the last position filled?
18     A:    That would have been William
19  Geglot. I believe that was May of 2000.
20     Q:    And that's right you said that all of
21  the officers indicated as present on Exhibit 73 are
22  currently in there positions.
23     A:    Right.
24     Q:    Is there anybody that has expressed
25  any intention of leaving their position?

85



1    A:    Oh there has, and not so much
2  leaving but exploring other opportunities. Myself
3  included. I don't think that is usual somebody sees a
4  position that they feel is better for them and their
5  personal life or whatever that I have certainly
6  expressed my support of them in them following that.
7  If they feel they can do better that's fine.
8    Q:    Are there any of those six people that
9  are currently aware of are in the process of
10  interviewing and actually looking for other positions?
11    A:    I'm not aware of the current six
12  officers being active or being involved in the selection
13  process right now.
14    Q:    Okay.
15    A:    I don't believe that is the case.
16    Q:    Document marked as Exhibit 70.
17  These three pages are copies of the same thing. Have
18  you seen that before?
19    A:    No I haven't.
20    Q:    Do you know whose handwriting that
21  is at the bottom of the document?
22    A:    No I don't.
23    Q:    Do you know who Jean Winn is?
24    A:    Jean Winn is I believe employee of
25  University Park police services, civilian employee.

86

1    Q:    That's all I have. Thank you.
2    VIDEO OPERATOR: It's now 12:35 the
3  deposition of Mr. Stoeher has concluded thank you.

87

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DORI L. BEARD        :    1 CV: 01-0374
    Plaintiff         :
                   :
v.                    :
PENNSYLVANIA STATE    :
UNIVERSITY HARRISBURG,   :
LEONARD SUPENSKI, and    :
DOROTHY GUY, in their     :
Individual capacity        :
    Defendants        :

*ORIGINAL*

PROCEEDINGS:   VIDEO DEPOSITION OF
              ROBERT MANEY

DATE:          January 29, 2002

APPEARANCES:

   For the Plaintiff      Andrew Ostrowski, Esquire
                   4311 North 6th Street
                   Harrisburg, PA

   For the Defense       Janine Gismondi, Esquire
                   McQuaide, Blasko LLP
                   811 University Drive
                   State College, PA 16801

1

---

1   MS. LYDE: Good Morning ladies
2  and gentlemen. Please be advised the video
3  and audio is in operation. My name is
4  Crystal M. Lyde, L-y-d-e. My address is 4310
5  Hillsdale Road, Harrisburg, Pennsylvania,
6  17112. I've been contracted by PR Video
7  Incorporated to be the video operator for this
8  deposition. The case is in the United States
9  District Court for the Middle District of
10  Pennsylvania. The caption is Dori Beard
11  versus Penn State University et al. The
12  docket number is 1: CV-01-0374.  The date
13  is January 29, 2002.  The time is 9:33 A.M.
14  the deposition is being held at the law office
15  of Andrew J. Ostrowski, 4311 North 6th
16  Street, Harrisburg, Pennsylvania, 17110.
17  The video deposition is being taken on behalf
18  of plaintiff Dori Beard and is also being done
19  stenographically.  The witness' name is
20  Robert Maney. Would you raise your right
21  hand for me please? Would you state your
22  name for the record and spell it please?
23      A:   Robert Maney. M-a-n-e-y.
24      MS. LYDE: Do you so swear to tell

2

---

1  the whole truth, nothing but the truth so
2  help you God?
3      A:   I do.
4      MS. LYDE: Thank you. May I have
5  a voice check around the room?
6      A:   Jeanine Gismondi.
7      A:   Donna Richards.
8      A:   Dorothy Guy.
9      A:   Andy Ostrowski.
10     A:   Dori Beard.
11     MS. LYDE: The usual stipulations?
12     MR. OSTROWSKI: That's fine with
13  me.
14     MS. GISMONDI: Agreed.
15     MR. OSTROWSKI: Mr. Maney, my
16  name is Andy Ostrowski we were introduced
17  shortly before your deposition. Do you
18  understand you are here today to give a
19  deposition in connection with an action that
20  Dori Beard had brought against Penn State
21  University and Leonard Supinski and Lou
22  Guy.
23     A:   Yes I do.
24     Q:   And have you given a

3

---

1  deposition before?
2      A:   Yes I have.
3      Q:   How are you currently
4  employed?
5      A:   I am employed as Manager of
6  Employee Relations of Penn State.
7      Q:   And how long have you held
8  that position?
9      A:   I've held that position for
10  almost nineteen years.
11     Q:   You say you're at the same
12  level, the same exact position as Manager of
13  Employee Relations?
14     A:   That's right.
15     Q:   And in what department is the
16  manager of employee relations.
17     A:   I'm the manager of that
18  division, employee relations division and
19  that's part of the central office of human
20  resources.
21     Q:   And who is your supervisor?
22     A:   My supervisor is James Elliott,
23  Director of Human Resources.
24     Q:   And then from him, from Mr.

4



1 Elliott on up whose, what's the next level of
2 supervision?
3     A:  Mr. Elliott reports to Billy
4 Willits who is the assistant vice president for
5 human resources.
6     Q:  And then is there a vice
7 president for human resources?
8     A:  No, she reports to the senior
9 vice president for finance and business.
10     Q:  Okay I just want to write that
11 down so I get it right, Manager of Employee
12 Relations. And that's the position you've had
13 for nineteen years?
14     A:  Yes.
15     Q:  Prior to that how were you
16 employed? Were you with Penn State?
17     A:  I was. Do you mean the
18 preceding job to this one?
19     Q:  Prior to the Employee
20 Relations Manager position?
21     A:  Okay my position before that
22 was Employee Relations Officer. It was in the
23 same division.
24     Q:  How long did you hold that

5

1 position?
2     A:  I had that position for just
3 under three years.
4     Q:  And prior to that?
5     A:  I was Classification Analyst in
6 the Salary Administration Classifications
7 Division. Also within the office of human
8 resources and that was for about three years
9 also.
10     Q:  And prior to that?
11     A:  Prior to that I was in a
12 different department, the Housing and Food
13 Service Operation where I served in several
14 capacities but most of the time as a dining
15 hall supervisor.
16     Q:  And was that the beginning of
17 your employment with Penn State?
18     A:  Yes.
19     Q:  So how long totally have you
20 been at Penn State?
21     A:  About twenty-nine and a half
22 years.
23     Q:  And do you have an
24 employment history before Penn State? And

6

1 twenty nine and a half years that's enough,
2 we don't need anything prior to that. How is
3 your department set up, Employee
4 Relations?
5     A:  We have a staff of six people
6 Including me, a staff assistant, an assistant
7 manager, two positions entitled Employee
8 Relations Officer and one position entitled
9 Human Resources Officer.
10     Q:  And is this all, you are at the
11 top of this organization that you described?
12     A:  Yes.
13     Q:  And then immediately below
14 you, what other position titles?
15     A:  Well the ones I just named the
16 one immediately below me is the assistant
17 manager and then the other titles I
18 mentioned.
19     Q:  Who is the assistant manager?
20     A:  Her name is Jeannie Andrews.
21     Q:  And how long has Ms.
22 Andrews been there?
23     A:  She has been there about six
24 years.

7

1     Q:  And then the positions below
2 here, what was the title again?
3     A:  Two employee relations officer
4 and one employee relations officer, one staff
5 assistant providing office support.
6     Q:  Two employee relations
7 officers, did you say one
8     A:  Human Resources Officer.
9     Q:  And then?
10     A:  One staff assistant.
11     Q:  Staff assistant. Who are the
12 employee relations officers?
13     A:  One position is held by Joe
14 O'Connell the other,
15     Q:  Was that Joe?
16     A:  No excuse me Jill.
17     Q:  Jill, okay.
18     A:  The other by Jennifer Wilkes.
19     Q:  How long have they been in
20 their respective positions?
21     A:  Jill has been at her position; it
22 will be a year in May. And Jennifer was,
23 came on board in September of last year.
24     Q:  And who were their

8

predecessors in those positions?

A:   Jennifer Lane and Angela Johnson-Tidsdale.

Q:   And how long were Jennifer and Ms. Johnson-Tidsdale at their positions?

A:   Jennifer Land had been at the position for about a year and Angela Johnson-Tidsdale been in the position for, oh about six years I believe.

Q:   And who was in, Ms. Johnson–Tidsdale was there then between 97 and 99?

A:   Yes.

Q:   Who was in the other position between 97 and 99?

A:   We had some turnover in there. I'd have to think about that for a moment. But we had two people in for a fairly short time. Kathy Long and Julie Reed and prior to them was Michelle Evango. I think I named everyone

Q:   And then who was the, who is currently the Human Relations Officer?

9

A:   That's Human Resource officer, that, his name is Ronald Rhody.

Q:   And how long has Mr. Rhody been in that position?

A:   He's been in that position for approximately six years I believe.

Q:   So he was there then in 97-97?

A:   Yes.

Q:   And this staff assistant?

A:   She's been there for about two years now.

Q:   And who was her predecessor?

A:   I'm blanking on the name.

Q:   Okay. If it comes to you

A:   Oh I beg your pardon. I guess I just realized it's Martha Matsko. She would have been there during that period.

Q:   Okay do you know a Joanne Fisher?

A:   I do.

Q:   And what is her position?

A:   I'm not sure of her exact title. She is, she does some Human Resource

10

officers duties. She is not a member of my division.

Q:   What are the other divisions within Human Resources? You're employee relations correct?

A:   Yes.

Q:   And what other divisions are there?

A:   There is an employment and compensation division. The benefits division, the Human Resources Development Center which is a stand alone division, the information / technology division, and health matters. There's another division which is kind of the amalgamation of unemployment compensation and foreign national matters.

Q:   Where in the organization is Ms. Guy's position?

A:   Ms. Guy is, she is in close contact with our department, the human resources department. She is a representative from the Capital College here in Harrisburg.

Q:   And is that separately administered, the Capitol College and Human Resources?

A:   Yes that's a separate operation from ours.

Q:   And who is your immediate supervisor?

A:   James Elliott.

Q:   James Elliot and his title again?

A:   Director of Human Resources.

Q:   How long has Mr. Elliott been Director of Human Resources?

A:   I don't how long he's held that title. He's been at that level for over thirty years. Probably thirty-five years.

Q:   To be at that level whatever the title is

A:   The director level yes.

Q:   Okay so he, for your nineteen years at employee relations has he been your direct supervisor?

A:   Yes.

Q:   And then what's the position

1 immediately above Mr. Elliott, assistant vice

2 president, I think you said?

3     A: That's right.

4     Q: And who is that?

5     A: Billie Willis.

6     Q: And how long has, is Billie a

7 male?

8     A: Female.

9     Q: How long has Ms. Willis been

10 in that position?

11     A: Dr. Willis has been in that

12 position since 1989.

13     Q: Did you ever meet Dori Beard

14 before?

15     A: Not that I recall. Now I did

16 meet her today.

17     Q: When do you first recall,

18 you've heard of her before obviously?

19     A: Yes.

20     Q: When do you first recall

21 hearing about Dori Beard?

22     A: I couldn't say for sure. I can

23 acquaint with the current case about the

24 mid 90's thereabouts.

13

1     Q: Okay what was the

2 circumstance that you first heard about her,

3 heard of her?

4     A: I can't say for certain when

5 was the first time I heard about her. What I

6 did was with regard to the events of an

7 investigation that her supervisor had been

8 conducting.

9     Q: And can you tell me more

10 about that, what you had learned?

11     A: Well simply that he had

12 conducted an investigation, that was in the

13 process of conducting an investigation.

14 There was an interview; Ms. Beard became

15 upset in that interview. She ended up going

16 to the Emergency Room, I believe at

17 Hershey, and then subsequently went on a

18 leave of absence.

19     Q: What, at what point did you

20 hear about that? Did you hear about that

21 before or while the investigation was going,

22 before this illness came about or did you

23 hear about all this after the fact?

24     A: No, my recollection is that I

14

1 heard about this as it was getting underway

2 because of the seriousness of it.

3     Q: Okay so you heard about the

4 investigation before anything dealing with

5 Ms. Beard getting sick and having to be

6 hospitalized?

7     A: That's what I recall, yes.

8     Q: Who did you talk about that

9 with?

10     A: I can't recall for sure. I believe

11 it was Dorothy Guy.

12     Q: Okay. Do you means through

13 which that was communicated to you?

14     A: Telephone.

15     Q: What was communicated to

16 you?

17     A: Well again I can't recall

18 specifics it was so long ago but I do recall

19 Dorothy letting me know that there where

20 some serious concerns about some issues

21 and the police, area and that the supervisor

22 there was looking into them.

23     Q: And do you have an

24 understanding as to why you were

15

1 contacted?

2     A: Well as the Manager of

3 Employee Relations one of my roles is to

4 administer the University's discipline

5 procedure, whether it's formal or informal.

6 And as a matter of course, Dorothy Guy and

7 her counterparts on matters not serious or

8 very serious would be in touch with our

9 division, either with me personally or one of

10 the staff.

11     Q: Can you tell me what your

12 primary responsibilities are? You just

13 described one of them as being responsible

14 for the disciplinary process I think you said.

15     A: Yes.

16     Q: What else, tell me as much as

17 you can about the scope of your duties and

18 responsibilities?

19     A: We have responsibilities for

20 administering many of the policies involving

21 many of the working conditions for staff

22 employees. We also have responsibility for

23 representing the university with our

24 unionized employees    day to day basis,

16

1 contacts from union officers, grievance
2 hearings, meetings all that kind of activity.
3 We get involved in a few academic matters.
4 One of the staff provides staffing support for
5 promotion and tenure. We administer the
6 job evaluation program for technical service
7 employees and just recently we've been
8 assigned the responsibility for Workman's
9 Compensation.
10    Q:   Okay and tell me more about
11 what you do in the disciplinary process? I
12 mean your office has responsibility for the
13 disciplinary process as it relates to college
14 employees?
15    A:   Yes, all employees across the
16 university, state wide.
17    Q:   And at what level or is there a
18 prescribed level at which your office at
19 University Park become involved?
20    A:   Yes, that prescribed plain is
21 under University Policy HR 78, Human
22 Resources HR 78, that's the formal
23 mechanism to deal with discipline and there
24 is a provision there that if dismissal is

17

1 contemplated, not about to happen but
2 contemplated then our office, my title is
3 shown there, is to be contacted.
4    Q:   And day to day matters such
5 as written warnings or reprimands those are
6 not matters that would have been the
7 normal course for your attention?
8    A:   Well they're not required to but
9 many times they do. They use us as a
10 sounding board seeking advice about
11 handling various kinds of work place issues.
12    Q:   And can you recall prior to this
13 matter when Ms. Guy came to you with a
14 situation regarding Dori Beard, whether you
15 had been involved or heard anything about
16 Dori Beard's employment prior to that?
17    A:   I can't say for sure. It's just too
18 long ago.
19    Q:   And what, at that point when
20 you first communicated with Ms. Guy about
21 that matter what was your input?·
22    A:   I can't recall specifically. It
23 sounded to me as if it were a proper thing to
24 do. There were issues at the work place, the

18

1 supervisor was looking in to them as was
2 standard for the supervisor should do and
3 that was the extent of it as I recall.
4    Q:   But what was the proper thing
5 to do?
6    A:   To look into matters and try to
7 get the facts.
8    Q:   Did you ask for input, or I'm
9 sorry, did you ask for input into what should
10 be done or how to go about doing what
11 should be done?
12    A:   I don't recall that specifically. I
13 do recall thinking that with the supervisor
14 being a trained police officer that I felt
15 comfortable with him knowing how to go
16 about something like that, knowing how to
17 ascertain the facts.
18    Q:   Are there prescribed
19 procedures for conducting disciplinary
20 investigations?
21    A:   None by policy no. There are
22 procedures which we espouse which simply
23 on get all the facts and then make the
24 decision after the facts have been gathered

19

1 and analyzed and formulate a plan of action.
2    Q:   What else is provided for in HR
3 78 as far as the process after your office
4 becomes aware of it and possible
5 termination situation?
6    A:   Well HR 78 lays out the
7 process that the supervisor must follow in
8 terms of having meeting with the employee,
9 what needs to be discussed at the meeting,
10 establishing a time table and then what
11 happens at the conclusion of that time table.
12    Q:   And what is you offices
13 responsibility in the oversight of that effort?
14    A:   When we are contacted at the
15 outset of that kind of process we ask areas
16 to let us know from time to time how things
17 are going because we would like to stay in
18 touch, but there is no requirement for us to
19 do that. We rely on areas to get back in
20 touch with us and at the end there is a
21 requirement for the areas to let us know in
22 the event there is going to be a dismissal,
23 the direction is to go to a dismissal. Then we
24 would be consulted as well as the dean or

20

1  administrative officer.

2      Q:   Do you recall, I don't know if

3  you put a date on when this occurred? Do

4  you recall the time framing when Ms. Guy

5  contacted you about Dori Beard?

6      A:   It was sometime in 97 but I

7  don't remember when in 97.

8      Q:   If I suggest January /

9  February 97 do you have any reason to

10  agree or disagree with that time frame?

11      A:   I have no reason either way.

12      Q:   Well at the time you were first

13  contacted then was it your understanding

14  that you were being contacted regarding

15  potential disciplinary action against Dori

16  Beard that could lead to her termination?

17      A:   Yes.

18      Q:   That's what your

19  understanding was?

20      A:   Yes.

21      Q:   And what was your continuing

22  involvement then in that process?

23      A:   Dorothy, as I recall anyway,

24  Dorothy would inform me from time to time

21

1  of what the Chief of Police had found out.

2  Dorothy was involved in some of the

3  meetings and she kept me informed during

4  that time.

5      Q:   Okay, telephonically?

6      A:   Yes. There may have been

7  some e-mails but I remember the telephone

8  in particularly.

9      Q:   I do have some e-mails that I'll

10  end up showing you here in a little while but

11  I just want to flesh out the background this

12  way first. Did you review any documents to

13  prepare for your deposition today?

14      A:   Yes I did.

15      Q:   What did you review?

16      A:   I reviewed the files I have of

17  this.

18      Q:   What's in your file?

19      A:   Copies of memos, copies of

20  letters, copies of e-mails.

21      Q:   Can you tell me a little more

22  specifically what you remember? Letters

23  from and to whom? E-mails from and to

24  whom?

22

1      A:   E-mails from Dorothy, from

2  Tom Harmon I believe, I'm hazy on details.

3  There were letters, reports there. I remember

4  a report from Len Supenski, excuse me that

5  was a letter from Len Supenski to Dori I

6  believe.

7      Q:   What was the nature of that

8  letter?

9      A:   That was in regard as to what

10  he had found. His findings concerning her

11  mental condition and having to, her weapon

12  had to be withdrawn

13      Q:   Suspended with

14      A:   Something like that.

15      Q:   Anything else that you can

16  think of?

17      A:   Nothing in particular. No.

18      Q:   And did you have any

19  discussions with Ms. Guy about this case

20  prior to your deposition?

21      A:   Yes we had one conversation

22  last week.

23      Q:   Okay what did you and she

24  discuss?

23

1      A:   That was in regard to a

2  technical matter.

3      MS. GISMONDI: Let me interject

4  here. Was your conversation with Mrs. Guy

5  in regard into something that I asked you to

6  look into?

7      A:   Yes.

8      MR. OSTROWSKI: Not if you

9  weren't there.

10      MS. GISMONDI: I think that's work

11  product. I think it's privilege.

12      MR. OSTROWSKI: He said the

13  conversation was when you're not around?

14      MS. GISMONDI: Something that

15  was a matter that I asked him to look into

16  relating to this case. I'm going to instruct

17  him not to answer.

18      MR. OSTROWSKI: Not on that. I

19  don't think you're being fair on that one

20  either. And I think you should know that

21  that's not privileged.

22      MS. GISMONDI: It's not? I think it

23  is work product. I think you're entitled to

24  know. I don't think my witness has to

1  disclose what I asked him to look into.

2  MR. OSTROWSKI: Okay. Well what

3  did you talk to Ms. Guy about? I'm not

4  asking him what you asked him to look into.

5  I'm asking him what he talked to Ms. Guy

6  about.

7  MS. GISMONDI: That's what he

8  talked to her about.

9  MR. OSTROWSKI: Then you just

10  breeched the attorney / client privilege by

11  telling me that what he is going to tell me he

12  talked to her about is something you talked

13  to him about.

14  MS. GISMONDI: I didn't disclose

15  what it was.

16  MR. OSTROWSKI: We wouldn't

17  have, I just, I mean it was, I don't think that

18  any conversations that someone has with

19  someone else when they are not in your

20  presence is privilege. And I'm asking him

21  about a conversation that he had with Ms.

22  Guy. I don't know, I don't buy it, if we get

23  back to it.

24  MS. GISMONDI: Let me just make

25

1  it clear for the record. I don't know whether

2  you missed what I asked you before. The

3  conversation that you're referring to Mr.

4  Maney you said before you were talking to

5  Ms. Guy about a technical matter, I think

6  you're term was right.

7  A:   Yes.

8  MS. GISMONDI: And was your

9  conversation with her in the discussion of

10  this technical matter an issue that I asked

11  you to look into?

12  A:   Yes.

13  MS. GISMONDI: I think its work

14  product. And I'm going to instruct him not to

15  answer.

16  MR. OSTROWSKI: Did you discuss

17  with Ms. Guy anything other that what Miss

18  Gismondi had asked you to look into?

19  A:   No.

20  Q:   What did she say to you

21  during that conversation?

22  A:   Ms. Guy?

23  Q:   Yes.

24  MS. GISMONDI: He just said they

26

1  didn't discuss anything other than what I

2  asked him to look into so it's the same

3  objection.

4  MR. OSTROWSKI: W ell I tried.

5  MS. GISMONDI: So it's the same

6  objection and the same instruction.

7  MR. OSTROWSKI: Any other

8  conversations with anybody else about the

9  Dori Beard case say in the last month or

10  two?

11  A:   Other than my supervisor and

12  my assistant manager no.

13  Q:   What have you talked about

14  with your supervisor?

15  A:   Just informed him of the

16  deposition.

17  Q:   Did you inform, she? He?

18  A:   He.

19  Q:   Did you and he discuss any

20  facts of the case?

21  A:   No.

22  Q:   Was he aware of the case?

23  A:   Pretty much. I had not kept

24  him; it was not the kind of a case where I

27

1  needed to keep him informed of every detail.

2  He was, I would say superficially aware.

3  Q:   And you said you also spoke

4  with your assistant manager?

5  A:   Yes I informed her of my

6  deposition also.

7  Q:   Just to tell her about the

8  deposition?

9  A:   Yes we did not discuss the

10  particulars in the case.

11  Q:   Was she aware of the case?

12  A:   I can't say for sure. The case

13  was in the news years ago and I'm sure she

14  heard about it at the time but there has not

15  been anything recent.

16  Q:   Are you aware in your term as

17  manager of employee relations of any other

18  gender discrimination cases that involved

19  the safety and police services department?

20  A:   Charges you mean?

21  Q:   Yeah charges whether they got

22  to the formal, anywhere from the internal

23  complaint process, the EEOC to federal or

24  state court?

28

A:   I can't recall any no. I'm not a part of that office so I wouldn't be seeing all the cases that come through.  I do hear of some cases. I don't recall hearing of any like that.

Q:   Have you been involved in any disciplinary matters arising out of the safety and police services, coming from the safety and police services department?

A:   Yes.

Q:   In the past five years?

A:   Yes.

Q:   Okay what are some of the other matters that you've been involved in?

A:   One case I'm thinking of was a police officer at one of the campuses that had received a warning letter for some kind of misconduct and that letter was grieved so our office got involved in handling that grievance procedure.

Q:   Was that a labor union grievance procedure?

A:   No.

Q:   Or a Penn State grievance

29

procedure?

A:   Yes that was at one of the campuses where we had a separate grievance procedure?

Q:   What campus was that?

A:   I believe that was at Worthington Scranton. There are other, there have been other cases at University Park with unionized employees, the service officers. I'm not recalling any others offhand elsewhere.

Q:   And beyond five years do you recall any other disciplinary matters or investigations involving personnel at the Harrisburg Capital College, police and safety services?

A:   I'm sorry would you rephrase that?

Q:   The first question I asked you I just asked you generally within the last five years and now I'm asking you at any time during your nineteen years do you recall being involved in any disciplinary matters or becoming aware of any disciplinary matters

30

involving employees at the Harrisburg Capitol College safety and police department?

A:   Yes. Thank you I have that.

Q:   Okay what can you tell me about with those?

A:   The case I'm remembering was back in the 80's. David Buckwash was the employee's name. He was disciplined. He grieved the disciplinary action. I was involved with that.

Q:   What was he disciplined for?

A:   As I recall it had to do with the way he had handled an incident at one of the campus residence areas I believe.

Q:   Okay.

A:   And I believe he received a formal warning letter, was disciplined that way and then appealed that. I was involved in the disciplinary process, the grievance process, excuse me after that.

Q:   Did he prevail on you though?

A:   I don't believe he did. My memory is hazy on that. I believe it went to

31

arbitration and I believe we prevailed. But I can't be positive.

Q:   Okay anything else?

A:   Nothing is coming readily to mind.

Q:   Well had there been something, anything that you are aware of recently or somewhat recently regarding an officer discharging a weapon in the office of the, in fact the college police department?

A:   I don't believe I heard about that.

Q:   Did your office, department; what involvement does your department have in leave use situations. I would assume based on what you're telling me about your general function that the only involvement that you have in the leave use of abuse situation would be when it gets to a point where disciplinary action based on that would be imposed. Is that a fair characterization or assessment?

A:   No it's more than that. Some leaves are automatic, for example a military

32

leave or maternity leave. There's little room for judgment needed in those. Others do require some judgment. There are questions whether a leave is justified. For example a sick leave, sometimes an employee believes he should be off, sometime a supervisor believes not so there can be issues there. Our office again is used as a resource, a sounding board when those questions arise.

Q: Have you ever, has your office as far as you know ever been involved in any leave use situations regarding Dori Beard? Let's say prior to 1997.

A: I don't recall any, no.

Q: Okay and then after 1997?

A: Yes. At the time she went on her leave I was aware of that.

Q: And how were you made aware of that?

A: I can't be sure. As I recall it was a communication of some kind from Dorothy.

Q: Okay, is that Dorothy Guy?

A: Yes.

33

becoming aware from Ms. Guy about Dori Beard's need for leave at some point in 1997.

A: Yes.

Q: And my question to you is do you have an understanding as to why that was communicated to you?

A: Well it was because it followed immediately the information that I received regarding the investigation. It was all part of that, those events going on at that time.

Q: Okay do you understand that it was communicated to you more as a part of the ongoing investigation process then it was a matter of we need your input or advice as to whether leave is appropriate under these circumstances?

A: It was an information item for me. Not to pass judgment on.

Q: And did you have any response to the communication when it was communicated to you?

A: I don't recall what my response was but certainly under the circumstances

35

Q: What was your involvement in that process or that event?

A: Well our role first of all is not approval or disapproval. And I don't recall that our advice was sought because it seemed to be a clear case of someone needing to be on sick leave.

Q: And yet you just, how was it that you became aware other than it being communicated by Ms. Guy? Do you have an understanding as to why that was communicated to you?

MS. GISMONDI: What is it that we're talking about with the it?

MR. OSTROWSKI: The situations in 1997. That's what we're talking about.

MS. GISMONDI: I don't know what you mean by the leave situation. But I'm going to object to the form of the question. If you're able to answer it go ahead and answer it.

A: I, if you wouldn't mind rephrasing that.

Q: Well we were talking about you

34

that was the proper course to take, was a leave of absence.

Q: This document is marked as; I think I actually want to do this in a little pack, Exhibit 27. Go ahead and take a moment to review that and familiarize yourself with the contents. Yeah that's the new one.

MS. GISMONDI: I didn't know what the last number was before.

A: Just the first page?

Q: Just make sure you're familiar with everything in there. I have questions on different aspects of it.

A: Okay.

Q: I guess really after looking at this a little more closely. I really don't want to ask about the first page of that document. Have you ever seen that before?

A: I don't believe so no.

Q: Do you understand, do you have an understating at the bottom where it says, Bill and Gerry understand from this conversation with me that that is the avenue

36

I intend to travel in these cases. Ditto Chris,
Linda and Bob. Do you have any
understanding as to whether you're the Bob
that is referred there?

A:   No I don't.

Q:   Do you know who Chris would
be?

A:   No I don't.

Q:   Linda?

A:   No.

Q:   And Mr. Stollner? Is his first
name Dave?

A:   Yes.

Q:   Who is Dave Stollner?

A:   He has been retired from the
university for awhile now. He was the
assistant vice president of environmental
health and safety.

Q:   And would that be the, the line
that would govern safety and police services?

A:   Yes and I'd like to correct my
answer. That was not the correct title. It was
Assistant Vice President, excuse me, it was
Director of University Safety. And that took

37

in police services and environmental health.

Q:   Okay who was Mr. Stollner's
replacement?

A:   His area was split upon his
retirement. He was not replaced.

Q:   Okay is John Rideout; do you
know who John Rideout is?

A:   I do.

Q:   And who is John Rideout?

A:   He was the Human Resources
representative for University Safety at the
time.

Q:   Did that come within your
office?

A:   No that comes, it's a
counterpart of Dorothy Guys is another way
to put it. It's the HR, Human Resources
person for that Administrative area.

Q:   That would have the same type
of involvement with your office?

A:   Same kinds of interactions yes.

Q:   Now as it relates to safety and
police services employees between Ms. Guy
and Mr. Rideout who had more direct

38

involvement or responsibility for such
employees at the Capitol College?

A:   That would, the answer to that
would depend on what time frame you're
talking about.

Q:   Okay talking 97-98 time
frame.

A:   I don't recall the exact date
that this happened but the budgetary
responsibility for a number of the police
positions at capital was transferred to
University Park. At the time they arched as I
recall and the overall responsibility was
transferred to the Director of Police Services
at University Park, Mr. Mervin.

Q:   Okay and the event at which
that was transferred that the police became
-

A:   I can't be positive about that.
That's my recollection, I guess.

Q:   And do you have any, can you
pinpoint the timeframe any more specifically
by events or subjects, anything going on?

A:   I think it was 97.

39

Q:   Maybe the summer of 97?

A:   It could have been.

Q:   There's a reference in the first
paragraph in the mail list on the top of 27
about a letter to Jeffrey Beard providing
notice that he was barred from the campus.
Did you have any knowledge of that matter?

A:   I did but not in detail.

Q:   Do you know how you were
aware of that?

A:   I can't say for sure where I
learned of that but I understand it was an e-
mail which I did not see, which was felt to be
inappropriate.

Q:   Okay, I'm sorry; you said you
did not see the e-mail?

A:   No I don't recall seeing it.

Q:   That, you said that was felt to
be, I wasn't sure if you said that I felt to be
inappropriate or that was felt to be
inappropriate.

A:   The, excuse me, the e-mail was
felt to be inappropriate.

Q:   When was it that Mr. Stollner

40

left his position?

A:   I can't be sure. I would estimate maybe two years ago, three years ago something like that.

Q:   And how was that position reallocated or changed after he left.

A:   It was eliminated. Tom Harmon who had been the Police chief at the time retained that title and his reporting relationship was changed. And the environmental health and safety portion of that department was reassigned to a different administrative unit.

Q:   So after Mr. Stollner's retirement the police department is separately set up as an organization that has a direct report to an assistant vice president? Is that it?

A:   No an assistant vice president, really there is none. No title like that. Tom reports directly to the Senior Vice President for finance and business.

Q:   Okay and who is that?

A:   Gary Schultz.

41

Q:   And prior to that time the police services department, police department was within the environmental health and safety department? Is that, what ever the department was that Mr. Stoner was the head of?

A:   Yes. University Safety.

Q:   University Safety, and then who did University Safety; who did Mr. Stoner report to at the time?

A:   Gary Schultz.

Q:   The second page of that e-mail or of that exhibit. Do you at the bottom, and it continues on to the third page , is an e-mail Bern Franyer from Darcy Pletts, did you have any knowledge or awareness of that at that time?

A:   I don't recall.

Q:   Okay. The document marked as Exhibit 28. Why don't we, I think I'm going to move on with that. Why don't you just put that aside for now?

Q:   This is a document marked as Exhibit 59. I wasn't intending this to set you

42

up but I sure did with that last one.  Did this, I actually forgot that this was in here, did you, did this refresh you recollection as to whether you had knowledge of the Darcy Pletts matter?

A:   Yes it does. This is from my file.

Q:   Okay just looking though the headings on this. How did this come to you? It looks like it came from Mr. South. That first set of arrows in the left hand margin on the first page.

A:   Can I just take a moment to breeze through?

Q:   Sure. Yeah.

A:   Yes, I'm looking at the front page and that would have been from Dr. South to me and then my forwarding it on. And then the same for the two page e-mail in front of that. It came from Dr. South to me and I forwarded it.

Q:   Okay. Just read through it. I wasn't trying to trick you or anything. Just want to ask you a question about that.

A:   I understand.

Q:   On the first page of that it refers to a Peggy Janowitz, Dave Annwerk.

A:   Yes.

Q:   Who is Peggy Janowitz?

A:   She is a worker's excuse me, an insurance specialist in the risk management office at Penn State.

Q:   When you, when she reported on the management of Beard's claim, do you have an understanding of what Beards claim is?

A:   No I don't.

Q:   And it refers down in the middle of that paragraph when Dr. Spanier's response to the e-mail was received, called Peggy and told her of the e-mail exchange, was there a response that you had ever seen by Mr. Spanier, Dr. Spanier to the e-mail from Dorothy Pletts?

A:   I believe the answer is on the first page of the two-page e-mail, that's from Graham Spanier. That's going back to her.

Q:   To whomever. Can you tell if

44

1  this was ever sent? Who is it that you sent
2  this to at the top on the first page?
3          A:  Wendell Courtney.
4          Q:  And that's Counsel for Penn
5  State?
6          A:  Yes.
7          Q:  Why did you send it to Mr.
8  Courtney?
9          A:  So he can be informed of the
10  contents of those e-mails.
11         Q:  And did you have
12  communications, any other communications
13  other than what's reflected on these e-mails
14  with Dr. South about this subject matter? E-
15  mail form Dorothy Pletts, Dr. Spanier's
16  response?
17         A:  I can't recall.
18         Q:  Did you have any
19  communications with Dorothy Guy about
20  this matter?
21         GISMONDI: this matter meaning
22  Dorothy Plett's e-mail?
23         MR. OSTROWSKI: Right.
24         A:  I can't recall.

                    45

1          Q:  And just to compare is your e-
2  mail address rlm1@psu.edu?
3          A:  Yes.
4          Q:  Okay I'm handing you this
5  document marked as Exhibit 60.
6          A:  Okay.
7          Q:  Okay can you identify what
8  this document is?
9          A:  Can I identify?
10         Q:  Yes describe for me what this
11  reflects.
12         A:  This is an e-mail from
13  Christopher Phebeck to me in regard to what
14  the e-mail states a letter from Ms. Beard's
15  attorney and a telephone conversation that
16  Dorothy Guy apparently had Dori.
17         Q:  Who is, on the cc line there is
18  an 'mrm2@email.psu.edu. Do you know who
19  that is?
20         A:  Yes that's Rachel Miller. She
21  was Christopher Phebecks supervisor.
22         Q:  And Mr. Phebeck was, what
23  was his position at the time?
24         A:  He was, his title shown there

                    46

1  is correct. Human Resources Officer. He was
2  an office of Human Resources employee at
3  the time. There was a separate division that
4  had individuals who traveled to campuses
5  performing human resources work.
6          Q:  Was he in your department?
7          A:  He was not in the Employee
8  Relations division but he was in my
9  department the office of Human Resources.
10         Q:  Did you have any
11  conversations with Mr. Phebeck about this
12  subject matter after this e-mail?
13         A:  I'm sure I did but I don't recall
14  specifics.
15         Q:  Okay did you have any
16  conversations with Mr. Supinski after this e-
17  mail about the content of the e-mail?
18         A:  Not that I recall. No.
19         Q:  Did you have any
20  conversations with Ms. Guy about this e-
21  mail after the e-mail?
22         A:  I don't recall that either.
23         Q:  There was a suggestion that
24  maybe 'we could plan on sitting down and

1  reviewing what we need to do, who should
2  reply and a plan of action.' Did anything of
3  that nature occur?
4          A:  I can't recall specifics but I'm
5  sure it did.
6          Q:  Okay.
7          A:  We had some things obviously
8  that needed to be taken care of.
9          Q:  What needed to be taken care
10  of here?
11         A:  The letter from Dori Beard's
12  attorney and the FMLA matter.
13         Q:  And what involvement did you
14  have in, what communications were you
15  involved in regarding the letter from Dori
16  Beard's attorney?
17         A:  I just can't recall specifics.
18         Q:  Okay. And do you recall any
19  specifics about the FMLA status?
20         A:  No. I can't recall any of that.
21         Q:  The greeting, thanks and then
22  it says '5K', do you know what that means?
23         A:  If you look at his last name it's
24  pronounced Phebeck.

Q:   Oh, okay got you. That document is Exhibit 61. Okay have you ever seen this document before?

A:   Yes.

Q:   When did first see this document?

A:   I can't say when I first saw it.

Q:   Was it at or around the time February, the end of February 1997?

A:   I can only guess. I don't want to guess.

Q:   Okay when I ask you that question are you maybe thinking this is something that you saw last week of two weeks ago or you know you saw this awhile ago if you can't specifically pinpoint it?

A:   The most recent time I saw it is when I reviewed the file just recently. I cannot recall when I first saw it.

Q:   Do you recall that you did see it before that time, well it was in your file right?

A:   I'm sorry, ask it again please?

Q:   It's not clear. Was it in your

49

file when you reviewed it a couple weeks ago?

A:   Yes.

Q:   So does that, would that lead you to believe you had placed it in that file at some point?

A:   Yes and just to clarify it wasn't a couple of weeks ago it was just late last week.

Q:   Okay. Do you recall anything, any communications that you had regarding the content of this Exhibit numbered 61?

A:   No I can't recall.

Q:   Did you have any discussions with Dorothy guy about the content of that e-mail?

A:   I can't recall.

Q:   And 'cqf3@email' is that Mr. Quebert?

A:   I can't remember his e-mail.

Q:   Look at 60, 60 on the from line that does reflect next to his identity up here. Did you ever meet Jeffery Beard?

A:   Not that I recall.

50

Q:   Did you ever talk to him?

A:   Not that I recall.

Q:   What was your, if you can, see these documents this is to refresh your recollection as to, you know, the process. What was your continued involvement in these matters regarding Dori Beard through 1997?

GISMONDI: Objection to the form of the question. If you can answer it go ahead and answer it.

A:   I don't think I can.

Q:   Well did you not understand something about my question? I just don't know how more specifically I can ask it. I'll try though. You were aware of working in some potential disciplinary action regarding Dori Beard in 1997 correct?

A:   You're talking about the investigation?

Q:   Right.

A:   Yes.

Q:   And then you're also aware of there being issues regarding her leave and

FMLA and things of that nature as reflected on these e-mails?

A:   That's right.

Q:   Was there, was there a contin, and do you know at the time there was some workers comp claim pending or did you know at the time? I don't think I asked you that before.

A:   I can't recall.

Q:   Can you recall any other involvement that you had in communications regarding Dori Beard's employment during 1997?

MS. GISMONDI: You mean like though the end of 1997? Is that your question?

MR. OSTROWSKI: Yeah during 1997? Through the end of 1997.

A:   I can't recall.

Q:   Can you recall having any communications regarding her medical status with anybody?

A:   Her medical status?

Q:   Yes her condition, her status.

1  A:  Well yes as it related to her
2  leave.
3  Q:  And what can you tell me
4  about that?
5  A:  I'm sorry. I'm not sure I'm
6  understanding the context.
7  Q:  Okay I'm just, what I'm trying
8  to do is before I show you documents I'm
9  just trying to determine what you recall
10  about situations, independent of the
11  documents.
12  A:  okay.
13  Q:  And I'm just asking you if you
14  had any communications or anything
15  regarding Dori Beard's medical condition, or
16  conditions through 1997 that you are aware
17  of?
18  A:  Yes as her medical condition
19  related to her leave I was aware of that yes.
20  Q:  Okay any, anything in
21  particular? Were you aware of what her
22  condition was?
23  A:  Yea, pardon me, yes. It was a
24  mental health situation.

53

1  Q:  And with who did you discuss
2  those matters?
3  A:  I don't recall. I don't want to
4  guess.
5  Q:  This is a document marked as
6  Exhibit 62. Can you identify what that
7  document is?
8  A:  This is an e-mail from Dave
9  Stollner to Peggy Janowitz with copies to
10  Tom Harmon, me and I'm not sure who
11  'kbs3' is.
12  Q:  Could that be Kevin Stuller the
13  police chief at the Harrisburg Capitol
14  College?
15  A:  It could be.
16  Q:  You don't know one way or the
17  other though?
18  A:  I'm not sure. No.
19  Q:  Do you recall receiving a copy
20  of this?
21  A:  I don't recall, today I can't
22  recall when I got this but I, this is from my
23  file. I saw it last week.
24  Q:  In the last series of e-mails

54

1  and this is kind of why I was asking you the
2  questions generally before. Was February 97
3  and this is October 97, do you recall
4  anything that occurred between February 97
5  and October 1997 and any involvement that
6  you had in matters dealing with Dori Beard's
7  leave or her employment in general?
8  A:  I can't recall anything specific
9  no.
10  Q:  Okay and Peggy, do you
11  understand that to be Peggy Janowitz?
12  A:  Yes.
13  Q:  And is she 'nxj4'?
14  A:  Yes.
15  Q:  It says 'Do you or Dorothy Guy
16  have the report from Hostetter yet? Do you
17  know what the report from Hostetter is?
18  A:  I can't say for sure.
19  Q:  And the last sentence 'I would
20  like a weekly update on her status as she
21  has been off for so long and we are anxious
22  to get her back or the position filled. Did you
23  have any communications with anybody
24  about getting her position filled or getting

1  her back?
2  A:  I can't recall that either.
3  Q:  Okay did you have any
4  communications with anybody regarding the
5  substance of this e-mail after you received
6  the e-mail?
7  A:  I can't recall.
8  Q:  Do you have any
9  communications with anybody regarding
10  Dori Beard's position at the Harrisburg
11  Capitol College around the end of 1997?
12  A:  About her position?
13  Q:  Yes about filling her position
14  or there being a vacancy at the position.
15  A:  I don't believe so, no.
16  Q:  Okay did you have any
17  communications with Dave Stormier about
18  Dori Beard's position in the safety or in the
19  Harrisburg Capitol college police services
20  department?
21  A:  At any time or this time?
22  Q:  At this time.
23  A:  I can't recall.
24  Q:  And then at any time?

1    A:   Yes.

2    Q:   When have you had

3  communications with Mr. Stoermer about

4  that position?

5    Attorney:Was the question when?

6    Q:   Yes.

7    A:   I can't say for when but I know

8  there, I can't say for sure when.

9    Q:   Have you ever seen a report an

10  October 15, 1997 coming from Dr. Hostetter,

11  Dr Hostetter. I'm not sure if there's an 'L' in

12  it or not?

13    A:   I can't recall for sure.

14    Q:   Do you need a break at all?

15    A:   I'm fine thanks.

16    Q:   Can I get this back? I just

17  want to show him that?

18    MS. GISMONDI: What's this being

19  identified as? Exhibit 20?

20    MR. OSTROWSKI: Yeah this is

21  Exhibit 20. I was using it in a prior

22  deposition. You don't have to read it in

23  detail, just flip through it. I'm only going to

24  ask you if you've ever seen that document

57

1  before.

2    A:   Yes I have seen this before.

3    Q:   When was the first time that

4  you had seen that document?

5    A:   I can't say.

6    Q:   Was it, did you see that last

7  week when you were reviewing the files?

8    A:   I believe I did yes.

9    Q:   And was there a time prior to

10  last week that you had seen it?

11    A:   I can't say for sure.

12    Q:   Okay how was your file

13  assembled, the file that you reviewed last

14  week?

15    A:   Chronological order.

16    Q:   Was it something that you

17  assembled, it could have been, you know?

18  Was it something that you sent to counsel or

19  was it something that you made on this

20  matter?

21    A:   My file.

22    Q:   And was that assembled as

23  you would see the documents or did you at

24  some point get it and rearrange it

58

1  chronologically?

2    A:   It was assembled

3  chronologically and then at one point I went

4  through it to make sure that everything was

5  in the proper order.

6    Q:   Okay and was that document

7  in the proper order?

8    A:   That I don't know.

9    Q:   Let me put this back so I don't

10  lose it. Did you, I'll leave it out I guess. Did

11  you recall reading that document before last

12  week?

13    A:   Yes.

14    Q:   And if you can't tell me

15  specifically when you recall first reading it

16  can you tell me generally was it in 97?

17    A:   It's just been so many years I

18  can't.

19    Q:   Did you have any, were you at

20  all involved in reviewing matters related to

21  Dori Beard's Workers Compensation

22  proceedings?

23    A:   Yes. I don't when I got involved

24  with that but it was all, you know, woven

1  because there were different policies

2  involved with different aspects of this.

3    Q:   And what was your

4  involvement, just guidance and advice on

5  Penn State policy?

6    A:   Yes.

7    Q:   Excuse me. Do you know if

8  you can put this into context, Exhibit 62?

9  Do you know if it was at or around that time

10  that you received that report from Dr.

11  Hostetter, Exhibit 20?

12    A:   I don't know.

13    Q:   If some one asked you as of

14  October 17, 1997 what is the status of Dori

15  Beard how would you have responded?

16    A:   If anyone had asked me?

17    Q:   Yes. Or if Dave Stormier had

18  asked you?

19    A:   That she was on a leave of

20  absence.

21    Q:   And did you understand there

22  to be any conditions on that leave?

23    A:   Well like any leave the leave

24  has to be justified so it's managements job

1  to make sure that if the leave is to continue

2  that it is authorized to continue.

3       Q:  Do you understand there to be

4  any conditions on, or there to have been any

5  conditions on Dori Beard's return from the

6  leave that she was on at the time?

7       A:  Only that she be able to

8  perform the functions of her job.

9       Q:  Do you understand, did you

10  understand her leave to relate to her medical

11  condition?

12       A:  Yes.

13       Q:  And I may have asked you this

14  one, I just want to be clear. Did you have

15  any communications with Mr. Stormier, Mr.

16  Harmon; Mr. Stormier or Mr. Harmon about

17  this statement that 'getting her back to her

18  position or her position filled around the

19  time of that e-mail?

20       A:  I can't recall.

21       Q:  I gave you a document marked

22  as Exhibit 63. Have you had a chance look

23  through that document?

24       A:  Yes.

61

1       Q:  Have you seen that document

2  before?

3       A:  I don't believe so, no.

4       Q:  Around December 5, 1997 did

5  you have any communications about filling a

6  vacancy in the police, as a police service

7  officer with the department of safety and

8  police services at Penn State Harrisburg?

9       A:  I don't recall any.

10       Q:  Do you know if around that

11  time there were any additional positions

12  created in the department of safety and

13  police services at Penn State Harrisburg?

14       A:  I have no knowledge of that.

15       Q:  Are you aware of there being a

16  vacancy in the department of safety and

17  police services at Penn State Harrisburg?

18       A:  At that time?

19       Q:  At that time.

20       A:  No.

21       Q:  Okay. How long does the

22  hiring process typically take for filling that

23  position? If there is a typicality to it?

24       A:  It depends entirely on the

62

1  position.

2       Q:  Okay is there; what's the

3  standard procedure for filling a position,

4  vacancy?

5       A:  At the time, it's changed since

6  97. I believe I'm right on this. The change, it

7  came right around that time so I might be off

8  a little bit, but the former procedure was the

9  position to be announced within the work

10  unit which would have been Capital College,

11  and the University wide, and then external.

12  And since then it's changed to, well in this

13  case Capital College wide, Philly wouldn't

14  have changed but that college does.

15       Q:  And then after, from that

16  point.

17       A:  External.

18       Q:  Do you know if there was a

19  Marlene Gardononi or a Ronzi Garanozi who

20  was employed at any time at Penn State?

21       A:  No. not aware of that.

22       Q:  This document is marked as

23  Exhibit 64. It's a series of documents. Are

24  you familiar just in general with what these

1  documents reflect?

2       A:  Yes.

3       Q:  The first page of that, what is

4  that document? And if it goes with more

5  than one page let me know.

6       A:  Okay this was all one action

7  and the document

8       Q:  I'm sorry, what did you say?

9       A:  I'm talking to myself, I beg

10  your pardon. It appears to be one action I

11  should say. The document number on the

12  first page 1952015 appears also on the third

13  page with the note pad and so this appears

14  to me to be an electronic form that was used

15  to extend her leave, Ms. Beards leave to

16  December 31, 1997.

17       Q:  Okay are you saying then that

18  the first and third pages of this document go

19  together?

20       A:  Yes, I'm not sure about the

21  middle page. Apparently does because the

22  circled date at the bottom December 31,

23  1997 matches the date that was on the

24  notepad.

Q:   With regard to the first page at the top left it says 1/5/98. Do you understand that to be the date that this document was printed?

A:   I don't know.

Q:   Do you know over in the upper right hand corner 'LvL0' do you know if that's someone's initials?

A:   No that's the

Q:   That's the, I'm sorry go ahead

A:   It's an acronym for the form.

Q:   That's l-v-l-o?

A:   Yes.

Q:   Leave- lay off.

A:   Correct.

Q:   Okay do you know who 'jxr3' is?

A:   I'm not positive.

Q:   Okay who do you think it might be?

A:   I think it might be John Rideout but I'm not positive.

Q:   And what is the significance of the 'jxr3' appearing there?  Could that be the

65

doing that? Getting month by month extensions of leave? This is leave for Dori Beard, right? Well what do you have to do to go about getting month by month extensions of leave for someone?

A:   What does the employee have to do?

Q:   What does, okay yeah what does the employee have to do?

A:   Well it depends entirely on the situation. The employee may need to provide information or this may just be an administrative convenience, instead of setting a far out date to handle this on a month by month basis.

Q:   What is the effect of these documents? Are these the Penn State official record of these actions?

A:   Yes this is the electronic record.

Q:   So the last page of this document, at least as of November 17, 1998, the last official record we have here is that Dori Beard's leave was extended until

person who accesses information to print it out?

A:   Yes.

Q:   On the third page, the handwriting at the bottom, 2136488, do you know what that number signifies?

A:   No I don't.

Q:   But does that number in your understanding have a relation to extending her to 1/31/98? If you have any idea?

A:   I don't know.

Q:   The next page of that document 'nqf2'. Do you know nqf2 is?

A:   No.

Q:   Do you of anybody in the; did Chris Lybeck have any other name other than Christopher, is his name Michael or

A:   Yeah.

Q:   After the first page can you just flip through and tell me what those continuing pages reflect?

A:   These appear to be month by month extensions of her leave.

Q:   And how would one go about

66

November 31, 1998?

A:   Yes.

Q:   This has an HR ref number and it's number 370. Do you know what that means?

A:   Each work unit is assigned a number that's associated with the Human Resources representative.

Q:   Did you say each work unit?

A:   Work unit yes.

Q:   Is that, that number 370, is that one person or when you say work unit what do you mean?

A:   I, another way to put it would be college administrative area.

Q:   Okay so that 370 couldn't refer to more than one person?

A:   No there would be one Human Resource representative who is representing one administrative area.

Q:   But anybody from that administrative area would be referred to by that same number.

A:   Correct.

Q: Do you know what the number 370 is?

A: No I don't.

Q: What's your office's number?

A: I don't know that either.

Q: How does that number end up appearing on the records, these electronic records?

A: I don't know.

Q: And what needs to be done in order to get an extension of your leave? Who does the approval come from? What's the process?

A: Well again it depends on the case and I don't know what the case was here, I don't remember that level of detail. But extending it month by month could be an administrative convenience as it was in this case extended month by month. Or it may be that an employee is bringing in medical information every month and the supervisor is extending it that way.

Q: At the bottom, are you on the last page there?

69

A: Yes.

Q: What is 'psuvm' mean?

A: That's the name of the computer system on which this electronic file resides.

Q: Okay what does the 'uvm' mean or don't you know?

A: I don't know.

Q: And then 128., 118., 109.3, do you know what that number is?

A: No I don't.

Q: And then the 24 slash 27 at the bottom, do you know what that reflects?

A: No I don't.

MS. LYDE: I just need to change the cassette.

END OF TAPE ONE

MS. LYDE: Okay thank you.

MR. OSTROWKI: This document is marked as Exhibit 28. Do you recall seeing that document?

A: Yes.

Q: And was that something in your file that you reviewed last week?

70

A: Yes it was.

Q: And was that something that you had seen prior to last week?

A: Yes.

Q: What, the package of sensitive information concerning Dori Beard, what does that refer to?

A: I don't recall.

Q: Was there additional information in your file that you reviewed last week that came to you from Mr. Sputniks?

A: I don't recall anything specific that came to me from him.

Q: Okay is there anything generally that came to you from him and you know it wasn't an e-mail from Mr. Sputniks to you? Are there things that he might have sent to you even if he wasn't identified as the preparer or recipient on the documents that he sent you?

MS. GISMONDI: Objection to the form of the question. If you got that one go ahead and answer it.

A: Will you please ask that again?

Q: Well, I'm just, I'm following your answer, your question was I don't remember. I mean your response was I don't remember specifically anything he said to me and you qualified your answer by saying specifically. Was there something that you had in mind in general, generally that he said to you?

A: No I didn't mean to mislead by use of that word no, I don't recall anything.

Q: Did you ever speak with Mr. Sputniks?

A: I did follow-up on this e-mail but as I recall not with him.

Q: Okay who did you follow up with?

A: I don't recall for sure.

Q: Meaning Mr. Sputniks?

A: No it would not have been him. He was gone by that time I believe.

Q: Do you have any communications with Mr. Sputniks after he left his employment with Penn State?



1  A: I don't recall any no.

2  Q: Any up until today?

3  A: No as I think about it back

4  after he left I may have been involved in a

5  conversation with him where there was some

6  information being gathered but I can't say

7  for sure.

8  Q: Here is a document marked as

9  Exhibit 39. Let me just flip through and

10  make sure. I think I'm going to have to pick

11  up the first page here. Do you recognize

12  what that first page reflects?

13  A: No I don't. I haven't seen any

14  printout like this that I can recall.

15  Q: Do you see those at the top of

16  the page that Charles Alexis is identifying?

17  Have you ever met Mr. Alexis?

18  A: Yes I have.

19  Q: Then you know he was. He

20  was the chief or supervisor of the Police

21  Services Department of Capital College at

22  one point.

23  A: Yes.

24  Q: Did he remain on as an

73

1  employee of Penn State at the Harrisburg

2  Capital College after Mr. Supinski was

3  brought in as Supervisor of that

4  department?

5  A: I can't recall.

6  Q: Actually these pages go with

7  that. Would you put that paper in for me? I

8  think I'll go back to the deposition exhibit 65

9  if you would look through that. Do you recall

10  having seen these documents before?

11  A: Yes.

12  Q: Let's start with the second

13  page. That e-mail who, you didn't

14  understand who KBS3 was? Do you know

15  who BP01 is?

16  A: Yes that was Bonnie Ortiz.

17  Q: And she's the director of

18  Affirmative Action Office?

19  A: Yes.

20  Q: And then this DJG1 is Dorothy

21  Guy. Correct?

22  A: Yes.

23  Q: MRJ is Peggy Janowitz?

24  A: Yes.

74

1  Q: And then JAT is that Janine

2  Tesher.

3  A: Yes.

4  Q: Do you recall what you were

5  trying to determine when he said Bob

6  Maney, Tom Harmon and I are trying to

7  determine precisely where the university

8  stands regarding the status of Miss

9  Beard. Let me ask you, the first

10  question is why was this matter being

11  discussed or addressed in or around

12  June of 1999?

13  A: I don't know what triggered

14  Jerry Sall to ask about it but his asking

15  me is what triggered this series of e-

16  mails.

17  Q: Okay what did he ask you?

18  A: He sent me another e-mail. I

19  don't know exactly what it said but it

20  was just raising the issue did I know

21  what the status of Dori Beard was or

22  words to that effect? And then that led

23  to other conversations. I'm not sure who

24  talked with whom but then his June 7

1  e-mail, the one that you're referencing

2  was his attempt to get the right people

3  involved to get some answers to see

4  where we were.

5  Q: Do you, did you have a

6  meeting with Tom Harmon and James

7  Sall?

8  A: I, there may have been I don't

9  recall and I know the results from

10  conversations.

11  Q: Were they conference calls or

12  did you have separate conversations

13  with Mr. Harmon and Mr. or Doctor

14  Sall?

15  A: I can't recall.

16  Q: Do you have any

17  understanding for what was their need

18  for determining precisely what the

19  status, or where the university stands

20  with Ms. Beard was?

21  A: Our regulation is that this

22  matter had gone on for some time with

23  a number of different officers involved

24  and Dr. Sall attempt was to make sure



that all the offices were talking with each other specifically with Capital College as well to make sure that everything was happening that should be happening with this.

Q:   Okay well what should be happening? What was your understanding of what should be happening with the case?

A:   Well it was, a number of people had individual pieces of information but there didn't appear to be a central depository for that. Each office was doing what it thought proper but the main area Capital College for whatever reason did not have the big picture and Dr. Sall's attempt back at this time was to try to get them the big picture.

Q:   And do you know what if anything precipitated the timing of this attempt?

A:   No.

Q:   And the first page of this is an

77

e-mail from you, or no, to you from Mr. Harmon.

A:   Yes the one we had.

Q:   It looks like here in the middle of it, Tom, hyphen, here are my thoughts. Is that your e-mail that you?

A:   We're looking at the same thing. This from here down to here is mine, the top half.

Q:   And was that, what was that responding to if that was responding?

A:   It was responding to his June 8 nine twenty e-mail.

Q:   So the top portion of this is responding to the bottom portion of this.

A:   Correct.

Q:   Okay the reference to at the bottom Mr. Harmon's e-mail to you, the two year mark. Did you understand what he meant by the two year mark?

A:   Yes he says some two year mark that meant to me that he believed that the leave she was entitled to was

78

two years but with the word some there it made me believe that he was hazy on the policy requirements.

Q:   And then your response to him was just to clarify and give your input on what appeared to be maybe some confusion regarding the matter? Is that a fair assessment?

A:   Yes that's it exactly. I'm sorry I didn't mean to interrupt you.

Q:   That's okay.

A:   That's exactly right.

Q:   I'll show you some more e-mails. Do you know what happened after your e-mail?

A:   Yes the records were examined after that.

Q:   Did you do an examination?

A:   No.

Q:   Here's a document marked as Exhibit 66. Anybody need a break? You do? Let me get through this document here. Could you identify what that document is?

A:   This starting at the bottom, this is Dr. South's message that we spoke of a few minutes ago.

Q:   When?

A:   Kevin Stoll replied to that and then that was forwarded on to me from Jerry Sall, me and others.

MS. GISMONDI: Let me just make a statement if I can for the record Andy as I look at this I see obviously that this was also sent to me. I just want to say there is at least some issue as to whether this document is privileged so by virtue of; I'm not going to tell him not to answer questions about it but I don't want that to be construed. But by taking that position I'm waiving an argument that this isn't that privileged. Do you agree on that? I'm not asking you to agree that it's privileged. I'm asking you to agree that I'm not waiving argument by letting him answer questions about it.

MR. OSTROWSKI: No I think it's



waived by I understand what you're
saying. I'm not agreeing on anything but
that's fine.

MS. GISMONDI: All right well at
any rate I'm just saying for the record
I'm not waiving that argument by virtue
of having him answer questions about
it.

Q:   Understood. Did you have any,
wait a second; let me try to interpret
this. In the middle of the page now that'
the e-mail from Mr. Steward to Dr.
South correct? NIC, oh I'll just ask you
specifically. Did you have any
discussions with anybody about the
statement that, in the middle of that
page, 'as we have discussed in the past
I do not believe she should return to the
University in a PSO since the job has
evolved so much during her absence
any return to this department would
also cause morale problems with the
few employees that have been here
during this entire situation. I feel that

81

the best option for the university and
for Ms. Beard is a final separation from
each other, although how we get to that
point is what needs to be determined.'
Did you have any discussions with
anybody about that paragraph, about
that point?

A:   Not that I recall.

Q:   I'm handing you a document
marked Exhibit 67.  Take a look at that.
Have you had a chance to review that?

A:   Thank you I just finished.

Q:   And this is a document you
have seen before?

A:   Yes.

Q:   And when do you first recall
seeing that?

A:   Well I remember at the time
that some things were going on while I
was on vacation and that as that, as it
indicates there, that note from Tom, so I
would have received this after I returned
from vacation.

Q:   After having reviewed 66 did

82

anybody ever express disagreement with
the point that the best option for the
university and Ms. Beard was final
separation from each other?

A:   I'm sorry where are you
reading from?

Q:   I'm coming from right here.

A:   All right thank you.

Q:   After that e-mail was
circulated did anybody ever express any
disagreement with that position?

A:   I don't know that that specific
position came up again. I know that
from a policy standpoint which was
where of course I was coming from
throughout, Ms. Beard was entitled to
return to her job if she was fit to
perform the duties of her job.

Q:   That was your position on
this?

A:   Yes.

Q:   Wasn't, didn't the letter from;
do you understand the letter from Dr.
Hostetter that you reviewed, Exhibit 20?

Back in 1997, do you know what
document I'm talking about? There you
go thank you. The letter from Dr.
Hostetter dated October 15, 1997, so
you understand that that letter was a
letter from a Penn State designated
physician release, or saying that Dori
was capable of returning to work?

A;   I did read this through the first
time you gave this to me. Is there
something you would like to direct me
to or should I

Q:   Yeah it would probably be
easier to do it that way, thank you.
Okay I'm referring to page six in the
letter if you can see it, the second full
paragraph. 'At this present time she is
recovered to the point that she could
return to full time duty as a police
officer. She is not disabled and her
intense level of activity with the
Humane Society indicates that she is
quite able to resume her work without
restrictions, including being able to



carry a weapon.' You expressed that your position as a matter of policy, can you restate how you said that. Was that as so long as she couldn't perform her duties she could return to work? Could that remain your position for that period of time?

A:   Of course.

Q:   Was there ever any discussion of her not being able to return to work for any medical reasons during the June 99 time frame?

A:   Well there were a number of discussions involving her fitness to return to duty. It was the assessment of the individuals in Police Services and at Capitol that she was not fit to return to duty.

Q:   Okay when did you understand that to be the assessment?

A:   That followed this series of e-mails in June of 1999.

Q:   Okay so you actually had communications with persons about

85

Ms. Beard not being fit to return to duty?

A:   Yes.

Q:   With whom did you have those communications?

A:   Either directly or indirectly with Tom Harmon, Kevin Steward, Dorothy Guy Jerry South.

Q:   And what was the substance of what was being communicated here?

A:   Well the discussion was about the leave, what should be done about the leave. And the discussion had to do with her inability to return from that leave to perform all the functions of her job the way that job at that time was to be performed.

Q:   Based on what? Was there medical evidence that was being discussed during that time period?

A:   I don't recall that in particular. There could have been.

Q:   And there were, there was information being communicated to you

86

from the persons that you identified that as a matter of medical necessity or of a medical condition she could not return to her position?

A:   I don't recall exactly how that factored into it. It was simply that she could not; she was not fit to return to her position.

Q:   And I'm just going to ask you to tell me what you mean by not fit. I mean because if you interpret Mr. Stoll's e-mail from 'the best option for the university' or 'there would be a morale problem should she return' and 'her job had evolved' that in a sense could be defined as not fit to return to her position. Would you agree or not agree with that?

A:   The morale problems I would not agree with. The job changing of course I would agree with. There was another factor in this as well that her leave had already expired.

Q:   But the fitness as you

87

understood it was that a medical fitness of her to return to work?

A:   Yes it related in part to what led to the leave in the first place.

Q:   Okay and maybe I'm; you don't recall anything specific that was discussed about that?

A:   That's right.

Q:   If you look at '67' this second page 'there have been several claims following. The only really active claim is a PHRC; it is docket number V-82231B. It says Bosco, Janine, Gismondi responded to the delegation on May 23. To my knowledge there have been no further action. Is there, do you understand that every one of those persons identified on Exhibit 67 in or around June 1999 was aware of a pending administrative complaint of discrimination that Dori Beard had against Penn State University.

MS. GISMONDI: I'm sorry Andy. I missed the beginning of that question.

88



Could you repeat it please?

Q: Okay do you know, do you understand that everybody identified on this document, Exhibit 67 and I'll just read Tom Harmon, James Sall, yourself, Mr. Rideout, Ms. Ortiz, at least those persons were aware that Ms. Beard had a pending administrative complaint of discrimination at that time?

A: Are you asking would they have been reminded or made aware of this thing through the e-mail?

Q: Let me just ask you. Were you aware at that time that Ms. Beard had an outstanding pending complaint of discrimination against Penn State University?

A: I don't believe I was aware at the time but when I saw this e-mail I was made aware.

Q: Okay and was that outstanding complaint of discrimination ever discussed as a factor in the events leading up to her ultimate termination?

89

A: As a factor?

Q: Yes.

A: When you say factor do you mean as part of the decision making process?

Q: As a consideration in the decision making process?

A: Absolutely not.

Q: Why don't we take ten minutes?

MS. LYDE: It's 11:32 AM we will take a short break. This is also the end of tape one.

MS. LYDE: Okay we are back on video. It's 11:47 A.M. and this is tape number two of the deposition of Robert Maney.

MR. OSTROWSKI: Mr. Maney I just placed a document before you marked as deposition exhibit 68. There's not much to it. Did you get a chance to review it?

A: Yes.

Q: It's fairly obvious you were on

90

vacation in June of 1999.

A: Yes.

Q: The fourth page of this there appears to be something missing. Okay I see the subject is at the beginning of that sentence. Is that how you understand that?

A: Yes.

Q: So I'm not missing anything on that e-mail you don't think?

A: No.

Q: Did this relate specifically to Dori Beard, this e-mail? Do you understand?

A: Yes.

Q: Okay what was so stressful about it, if you know, that you thought was stressful?

A: No I didn't think it was stressful. That was Jerry's attempt at humor.

Q: And then the second page of that it references a discussion between you and Dr. South. Do you recall having

91

a discussion with him?

A: I do.

Q: And was you discussion in response to the first e-mail you got, the first page of that letter?

A: Yes, he had written this first e-mail and that which came after his original e-mail to a number of people that we talked about earlier asking for their respective updates. So when I returned I had those to review as I recall and then we talked and that is when I do recall doing this, recommended that we have a meeting with the key people involved.

Q: And did you have a meeting?

A: And who was at the meeting?

Q: As I recall it was Peggy Janowitz, Joe Phillips, Tom Harmon I believe was there; Joey South, Kevin Storm, Janine's name is on here but I don't recall her being there.

Q: Okay, who was, what was discussed?

92



MS. GISMONDI: I object. I'm going to instruct him not to answer since the discussion was in the presence of counsel.

MR. OSTROWSKI: He says you weren't there.

MS. GISMONDI: Joe Phillips was there and he is the University's Workman's Comp Attorney.

MR. OSTROWSKI: What was the purpose of the meeting?

A: There were so many individual facts coming from different people, which is obvious in those e-mails that it was having a review of all those facts in one place with all the principles there.

Q: Okay and why was Mr. Phillips there?

A: He is the University's attorney for Worker's Comp in this case.

Q: Did you discuss the Worker's Comp case?

A: As I recall he gave an update of where it was.

93

Q: And was his only purpose in being there to discuss the Worker's Comp issues?

A: I don't recall if he got into any Non- Worker's Comp issues but yes his primary purpose was from that angle.

Q: What there other than Worker's Comp issues were discussed at that meeting?

MS. GISMONDI: I'm going to make the same objection and instruct him not to answer.

MR. OSTROWSKI: Let me think here. Yeah I think the scope of his representation was just for Worker's Comp proceedings. I mean we're talking about all the main e-mails that are referencing the preceding page are e-mails relating to Dori Beards leave, what her status is. His involvement in this matter had nothing to do with what her employment says with the university. I don't think he was counsel; in fact that was probably why you were

94

asked to be there is you were counsel for these other matters. So to the extent that it doesn't relate to the Worker's Comp proceedings you know I think I should be able to inquire because this is really critical factual information here.

MS. GISMONDI: No let me say a couple of things. Number one I think you're doing a lot of speculating. Number two I think this is evident by virtue of the nature of the issues but I believe that Mr. Maney has already testified that these matters were all interwoven. They're not questions of leave, questions of return to work, questions of her status, they are all interrelated. You can put them in a discreet Worker's Comp box or not Worker's Comp box. I guess I would say this. I think that what was discussed at the meeting in the presence of counsel is something that is subject to the Attorney / Client privilege. I understand what you're saying. I'm not certain what

95

other way we might be able to work it out. But I don't think this witness or any other witness is obligated to disclose to an opposing party what was discussed in the presence of their attorney. Particularly given the facts in this case and given that the issues are as Mr. Maney said all interwoven.

Mr. Ostrowski: I'll reserve the right to take that up later but I won't bother with it now. This document marked as exhibit 69. Do you, can you identify that document?

A: Well there are two separate documents. The first is a copy of an e-mail from me to Tom Harmon November 18 and the other is an October 4 letter from Harmon to Ms. Beard.

Q: They're not related in any way from the content right?

A: No they are not.

Q: I'll keep them together but I'll just remember that. The first page this is an e-mail from you?

96

A:   Yes.

Q:   And it references John Rideouts August 30, 1999 letter to Dori Beard saying that she was terminated?

A:   Yes.

Q:   The, at the top the 3:50 PM 11/18/1999 what is that date the date of?

A:   Do you mean what triggered this e-mail?

Q:   No, no just what does that, because there is no date I can't tell when you sent this message. And I don't know if that's the date that Tom Harmon printed this out or if that's the date that you sent this or if you can clarify any of that for me.

A:   This is from my file. I printed this out. Down there at the bottom is my name and my printer and so this was sent on that date and that time.

Q:   What did you mean by as of this moment she has not been terminated?

97

A:   That means that I don't know how the retirement question arose but it came to my attention that the electronic system did not have a form terminating Ms. Beard from her leave. And my purpose in my writing to John, excuse me to Tom was in regard to that lapse so that could be done.

Q:   So are you saying that the August 30, 1999 letter to Dori Beard was not effective as the date of termination?

A:   No I'm saying that. The letter speaks for itself. She was terminated effective that date. However the University's internal record keeping system was not accurate and that's what had come to my attention in November.

Q:   And why did you send this to Tom Harmon?

A:   Tom is John Rideout's supervisor.

Q:   Now when you say that this is

98

not helpful to us, helpful in what context?

A:   Not helpful, it's a routine administrative function that should have been done. It's just a distraction in the scheme of things. Something could be made of it when there is nothing to be made.

Q:   Like me asking you questions about it today?

A:   I was not implying that at all.

Q:   did you have any discussions with Mr. Harmon after sending that e-mail about the content of the e-mail?

A:   Not that I recall no.

Q:   This document marked as Exhibit 70. It looks like its three pages of the same thing got copied together. Did you ever see this document before?

A:   No.

Q:   The handwriting at the bottom. Dori Beard  (colon) is this, is the A.D.D.P.O hers? No (hyphen) her move. Do you recognize any of that

99

handwriting?

A:   No.

MS. LYDE: We're suspending for just a second.

MS. LYDE:   Thank you.

Q:   Do you know who is Jean Williams?

A:   No I don't.

Q:   Were you aware around you know the end of August or September 1999 that Dori Beard had submitted a letter of interest or I guess we could call it an application for an advertised police position on the Harrisburg campus?

A:   Would you repeat the date please I didn't hear that?

Q:   Around the end of August, beginning of September 1999.

A:   Yes to your entire question. I was aware of it.

Q:   How did you become aware of that?

A:   I don't recall who told me that.

100



Q:   What discussions or what communications were you involved in regarding that matter?

A:   I was involved in discussions with more than one person but I don't remember exactly who they were. But I do remember the subject matter. It was that she was in effect applying for her own job. It was the same job that she had held before. And she had just been deemed as I testified before unfit to return to work from her physician which was still her physician up until the time of termination from the leave.

Q:   I think we already talked about all that. Do you recall, I think you said you didn't recall though I'll ask again because I wasn't sure who you talked about that with?

A:   Her job bid?

Q:   Yes.

A:   No I don't recall.

Q:   Did you have, did you talk to more than one person about that?

101

A:   That's my recollection but again I don't recall who.

Q:   Was it, did you talk about that on more than one occasion?

A:   Well if it was more than one person it would have been more than one occasion but I, as I recall whatever discussions there were, were not lengthy and was to my mind a very straightforward matter.

Q:   What do you mean by a very straightforward matter?

A:   Well Ms. Beard's application for a position did not effect in any way the action of terminating form the leave. Because the leave was up as I testified before and was deemed or had been deemed unfit to return and so any application on a vacant job different than her own would be handled like any other application.

Q:   So there were two aspects to it, her leave having been up and her having been deemed unfit to return. Is

102

that part of the seemed justification?

A:   I'm sorry. Could you ask that again?

Q:   When you gave you response to the previous question you said as I explained before you know her leave had been up and she had been deemed unfit for her position therefore any, and I mean, I'm trying to recapture the question and your answer. Therefore any, her application for a position that wasn't her position really didn't have any effect?

MS.GISMONDI: What's the question?

MR. OSTROWSKI: Well is that what his answer was to my previous question. I'll try to be more clear. So as far as you understand was the position that was being advertised not her position, not the position that she vacated.

A:   It was her position correct.

Q:   Was there a new Police

Q:   Okay what records did you examine to determine that?

A:   There is an electronic file that can be accessed showing budgeted positions, there is a standing appointment at Penn State has a number to keep track of the funded or the annually funded positions.

Q:   And so at he time you reviewed that information there were two vacant positions?

A:   Ms. Beard's position was never vacant. She held it until the time of her termination.

Q:   Was there, and you said you didn't know if there was an additional position created in the Police Services Department at the Capital College.

A:   That's right.

Q:   And what happened when Ms. Beard was terminated? Was her position eliminated?

A:   No that position was filled sometime later. I don't know by whom.



Q: So from 1990 or as of the date of the posting, that position advertisement, vacancy advertisement went out there were two Police Officer positions at Penn State that were currently , then currently not occupied. Ms. Beard and another one?

A: It's a fine shading of meaning but that's not quite correct. Her position was occupied even though she was not at work in uniform. But she was occupying that the entire time she was on leave until the day of her termination in August.

Q: So if I could get into all records regarding to that position vacancy I should be able to go through my records and track down how that position separate from Beards' correct.

MS. GISMOLDI: Objection to the form o the question. If you are able to answer it go ahead and do that.

A: No I can't.

Q: In you understanding, if I were

106

summer of 1999. Is that correct?

A: That's correct.

Q: And you did that based upon your review of the documents relevant to those two positions correct?

A: Yes.

Q: So if I had been given all documents relevant to those two positions I should be able to review those documents and come to that conclusion myself. Correct?

A: I don't know.

Q: I mean what we might have to do is pull up a box of documents and sit and show me. We'll have to take a break and do that then. Describe for me what all the documents are that are relevant to this evaluation regarding the issue or this concept.

A: Well the documents those are electronic documents for the most part

Q: That you can print out

A: I don't know what records, what additional records there may be

given all relevant records regarding the position vacancy I should be able to go through those records, evaluate them and determine if that position was indeed a position other than Ms. Beard's position. Correct.

MS. GISMOLDI: Objection form of the question. If you can answer it go ahead and answer it.

A: No I can't.

Q: Why can't, I don't understand why you can't answer it. I mean where were you not clear?

MS. GISMOLDI: You can answer that but I think that's a hard question to answer. But if you are able to answer that you can go ahead and answer it. I don't know if you're able to do that.

MR. OSTROWSKI: Okay let me break it down them. You've made the determination that was held by Dori Beard was indeed, in fact, a position separate from the position that was advertised and filled in or around the

107

but normally it's done electronically and its part of the budget management system at Penn State. I think it's important to keep in mind though that whatever budget matters we've been discussing had nothing to do with what I said earlier. That is that position that Dori was holding no matter what number it had or any other of these details that we have been discussing that was her position by policy until she was terminated in August 1999.

Q: And when she was terminated in August of 1999 what happened to that position?

A: That position then became vacant and I believe that position then became filled. Later it was advertised and filled.

MS. GISMOLDI: Let me just say Andy if I can. I don't see any reason why we wouldn't be able to be clear this up. I'm talking now as between you and me as a matter of discovery. I frankly don't



recall at this point in time exactly what documents you asked for. It might fall into this category and I don't recall what I produced to you. But and I can't imagine that any of these documents would be non-discoverable. So what I'm saying is if in fact it turns our when you review you records that you think there are further documents that are relevant to this record that haven't been produced to you let me know and barring the very unforeseen; as I said I can't imagine they wouldn't be discoverable but assuming that to be the case I would produce them to you.

Q:    Okay. Here's a document marked as Exhibit 71.  I don't know if you can make anything out. There is a stamp at the bottom; I believe it's upside down Human Resources stamp?

A:    I believe that's our departmental stamp.

Q:    Okay and the date portion at the bottom of this stamp what's all the

110

information contained in that portion. I understand you might not be able to make this out but how does that read?

A:    I can't make it out but it stamps the date and the time?

Q:    And you see right below the "ou" in resources there's a letter that looks like a "P".

A:    I can't tell.

Q:    Does that look like a "P" to you. Well let me just ask you this. To the right of that as you understand your stamp that would be the time that it's received?

A:    Yes.

Q:    And the rest of that that would be the date.

A:    Yes I think it goes month, day, I'm not sure after that. It might be P or A for the morning or afternoon, I don't know.

Q:    And would you would agree with me that's to the left of whatever that, if it's a "P" that I identified there

111

that looks like a 27?

A:    Yes.

Q:    And so that, if that says August 27, if that's August 27, 1999 then that's the date that this letter had been received in your office correct?

A:    That's correct.

Q:    So then if that's the case then this letter was received in your office before Ms. Beard was terminated August 30, 1999? If that's August 27, 1999.

A:    Yes. When we say our office it was the Office of Human Resources Employment and compensation Division. This did not come to me or my division.

Q:    But you recognize the stamp as an office stamp.

A:    Yes that's our departmental stamp.

Q:    And are you aware that Mr. Rideouts letter was received on August 30, 1999? His termination letter. It's not

112

one of the letters attached here.

A:    No. I believe that date of that.

Q:    So until he sends, apparently your August 24, 1999 letter to the Employment and Compensation division and my August 30, 1999 letter crossed in the mail. That in fact is incorrect right?

MS. GISMONDI: Objection

MR. OSTROWSKI: If this was received in Human Resources on August 27.

A:    John is in a different office and that's not at all unlikely that it took that much time to get from our office to his.

Q:    But in any event as of August 24, 1999 the day that the first page of this letter was sent in your mind Dori Beard's position was still Dori Beard's position. Is that correct?

A:    When she wrote the letter her position was still her position?

Q:    Yes.

A:    That is correct.

113



Q:   And it remained her position until August 30, 1999?

A:   That's correct.

Q:   The second paragraph of this letter says as per your request I went to your physician and was cleared to return to work. As of the date I have not been contacted by any Penn State employee. I am requesting to return to my position as a Police Service Officer at Penn State Harrisburg. Why was she not returned to her position?

A:   I can't answer that.

Q:   As of according to your understanding of her status was and according to what she explained all conditions preceding to her resuming her full time position were satisfied correct?

A:   That's what she states here yes.

Q:   And did you have any discussions with anybody after August 24 or August 27, 1997 where someone

114

containing Dori Beards resume. Let me ask you more specifically. Are you aware that sometime in early August that Dori Beard submitted a resume to request consideration for the posted position, the posted Police Officer position?

A:  I'm aware because of this document I am looking at.

Q:   And you're aware that she didn't get that position is that correct?

A:   Yes.

Q:   And then you're also aware that she wasn't returned to her position?

A:   Yes.

Q:   And then after she didn't get that position, the posted position and she wasn't returned to her position was fired correct?

A:   I'm sorry ask that again please.

Q:   After she didn't get the posted Police Service Officer position and after

116

said no she is medically non-fit to return to her position?

MS. GISMONDI: I'm sorry did he have any conversations after August 27

MR. OSTROWSKI: After August 27, 1999, I think that's a seven. Did you have any discussions after August 27, 1999 regarding Dori Beards request to return to her position?

A:   Yes. I don't recall everyone I talked with but I know this, her letter to the Employment Compensation division eventually made it's way to me and I don't know how that happened whether it was from that division or by the way of John. Probably it was by John because that division would have no reason to think they should send this to me.

Q:   And you're aware, were you aware that on or around August 2, 1999 an employee of the Employee of the Employment and Compensation Division signed fro a certified letter

115

she was not returned to her position she was formally terminated correct?

MS. GISMONDI: Objection to the form of the question. If you can answer it go ahead and do that.

A:   If he could restate.

Q:   Now, I'll restate because you asked me to. Okay we have established that she didn't get the Police Service Officer position that was posted? Right?

A:   That's right.

Q:   And you were also aware obviously that she hasn't been returned to her position that remained open at that time correct?

MS GISMONDI:   At that time being?

Q:   August 1999 I think it's the 24th 1999.

A:   I don't know when she was turned down for that position. The letter in August from Rideout to her was in regard to here leave ending.

Q:   But unequivocally she was

117



1 terminated from her position after she
2 requested to be returned to that
3 position and stated that she was cleared
4 to do so. Correct.
5 MS. GISMONDI: Objection to the
6 form of the question. If he can answer it
7 he can go ahead and do that.
8 A:   Try again please?
9 Q:   Okay there is categorically and
10 unequivocally no questioning
11 whatsoever that after Dori Beard said
12 that she wanted to be returned to the
13 position that was being held for her.
14 And after she said her physician cleared
15 to do so she was not returned to that
16 position and was indeed terminated.
17 Correct?
18 MS. GISMONDI: Same objection
19 but if he can answer it go ahead and
20 answer it.
21 Q:   It is categorically and
22 unequivocally clear and your objection
23 is just an objection to try to get him to
24 avoid the absolutely obvious.

118

1 that I made there?
2 A:   The implication is that there is
3 a cause and effect and that is absolutely
4 not the case.
5 Q:   What's the cause that I
6 suggest and the effect that I suggest to
7 you?
8 A:   Let me attempt to answer your
9 question if I may. And I hope I'll be able
10 to explain what I mean as I answer. The
11 decision to inform Ms. Beard that her
12 leave had ended was made long before
13 John Rideouts letter went out. It was
14 delayed. I don't the reasons why and it
15 was a coincidence that her letter came
16 in. his letter to her was in no way
17 triggered by the application for that job.
18 MS. GISMONDI: Wait a minute he's
19 entitled
20 MR. OSTROWSKI: No that was
21 satisfactory. There's no need.
22 MS. GISMONDI: Well he's entitled
23 to finish his answer.
24 MR. OSTROWSKI: Finish your

1 MS. GISMONDI: Andy let's not
2 start with the editorializing.
3 MR. OSTROWSKI: Well then don't
4 you start with the nonsense objections.
5 MS. GISMONDI: I'm objecting to
6 the question because I think it's
7 unclear. I think its' a confusing
8 question.
9 MR. OSTROWSKI: Okay. Did you
10 understand the question?
11 A:   It didn't sound like a question
12 to me.
13 Q:   Isn't it true that after Dori
14 Beard requested that she be returned to
15 the position that was being held open
16 for her pending her medical clearance to
17 return to that position she not only was
18 not returned to that position but she
19 was also terminated?
20 MS. GISMONDI: I make the same
21 objection. If you can answer it.
22 A:   Well I don't think I should
23 answer a question involving implication.
24 Q:   Okay what's the implication

119

1 answer.
2 A:   As he says here the letters did
3 cross in the mail though the dates I can
4 understand would lead somewhat to
5 question but the fact is as I explained
6 before that letter did not go directly to
7 John. It gets stamped then at Johns'
8 place of work. It gets stamped then as
9 John's place of work it came to our
10 central office.
11 Q:   Then does not your response
12 to my question also give rise to the
13 implication that you were not being
14 truthful with me when you told me that
15 until August 30, 1999 that position
16 remained open for Dori Beard?
17 A:   That's a fact. It remained open.
18 That termination did not take effect
19 until August 30. It should have ended
20 months and months before but it didn't.
21 Q:   And she requested that she be
22 returned to that position that was being
23 held open for her before August 30,
24 1999 correct?

121

A: Yes that's right but it didn't

Q: She could have returned to that position correct?

A: That's right.

Q: What's the implication? Strike that.

MS. GISMONDI: You just saved me the objection.

Q: I'm handing you a document marked as 72. Without having to go through that to any great extent do you know who 'PAK' is?

A: No I don't recognize that.

Q: Who is Donald Plourde?

A: He is the Financial Officer at Capital College.

Q: Do you know why all of these, not all of them but the first eight pages of this document were printed on August 17, 1999?

A: No I don't.

Q: I think my question before was is there any information contained on these documents that can help you help

122

me to understand who printed these other than the 'PAK8'. Like what organization PAK8 was in, anything of that nature?

A: It was someone at Capital. If on the first page if you look at about the third line down where the dash is, Homebudgets/ HRF# that's a 'CL' that means it's a capital budget.

Q: Point to where you are on that. Does that mean that these were printed from the capital College or that this relates to Capital Campus?

A: Relates to.

Q: Why what's the significance of this being non-academic promotion / demotion / lateral change?

A: I'll need to take a look at these for a moment.

Q: Okay.

A: Well there are several different forms in here. Is there one or more that you want me to review?

Q: Well let's just stick with the

123

first one then. What is the significance of a non-academic promotion / demotion / lateral change form?

A: I can't tell from the first page what was happening but the notepad indicates that this was the transfer of budgetary from Capital to University Park on July 1, 1997.

Q: Okay. On the first page that handwriting at the top 1907328. Do know what that reflects?

A: Yes that's the form number. The form number is seen on the third page, third line down from the top it says document number.

Q: Okay. I'm sorry could you point that to me? Okay, so that would mean that this would be part of that third page?

A: I believe so, yes.

Q: I think that's all the questions I have about that. Take a look at this document that we previously marked as Exhibit 6.

124

A: All right.

Q: Do you recall at all receiving a copy of that document.

A: It's in my file. I don't recall receiving it.

Q: What is HR-34?

A: HR- 34 is a University policy that covers working conditions for staff employees.

Q: And does that talk about work schedules?

A: Yes.

Q: And how does HR – 34 apply to the situation that's addressed in this e-mail?

A: HR- 34 is the policy that governs the working conditions for the Police Service Officer Positions and all other staff position, staff positions excuse me, at the University.

Q: And who was Jeanie? Do you know?

A: Yes is assistant manager I mentioned earlier, Jeanie Andrews.

125

Q: Right. And she is there at thirty three?

A: Yes.

Q: Now the third page of that document, do you recall receiving that?

A: No but I believe it's in my file.

Q: Do you know what the two separate documents with one having Gloria's signature and one having been executed by PFC what's that? Do you know what that's in reference to?

A: No I don't.

Q: Exhibit nine I'll give you a copy of. I think I'm only, let me see here. On the first page of this did you have a discussion with and I understand it says Mr. Meanny but did you ever talk to Len Sputniks about Administration administering a polygraph test to Dori Beard?

A: I don't recall doing that.

Q: Do you know a Mr. Meanny?

A: That's probably me. I've been called that several time in my career.

126

Q: You don't recall anything about that, about a polygraph, even if you didn't have it with Mr. Sputniks do you recall anything about there being discussions about Polygraph examinations for Penn State personnel.

MS. GISMONDI: Are you talking about with anybody? For anybody?

MR. OSTROWSKI: Well yeah. Do you recall any discussions about using polygraph?

A: For anybody anytime.

Q: For anybody. Well do you recall first of all about Dori Beard? Any discussions about using a polygraph?

A: No I don't.

Q: Anybody? Anytime?

A: Oh sure. I've discussed that subject with Dave Stoermer and the with Tom Harmon just a matter of employment law interest.

Q: And you don't, but you don't specifically recall ever having such discussions about Dori Beard?

127

A: No I don't.

Q: Well the second to last page of that document you are referenced in there about three quarters of the way down, Bob please comment on what dorkeys response should be that I have a security letter coming to you etc etc. That's the kind of mentality we were working with. Do you know of have any recollection of what that was about?

A: The scarey letter?

Q: The scarey letter yah.

A: No I don't.

Q: And what about the request to comment on what dorkey's response should be?

A: Response to what?

MS. GISMONDI: What is the question you are asking him?

MR. OSTROWSKI: If he knows what that's referring to.

MS. GISMONDI: Do you understand the question

A: Yes I'm reading the previous e-

128

mail.

Q: Yes if you flip to the last page maybe that will give you a little more.

A: Yes okay I'm following you. This is an e-mail from Dori Beard to Dorothy. I've seen that before in another Exhibit this morning and that's forwarded on to Chris Stevik by Dorothy and then from him on to me asking me for my comment. And my comment is up by the top.

Q: Do you recall any discussions you've at all about Jeffrey Beard that are reflected; are there any communications that you had seen reflected in various e-mails?

A: No I don't.

Q: This is Exhibit 11. On the second page of that document. Tell me when you're done reading that.

A: I am thank you.

Q: Do you recall having a discussion with Dorothy Guy or Jerry Sall or reporting about these seven

129



1 separate letters that Lynn wants to send
2 to Dori.
3 A: I don't recall the detail but yes
4 I do remember having a conversation
5 about all that
6 Q: What do you recall the subject
7 of those matters being?
8 A: As I recall what the
9 conversation was to try to determine
10 what action if any should be taken. And
11 though as I said I don't remember all of
12 the details, my recommendation was
13 that there was, there was a lot of things
14 going on but none of them rose to the
15 level of summary dismissal.
16 Q: Would you agree that for at
17 least two years Penn State was looking for a
18 way to get rid of Dori Beard?
19 MS. GISMONDI: What two year
20 period are you referencing?
21 MR. OSTROWSKI: Well let's take
22 the March 97, two and a half years March
23 97 until August 30, 1999?
24 A: Whatever time period you're

130

1 talking about absolutely not.
2 Q: This document marked as
3 Exhibit twelve.
4 A: Okay.
5 Q: Do you recall receiving a copy
6 of that?
7 A: No I don't but this is in my file.
8 Q: Do you know, did you have
9 any discussions with anybody over this e-
10 mail or the content of this e-mail?
11 A: I know this topic came up in
12 discussions but I don't know what context it
13 could have been in. the conversation with
14 Dorothy that I was discussing a few minutes
15 ago but at the time I don't recall talking with
16 anyone about it.
17 Q: This document was previously
18 marked as Exhibit 16.
19 A: Okay.
20 Q: These, this is something
21 prepared by you here right?
22 A: I guess.
23 MS. LYDE: I'm going to change
24 cassettes.

131

1 Q: When did Dori Beard run out
2 of leave?
3 A: I can't tell from this set of e-
4 mails.
5 Q: What other information would
6 you need to have in order to be able to
7 determine that?
8 A: As I indicated in the top
9 message to Dorothy what was needed
10 was the last day of pay that would start
11 the clock for the unpaid leave of
12 eighteen months.
13 Q: Okay. At the bottom it says
14 that Dori Beard was last paid on July
15 31, 1997. So are you saying? What's the
16 significance of that date?
17 A: Well at the time that I wrote
18 this note I wanted to make absolutely
19 sure that I was understanding correctly
20 that they correctly and that's why I
21 asked the question that I did that I want
22 to make absolutely sure that she used
23 up her paid sick with any vacation that
24 she wanted to and then the no pay for

132

1 the leave of absence. That last day of
2 pay was the critical date.
3 Q: That's all I have. Thank you.
4 A: You're welcome.
5 MS. GISMONDI: I don't have
6 anything thank you.
7 MS. LYDE:   It is now 4:26 and the
8 deposition of Robert Maney is
9 concluded. Thank you.
10
11
12
13
14
15
16
17
18
19
20

133

99-341



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Philadelphia District Office

21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515
(215) 451-5800
TTY (215) 451-5814
FAX (215) 451-5804, 5767 & 5838

Our Reference:  Charge Number 17F972286
                Beard v. Pennsylvania State University

Ms. Dori L. Beard
9148 Joyce Lane
Hummelstown, PA 17036

Dear Ms. Beard:

The Equal Employment Opportunity Commission (EEOC) has received your attorney's request for the issuance of a Notice of Right-to- Sue in connection with the above-referenced charge.  Because the Respondent in this charge is from the public sector, the Notice of Right-to-Sue must be issued by the U.S. Department of Justice.  Therefore, the request has been forwarded to that Agency for action.  The Department of Justice will act on your request as soon as possible and issue the Notice of Right-to-Sue directly to you.  You will then have 90 days from your receipt of the Notice of Right-to-Sue to file suit in Federal District Court.

If you have any further questions concerning the issuance of the Notice of Right-to-Sue, you may write to the Department of Justice at the following address:

> Department of Justice
> Civil Rights Division
> Employment Litigation Section
> Room 4712
> P.O. Box 65968
> Washington, DC  20035-5968

Please note that with the issuance of the Notice of Right-to-Sue the EEOC will discontinue its administrative processing of this charge.

If you have any questions concerning the charge or the EEOC's processing, please call Genevieve Delaney, Investigator, at (215) 451-5813.

Sincerely,

*William D. Cook*

William D. Cook
Enforcement Manager

*November 13, 2000*
Date

cc: Pennsylvania State University
    Andrew J. Ostrowski, Esquire (for Charging Party)



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Philadelphia District Office**

21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515
(215) 451-5800
TTY (215) 451-5814
FAX (215) 451-5804, 5767 & 5838

Our Reference:  Charge Number 17FA01434
                Beard v. Pennsylvania State University

Ms. Dori L. Beard
9148 Joyce Lane
Hummelstown, PA 17036

Dear Ms. Beard:

The Equal Employment Opportunity Commission (EEOC) has received your attorney's request for the issuance of a Notice of Right-to- Sue in connection with the above-referenced charge.  Because the Respondent in this charge is from the public sector, the Notice of Right-to-Sue must be issued by the U.S. Department of Justice.  Therefore, the request has been forwarded to that Agency for action.  The Department of Justice will act on your request as soon as possible and issue the Notice of Right-to-Sue directly to you.  You will then have 90 days from your receipt of the Notice of Right-to-Sue to file suit in Federal District Court.

If you have any further questions concerning the issuance of the Notice of Right-to-Sue, you may write to the Department of Justice at the following address:

> Department of Justice
> Civil Rights Division
> Employment Litigation Section
> Room 4712
> P.O. Box 65968
> Washington, DC  20035-5968

Please note that with the issuance of the Notice of Right-to-Sue the EEOC will discontinue its administrative processing of this charge.

If you have any questions concerning the charge or the EEOC's processing, please call Genevieve Delaney, Investigator, at (215) 451-5813.

Sincerely,

*William D. Cook*

William D. Cook
Enforcement Manager

*November 13, 2000*
_____
Date

cc: Pennsylvania State University
    Andrew J. Ostrowski, Esquire (for Charging Party)

2

COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

PENNSYLVANIA HUMAN RELATIONS COMMISSION

Dori L. Beard,                                    :
                                                  :
        Complainant                               :
                                                  :
                v.                                : PHRC DOCKET No. E-94532-D
                                                  :
                                                  : EEOC Charge No. 17FA01434
Penn State University at Harrisburg,              :
                                                  :
        Respondent                                :

AMENDED
COMPLAINT


1.      The Complainant herein is:

               Dori L. Beard
               9148 Joyce Lane
               Hummelstown, PA  17036


2.      The Respondent herein is:

               Penn State University at Harrisburg
               777 East Harrisburg Pike
               Middletown, PA  17057

               Penn State University, c/o Allen Finncey
               201 Willard Bldg.
               University Park PA  16802-2801

3.      I allege the respondent violated § 5 of the Pennsylvania Human Relations Act, as
        follows:


**3**

a.   From October 15, 1997 to August 30, 1999, the respondent refused to reinstate me because of my non-job related disability, depression and or gender, female and or as retaliation for my filing charges, E-67348-DH, E-76707-D and E-82231-D.

   (1)   About February 1997, I filed the charge E-82231-D based on gender, female and retaliation for filing the other charges.

   (2)   About February 1997, I experienced depression.

   (3)   About August 17, 1997, my doctors released me to return to work.

   (4)   Several times subsequent to August 17, 1997, my doctors released me to return to work.

   (5)   The respondent's doctor had also released me to return to work.

   (6)   On July 29, 1999, I applied by fax and letter for my position which the respondent had advertised.

   (7)   I do not believe that males have been denied reinstatement under similar circumstances.

b.   On or about August 30, 1999, John E. Rideout, manager of human resources and business, notified me by mail of my termination.

   (1)   His letter stated that the respondent fired me because my entitlement to 18 months of unpaid leave under the provisions of HR-18 ended on August 26, 1998.

   (2)   In August 1999, I applied for a full time police services position.

   (3)   About 1997 per the respondent, I was examined by their physician who cleared me to return to full duty.

   (4)   I do not believe that males have been fired under similar circumstances.

4

Dori L. Beard  v. Penn State University at Harrisburg

4.   The complainant prays that the respondent be required to provide all appropriate remedies under § 9 of the Pennsylvania Human Relations Act.

5.   This charge has been dual filed with EEOC.

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

*1/5/00*
(Date Signed)

*Dori L Beard*
Dori L. Beard

5



COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

PENNSYLVANIA HUMAN RELATIONS COMMISSION


COMPLAINT

|  |  |
|---|---|
| Dori L. Beard  , | : |
| COMPLAINANT(s) | : |
|  | : |
| vs. | : DOCKET NO(s): *E82231I* |
|  | : |
|  | : |
|  | : |
| Pennsylvania State University, Harrisburg, | : |
| RESPONDENT(s) | : |


1. The Complainant(s) herein is/are:

    Name:   Dori L. Beard

    Address:  9148 Joyce Lane   Hummelstown,   PA    17036

    Name:

    Address:

2. The Respondent(s)s herein is/are:

    Name:   Pennsylvania State University, Harrisburg

    Address:  777 West Harrisburg Pike    Middletown,  PA  17057-4898

    Name:

    Address:

    Name:

    Address:


0131

6

Pennsylvania State University, Harrisburg

Dori L. Beard                    v.

3.   The Complainant alleges that on or about January 14, 1997 and/or until January 23, 1997 the respondent: (1) on or about January 14, 1997, refused to assign her the scheduling duty and (2) on or about January 23, 1997 refused to assign her training duties because of her sex and/or because she filed complaints with the Pennsylvania Human Relations Commission.

A.   I, Dori L. Beard, the Complainant, further allege:

1.   I identify my sex as female;

2.   In July 1989, the respondent hired me as a police officer and assigned me to the Harrisburg Campus;

3.   On or about November 18, 1993, I filed a complaint of discrimination against the respondent with the Pennsylvania Human Relations Commission, E-67348-DH;

4.   On or about February 29, 1996, I filed another complaint of discrimination against the respondent with the Pennsylvania Human Relations Commission, E-76707-D;

5.   Prior to March 1996, I would schedule the other officers for their shifts in the absence of the chief;

6.   In March 1996, the respondent appointed Leonard Supenski as the new chief of the safety/police services on the Harrisburg Campus;

7.   In December 1996, Leonard Supenski hired Tony Kuklinski as a new police officer on the Harrisburg Campus;

8.   On or about January 14, 1997, Leonard Supenski assigned the duty of scheduling all police officers to Tony Kuklinski;

9.   On or about January 23, 1997, Leonard Supenski assigned the duty of Training Officer to Tony Kuklinski;

10.  I have more time in service with the respondent at the Harrisburg Campus than any other police officer;

11.  I have more knowledge of the said Campus, the respondent's policies, procedures and daily operations than any other police officer;

12.  My sex makes me the only female police officer on the Harrisburg campus.

0132

7

Pennsylvania State University, Harrisburg

Dori L. Beard                          v.

- B.   Based on the foregoing allegations, I charge the respondent discriminated against me because of my sex, female, and/or because I filed complaints with the Pennsylvania Human Relations Commission, E-67348-DH and E-76707-D, when Leonard Supenski refused to assign the scheduling and training duties to me, in that:

    1.   The respondent assigned the duty of scheduling all police officers to a less qualified male;

    2.   The respondent assigned the duty of training new officers to a less qualified male.

beard_dl\IN_32

0133

8

4.   The allegations in paragraph 3 hereof constitute(s an unlawful discrimi-
     natory practice or unlawful practice and is in violation of:

     (X)   Pennsylvania Human Relations Act (Act of October 27, 1955, P.L. 744,
           as amended) Section 5, Subsection(s), (a) & (d).

     ( )   Section 5.1 Subsection(s)_____.

     ( )   Section 5.2 Subsection(s)_____.

     ( )   Pennsylvania Fair Educational Opportunities Act (Act of July 17,
           1961, P.L. 766 as amended). Section 4 Subsection(s)_____.

5.   The complainant(s) alleges(s) that the alleged unlawful discriminatory
     practice(s):

     ( )   is/are of a continuing nature which has/have persisted up to and
           including the present time.

6.   No other action based on the aforesaid allegations has been instituted by
     the complainant in any court or before any other commission within the
     Commonwealth of Pennsylvania except as follows:

     (X)   None.

     ( )   This charge will be filed with the Pennsylvania Real Estate Commis-
           sion under the PA Licensing and Registration Act Section 604.

     (X)   This charge will be referred to EEOC for the purpose of dual filing.

     ( )   This charge will be referred to HUD for the purpose of dual filing.

7.   The complainant(s) pray that the respondent(s) be required to:

     (a)   Make the complainant(s) whole, including but not limited to an award
           of back pay, hiring, reinstatement, upgrading and restoration of job
           benefits; or to provide housing sought or the loan sought in connec-
           tion with housing;

     (b)   Eliminate all unlawful discriminatory practice(s) and procedure(s);

     (c)   Remedy the discriminatory effect of past practice(s) and proce-
           dure(s);

     (d)   Take further affirmative action necessary and appropriate to remedy
           the violation complained of herein;

     (e)   Provide such further relief as the Commission deems necessary and
           appropriate.

I hereby verify that the statements contained in this complaint are true and
correct to the best of my knowledge, information and belief.  I understand that
false statements herein are made subject to the penalties of 18 PA. C.S. section
4904, relating to unsworn falsification to authorities.

2/6/97
(Date Signed)

_Dosie L. Beard_
(Signature)

(717)56-3821
(Telephone Number)

9148 Joyce Ln.
(Address)

Hummelstown, PA. 17036
(City, State and ZIP Code)

beard_dl\IN_32.sig

0134

9

# CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon all parties of record in this proceeding in accordance with the requirements of 1 Pa. Code § 33.31 (relating to service by an agency).

Dated at this 26th day of March, 1997

Rhonda Sechrist

0135

10

# McQuaide Blasko

ATTORNEYS AT LAW

*Jul 28   11   28 AM '00*

**811 University Drive, State College, Pennsylvania 16801-6699**        814-238-4926   FAX 814-234-5620
600 Centerview Drive • M.C. A560 • Suite 5103, Hershey, Pennsylvania 17033-2903        717-531-1199   FAX 717-531-1193
        www.mcquaideblasko.com

Reply to: State College Office

July 27, 2000

**Via First Class Mail**

Robert G. Flipping, Jr.
Pennsylvania Human Relations Commission
State Office Building
300 Liberty Avenue
Pittsburgh, PA 15222-1210

In Re:   **Beard v. The Pennsylvania State University**
        **No.: E-82231D**

Dear Mr. Flipping:

This is in follow-up to our recent telephone conversation concerning the above complaint filed by Dori Beard against The Pennsylvania State University.

You asked whether the University was willing to reinstate Ms. Beard to her previous position or offer her a cash settlement in order to resolve her claim. The University's position in this matter continues to be that Ms. Beard was not the subject of any unlawful personnel action and that her complaint is without merit. Accordingly, Penn State does not intend at this time to offer Ms. Beard either reinstatement or a cash settlement.

If we can be of any further assistance with respect to your investigation of this matter, please feel free to contact me.

Very truly yours,

McQUAIDE BLASKO

By: *[signature]*

Janine C. Gismondi

JCG/lh

---

MCQUAIDE, BLASKO, SCHWARTZ, FLEMING & FAULKNER, INC.

John W. Blasko   Thomas E. Schwartz   Grant H. Fleming   R. Mark Faulkner   David M. Weixel   Steven S. Hurvitz   James M. Horne   Wendell V. Courtney   Darryl R. Slimak   Mark Righter   Daniel E. Bright
Paul J. Tomezuk   Janine C. Gismondi   Maureen A. Gallagher   John A. Snyder   April C. Simpson   Allen P. Neely   Charles Eppolito, III   Katherine V. Oliver   Katherine M. Allen
Wayne L. Mowery, Jr.   Pamela A. Ruest   Michelle S. Katz   Richard K. Laws   Stacie Wagner Patterson   Ashley Himes Kranich   Chena L. Glenn-Hart

John G. Love (1893-1966)   Roy Wilkinson, Jr. (1915-1995)   Delbert J. McQuaide (1936-1997)

**11**

**TransCore**

# Fax

| To: | Mr. Robert Flipping | From: | Jeffrey Beard |
|---|---|---|---|
| Fax: | (412)-565-2894 | Pages: | 12 including cover |
| Phone: | 412)-565-7650 | Date: | 08/17/00 |
| Re: | Dori Beard complaint | CC: | |

☐ **Urgent**   X **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

● **Attached please find:** 3 letters in regard to Dori's HR complaint. The first letter is 7 pages long. It is correspondence from Hershey Psychiatrics (Penn State's independent physician) to Joe Phillips (Penn State's attorney). On page 6 paragraph 2, you will find that Abram Hostetter (MD) cleared her to return to work including carrying weapon (firearm).

The second letter (2 pages) is Dori's own account of the events regarding fellow officer Phil Negrete (no longer with Penn State) calling her an "idiot", along with subsequent verbal complaints about the incident to University personnel.

The third letter (again 2 pages) is a memo from Chief (I must use that term loosely. It is my understanding that at the time of his employment with Penn State, he was NOT certified to enforce ANY Pennsylvania crimes codes, only Maryland's, therefore I will refer to him only as Supervisor) Supenski regarding Seniority and "permanent shift" scheduling.

Dori & I will be going through all of her material this weekend. Expect to see more information coming your way with in the next week. Including 3 possibly 4 (at least a copy of the transcript of the last audio tape) cassettes of her four hour interrogation with Supervisor Supenski and Human Resources Head, Dorothy Jean Guy.

Thank-you. If you need any additional information, please call: (717)-939-4734.

12

**Chairperson**
ROBERT JOHNSON SMITH
**Vice-Chairperson**
RAQUEL OTERO de YIENGST
**Secretary**
GREGORY J. CELIA, JR.
**Executive Director**
HOMER C. FLOYD
**Regional Director**
GEORGE A. SIMMONS

**COMMISSIONERS**
M. JOEL BOLSTEIN
JOSEPH J. BORGIA
THEOTIS W. BRADDY
CARL E. DENSON
RUSSELL S. HOWELL
ELIZABETH C. UMSTATTD
SYLVIA A. WATERS
DANIEL D. YUN

Writer's Direct Dial:



COMMONWEALTH OF PENNSYLVANIA
**HUMAN RELATIONS COMMISSION**
Pittsburgh Regional Office
State Office Bldg., 300 Liberty Avenue
Pittsburgh, PA 15222-1210
(412) 565-5395 (Voice)
August 16, 2000 565-5711 (TT)

Janine C. Gismondi, Esquire
McQuaide, Blasko, Schwartz, Fleming and Faulkner, Inc.
811 University Dr.
State College, PA 16801

Re:  E-82231D
Beard v. Pennsylvania State University

Dear Ms. Gismondi,

The investigation of the above-named complaint is continuing. In order for the Commission's investigation of this matter to proceed on towards its completion, however, additional documents are still needed. At this time, the Commission is hereby requesting that, on the behalf of the Respondent, your office will provide us with the documents listed below. Perhaps these documents will help serve to reveal the actual facts surrounding the Complainant's allegations and the Respondent's position.

The Complainant has alleged that in December, 1996, Chief Leonard Supenski assigned a less senior officer Tony Kuklinski the duty of scheduling Respondent police personnel. Thus, replacing the Complainant. She further alleges that in January, 1997, Chief Supenski replaced her in another capacity of Training Officer with the assignment of the "lesser qualified" Officer Kuklinski to perform those associated duties. The Commission is interested in learning what necessitated this action. Please provide his employment application/resume for its review as well as a narrative detailing the circumstances surrounding this change.

Please provide the Commission with documentation regarding policies pertaining to the pre-existing scheduling of police tours of duty prior to Chief Supenski's tenure. The previous policy relative to permanent shift assignments were reportedly based on seniority. Following the Chief's arrival, it is alleged that said policy was changed. Consequently, the Complainant, a senior employee, was removed from the daylight shift that she had selected and placed on a 3-11 p.m. shift. Did other employees have a shift change as a result of this change in policy? Moreover, she has indicated that following the policy change instituted by the new chief, less senior officers male police officers were assigned daylight and more preferential

13

P. 2
Gismondi

shifts.  In accordance with the new policy "seniority was not an issue" or criterion.  The Commissiom would like to examine the employment applications of all police officers who were given the opportunity to work daylight hours.

The Complainant has charged that fellow police officer Philip Negrete, a co-worker, allegedly referred to her as an "idiot."  When this alleged behavior was reported to Respondent Supervisor, Sandra Jackson, she alleges that no corrective action was taken against Mr. Negrete.  Ms. Beard avers that Negrete's continuing harassment and misconduct contributed significantly to her decision to her separation from employment.  Does the Respondent have knowledge of his alleged misconduct?  Was any disciplinary action taken against Mr. Negrete?  Did Respondent Supervisor Jackson document her conversation(regarding Negrete) with the Complainant?  Ms. Jackson was said to have alluded to the fact that she had also been disrespected (in having been yelled at) by Mr. Negrette. Was any disciplinary action against him in that alleged incident?  Please submit any related documentation to the Commission's attention along with an affidavit from Ms. Jackson detailing these turn of events.  If she is no longer in the Respondent's employ, provide the Commission with contact information or request that she contacts us.

Furthermore, the Commission would like to have the Respondent's provide the names of all employes in addition to documentation reflecting their respective sex.

Regarding the Complainant's relationship with Respondent Chief Supenski, upon his arrival, he conducted private meetings with each police officer under his supervision.  In the meeting with the Complainant, he was alleged to have prefaced his remarks by telling her that he was well aware of previous problems that she had experienced throughout her related emploment tenure.  How/why was this information conveyed to the chief prior to becoming acquainted with the Complainant?  Could this information have been used against her in an alleged retaliatory manner and, in turn, subjected her to conditions (that she asserts) contributed to an allegedly hostile work environment?

The Respondent Police Chief was reported to have allegedly questioned the Complainant regarding her abilities and qualifications as a police officer.  In another instance that the Complainant has cited as a contributing factor for her having experienced a nervous breakdown, she was questioned extensively regarding his inability to locate keys to University facilities.  In fact, Ms. Beard indicated that she was accused of taking these keys.  Please provide a narrative detailing/documenting each of these incidents.  Also, explain the outcome of these incidents.

The Complainant has averred that she approached management, particularly Respondent Human Resources Representative Dorothy Guy, with the problems that she was experiencing allegedly as a result of Chief Supenski's administration.  In response to issues arising from the scheduling controversy, she informed the Commission that only minimal action was taken.  What was done to correct the situation?  In response to other issues or concerns that arose, the Complainant states that she phoned the Human Resources Department on numerous occasions and each time

14

p. 3
Gismondi

did not receive a courtesy phone call. Are these calls documented? If the Complainant's charge is true, why weren't these telephone calls returned as a courtesy?

The Respondent has stated that this complaint could not simply be resolved with the negotiation of a settlement agreeing to reinstate the Complainant. The reason being that she had experienced a nervous breakdown and in the capacity of a police officer was required to carry a firearm. The Commission has learned that the Complainant has received the proper medical treatment and has fully recovered from her illness. Would such a determination make a difference in related efforts to negotiate a potential settlement? What documentation does the Respondent have regarding the Complainant's medical condition. Please provide all related documentation to the Commission.

Please provide the Commission with documentation that involves any disciplinary action taken against the Complainant.

The Complainant was reportedly told by Chief Supenski that for the purpose of completing a detail relative to paperwork, she was instructed to phone his residence. To which she responded that it was not her responsibility to do so. Please furnish the Commission with similarly situated male employees who were directed to complete assignments in this manner.

You are asked to respond to this request within 15 days upon the receipt of this correspondence. The Commission would like to express its appreciation in advance for your cooperation in helping to further this investigation in hopes that this matter can be expeditiously resolved. In the event that you have any questions or concerns, please don't hesitate to contact me at 412-565-7560.

Yours Truly,

Robert G. Flipping, Jr.
Human Relations Representative

15

To: BEARD.DORI <DQB4@PSUADM ,
    NEGRETE.PHILLIP <PAN2@PSUADMIN>,
    HATHAWAY.MATTHEW <MA█ █@PSUADMIN>,
    PICCOLO.VERA.MAE <VMF1@PSUADMIN>
From: LZS9@PSUADMIN     (SUPENSKI.LEONARD)
Subject: New Schedule Assignments

I am sending you the new,computerized schedule format for your information.
You will notice that one copy lists the leave/work schedule for all personnel,
full-time and part-time. The second copy lists all regularly scheduled days
off in the normal rotation (7-2-8-4).  This represents your normal leave and
holidays.  It does not include your personal days and vacation.

Next week I will setup the schedules for April and May.  That will be the
official work schedule for PS-H Police Services.  When received, review,
initial and return to Vera Mae.

If there are any requests for ADDITIONAL time-off (an extra day, personal day,
vacation day or days owed due to working holidays) that does not appear on the
schedule, these will be made to me IN WRITING.  Once the schedule is "posted"

 PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      EMCC0000


no changes will be made unless personnel shortages
require me to fill in open shifts.  In that case, part-time officers will be
called FIRST.  If it is necessary to assign overtime to fill in a shift due
to the unavailability of part-time officers, I will offer the slots to full-
time officers on the basis of seniority or,if no takers, assign them.

A practice of informal swapping of leave/work days has crept in to the
leave schedulling process. This practice has been discontinued as of this
month.  I will assign ALL work days and leave time.  I will continue the
policy of "permanent shifts" (tours of duty) with the pick of tours based
upon seniority.  Seniority will also be used in picking vacation, holiday
substitute days, personal days and "extra" days.  These must be REQUESTED
in writing or by E-Mail and approved prior to being entered on the leave
schedule.  Officers working the 1st Shift (2300-0800 hours) will be rotated
after two months to either the daylight or evening tours in order to re-
integrate them into the campus community.

The addition of a computer-based scheduling system means that officers will
know well in advance when they are due to work and when they are off.  It
will stablize the work schedule and allow for proper coverage of the campus.
Finally, it will reduce our overtime costs possibly freeing up funds needed

 PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      EMCC0000


for other critical purchases.

If you have any questions about how this will work, see me.
-------------( end of letter )-----------------------------------------------

16

FROM : PSH HUMAN RESOURCES         PHONE NO. : 717+948+6518         Sep. 08 2000 04:11PM P2



FILE

**PENNSTATE**

**Harrisburg**

Safety/Police Services

(717) 948-6232

777 W. Harrisburg Pike
Middletown, PA 17057-4898

# *All Officers/All Shifts*
# *Re: Officer Assignments/Lists of Duties*

*Effective Immediately, the following additions, changes and modifications to the list of Officer assignments and duties are in effect. Not all Officer's will have had changes made in their existing list of tasks; this memo updates the list which was in effect earlier. Note: these duties are above and beyond the primary responsiblity of all police officers (patrol, calls for service, traffic regulation, etc.).*

*Officer Dori Beard:  Crime Prevention Programs, Child Safety Programs, Press Logs, Alarms Testing and Documentation.*

*Officer Keith Farren: Midnight Shift weather reporting and analysis (in conjunction with the inclement weather policy); Internet Web site project for Penn State Harrisburg Department of Police and Safety Services.*

*Officer Matt Hathaway: Bicycle Patrol Unit (when scheduled); Commercial Vehicle Safety and Enforcement; UCR/PIBRS monthly/annual updates to PSP.*

*Officer Tim Rine: Weather reporting and analysis (for Inclement Weather Policy) when assigned to the Midnight Shift; Alcohol/Drug Awareness and Prevention.*

*Officer Tony Kuklinski: Project work as directed by the Chief; Training Officer for the Department; Criminal investigative assistance to all officers (viz Officer Negrete's departure).*

*These changes are effective will remain in effect until modified.*

*L. J. Supenski*
*Chief*
*January 23, 1997*

17

An Equal Opportunity University

JANUARY 31, 1997

THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
THE BOURSE - SUITE 200
21 SOUTH FIFTH STREET
PHILADELPHIA, PA
19106 - 2515

            RE:    DOCKET NO. E76707D
                   DORI LEE BEARD V.
                   PA STATE UNIVERSITY AT
                   HARRISBURG
                   EEOC NO. 17FP961362

TO WHOM IT MAY CONCERN:

I AM REQUESTING THE EEOC TO REVIEW DOCKET NO. E76707D -
DORI LEE BEARD V. PENN STATE UNIVERSITY AT HARRISBURG
EEOC NO. 17F961362.  I PREVIOUSLY WITHDREW THIS
COMPLAINT DUE TO THE FACT THAT MY EMPLOYER PROMISED TO
CEASE AND DESIST ALL FORMS OF HARASSMENT AND CREATE A
NON-HOSTILE WORK ENVIRONMENT.  INITIALLY, I BELIEVED MY
EMPLOYER WOULD FOLLOW THROUGH WITH THE ABOVE.
UNFORTUNATELY, I WAS WRONG AND AS A RESULT I AM NOW
IN THE PROCESS OF FILING A THIRD COMPLAINT WITH THE
PENNSYLVANIA HUMAN RELATIONS COMMISSION.

THANK YOU FOR YOUR ASSISTANCE.

                   VERY TRULY YOURS,
                   *Dori Lee Beard*
                   DORI LEE BEARD

0359

On 02/08/97 I left the Police Services Department via ambulance. I was experiencing chest pain and having a mental breakdown as a result of a long interrogation and a hostile work environment. I was admitted to the Hershey Medical Center Psychiatric Unit for three days.

On August 18, 1997 Bonnie Howard, Ph.D. sent a letter to Dorothy Guy (employee of Penn State Harrisburg Human Resources).  Bonnie Howard, Ph.D. "recommended" that I return to work with limited conditions.  She advised that I "begin with a part-time transition period of two weeks and that, following the transition period" my "schedule be limited to 8-hour day shifts". She went on to state she "believes that a return to the same schedule" I "had at the Department at one time is important in maintaining" my "recovery".

On October 15, 1997 Abram M. Hostetter, M.D. wrote a letter to Joseph C. Phillips, Esq. (Penn State Harrisburg's Attorney) advising that I was "recovered to the point" I "could return to full-time duty as a police officer" and I am "not disabled".

My attorney, Cathi Radnor, Esq., made several attempts to have me reinstated after I was cleared to return to work with limited restrictions and without restrictions.

On July 25, 1999 the position of Police Service Officer Penn State Harrisburg was advertised in the Sunday Patriot News.

On July 29, 1999 I faxed my resume to the Employment & Compensation Division.  On August 2, 1999 an employee of the Employment & Compensation Division signed for a certified letter which contained my resume.

On August 24, 1999 I sent a certified letter to Penn State University regarding not being reinstated.  On August 27, 1999 an Employee of the Employment & Compensation Division signed for the certified letter

On September 5, 1999 I received a certified letter from John E. Rideout, Manager, Human resources & Business advising my employment was terminated effective August 30, 1999.  The reason for my termination was my entitlement to 18 months of unpaid leave ended on 26  August 1998.

I feel I was treated differently because I had a mental breakdown as a result of a long interrogation and a hostile work environment and had filed previous Human Relations Complaints and a Workmans' Compensation Claim against Penn State Harrisburg.

NOTE:   I filed the Human Relations Complaints due to the fact I was being harassed because I am a woman.  The department consisted of all white males and one female officer (me).

19

| | |
|---|---|
| From: | "JEAN WINN" <WINN.SAFETY.PSU> |
| Organization: | UNIVERSITY SAFETY |
| To: | Rideout |
| Date sent: | Wed, 8 Sep 1999 16:10:39 +0500 |
| Subject: | Phone call: Jolaine Teyssier |

** At 8 Sep 99, 16:09,
** Jolaine Teyssier, of Employment Bene.  Phoned you.
** Phone number: (5) 2749
** He/She would like you to call back.

He/She also left the following message:

Please call her today yet, it is really important

Dori Beond: is the ADV po heas?

NO!

— Her move

---

*Probationary Period of 6 mos*   D R A F T # 2

February 6, 1996

(X)

*Mrs. Guy 2/6/96*
*Review +*
*Comments by Wed*
*Feb. 7. 10 am*
*Ann*

Mr. Leonard J. Supenski
1498 Reisterstown Road, #250
Baltimore, MD 21208

Dear Mr. Supenski:

This letter is written in order to clarify your employment status with the Pennsylvania State University. On December 11, 1995, you signed a letter of appointment for the position of Manager, Safety and Police Services at Penn State Harrisburg. That appointment was contingent upon several factors including "Certification under the Municipal Police Officers Education and Training Act (Act 120) within the first year." At the present time, it is not possible for the University to submit your name for certification as a police officer, however, we are offering you employment with this knowledge.

As a result, you may not perform any of the manager's duties which require police powers. Among those are: operation of emergency vehicles, on-view arrests, issuing citations, filing citations, carrying a fire arm, executing search or arrest warrants, and filing criminal charges. These are examples of some typical law enforcement duties and, of course, not a complete list. You should consult with Mr. David Stormer, Assistant Vice President of Safety and Environmental Services, to ensure that the actions you are taking comply fully with your restricted status. As you are aware, we prefer the leader of the department be vested with police authority and encourage you to pursue that authority.

D R A F T

21



Based upon your history of effective leadership in a police setting, we believe you will provide that leadership here. While we do not believe your leadership or management will be affected by not having police authority, we will monitor the operation of the department to determine whether it is a factor. Your appointment as Administrative Manager, Safety and Police Services, is dependent upon the results of your efforts. In the meantime, I would encourage you to continue to work with Mr. Stormer in order to achieve certification as a police officer in the Commonwealth of Pennsylvania.


Sincerely,



DRAFT



James D. South

Associate Provost for

Administrative Operations



JDS — I encourage you to share w/ the officer, the fact that LS will not have 'police powers' in the Commonwealth. This cd be more damaging if they found out on their own than if they were told by you.


DRAFT


22

DEC 12 1995



**PENN STATE**
**Harrisburg**

BUSINESS SERVICES
116 OLMSTED BUILDING

777 W HARRISBURG PIKE
MIDDLETOWN PA 17057-4898

December 6, 1995

Mr. Leonard J. Supenski
1498 Reisterstown Road, #250
Baltimore, Maryland 21208

Dear Mr. Supenski:

With the concurrence of Dr. James D. South, Associate Provost for Administrative Operations, I am pleased to offer you appointment to the staff exempt position of Manager, Safety & Police Services at Penn State Harrisburg, effective January 15, 1996.

This appointment is conditional upon your satisfactory completion of the employment physical, psychological examination, and background check. It also requires certification under the Municipal Police Officers Education and Training Act (Act 120) within the first year.

Your monthly salary will be ████ via direct deposit. The University will permit you to rent a residence on campus from your employment date until June 30, 1996.

You must present **ORIGINAL** documentation to establish **IDENTITY** and **EMPLOYMENT ELIGIBILITY** on the first day you report to work. This documentation is outlined on the attachment. After these documents are reviewed, you will then be required to complete and sign an Employment Eligibility Verification (I-9) form in the presence of an authorized representative in the Human Resources Office at Penn State Harrisburg. This process must be completed on or before your first day of work in order to be eligible to be placed on the University payroll.

Upon your arrival on campus please schedule an appointment with Ms. Angela Brodie to receive an explanation of our benefits program and to complete necessary forms.

If these arrangements meet with your approval, please sign this letter and return to me as soon as possible.

We look forward to your association with the Office of Safety and Police Services at Penn State Harrisburg.

Sincerely,

Sandra G. Jackson
Manager of Business Services
and Vehicle Registration

SGJ:jmk
Encl:  Employee Handbook
       Documents List

THE ABOVE CONDITIONS OF EMPLOYMENT ARE ACCEPTABLE TO ME:

Signature _____   Date 12/11/95

An Equal Opportunity University

23

1287133

#332
2/7/96

FEB 1 c 1996

PENNSTATE
Harrisburg
1855

777 W HARRISBURG PIKE
MIDDLETOWN PA 17057-4898

February 8, 1996

Mr. Leonard J. Supenski
1498 Reisterstown Road, #250
Baltimore, MD 21208

Dear Mr. Supenski:

This letter is written in order to clarify your employment status with the Pennsylvania State University. On December 11, 1995, you signed a letter of appointment for the position of Manager, Safety and Police Services at Penn State Harrisburg. That appointment was contingent upon several factors including "Certification under the Municipal Police Officers Education and Training Act (Act 120) within the first year." At the present time, it is not possible for the University to submit your name for certification as a police officer, however, we are offering you employment with this knowledge.

As a result, you may not perform any of the manager's duties which require police powers. Among those are: operation of emergency vehicles, on-view arrests, issuing citations, filing citations, carrying a fire arm, executing search or arrest warrants, and filing criminal charges. These are examples of some typical law enforcement duties and, of course, not a complete list. You should consult with Mr. David Stormer, Assistant Vice President of Safety and Environmental Services, to ensure that the actions you are taking comply fully with your restricted status. As you are aware, we prefer the leader of the department be vested with police authority and encourage you to pursue that authority.

Based upon your history of effective leadership in a police setting, we believe you will provide that leadership here. While we do not believe your leadership or management will be affected by not having police authority, we will monitor the operation of the department to determine whether it is a factor. Your appointment as Administrative Manager, Safety and Police Services, is dependent upon the results of your efforts. In the meantime, I would encourage you to continue to work with Mr. Stormer in order to achieve certification as a police officer in the Commonwealth of Pennsylvania.

Sincerely,

James D. South
Associate Provost for
Administrative Operations

bcc:   D. Stormer
       D. Guy

An Equal Opportunity University

24

X-Sender: djg1@email.psu.edu
X-Mailer: Windows Eudora Version 1.4.3
Date: Wed, 26 Mar 1997 17:06:48 -0500
X-PH: V4.1@r02n02
To: "JoLaine A. Teyssier" <jat2@psu.edu>
From: djg1@psu.edu (Dorothy Guy)
Subject: Re: Anthony Kuklinski
Cc: djg1@psu.edu



Jolaine:

I will be at UP tomorrow for a meeting in 307A Old Main. My meeting is from
9:00 - 10:30am. I would like to meet with you for about 45 minutes to an
hour. Jerry is ready to proceed with the posting of the Director of Police
Services position and would like it to appear in Sunday's (3/30/97) paper.
I know this may be tough, but if the PIQ looks complete, and I have spent
some time on it, maybe we can make that deadline.

The second item is related to Dori Beard. I have been faxing every document
to you that I have received. And, this week, I received two such
official-looking documents. If we can just review these, that would be
helpful. I won't take up more time than my allotted hour...I promise.

Thanks

>Dorothy:
>
>Anthony Kuklinski's current salary is██████████. In order to make him an
>Acting Manager of Safety and Security, a temporary increase to ███████████
>████) is appropriate based upon his background. Kuklinski is currently a
>grade 18 and the Manager position is a grade 22. Let me know if I can
>provide any additional assistance. It was good to talk on Thursday.
>JoLaine
>
>
>

25

9



The Municipal Police Officers' Education and Training Law, Act 120 of 1974, requires municipal police officers, defined by the law, to have a current certification prior to enforcing the Pennsylvania Crimes Code, moving violations of the Vehicle Code and carrying a firearm. This certification card is evidence that the holder is certified and in compliance with the Act.
An expired certification card is invalid for any purposes whatsoever.
Warning:  Unauthorized use of this Certification Card is prohibited under the laws of the Commonwealth of Pennsylvania and will result in Criminal Prosecution.

If found, please drop in any U.S. mailbox
Return Postage Guaranteed By:
Executive Director
M.P.O.E.T.C.
75 East Derry Road
Hershey, PA 17033

SPB-506 (9-96)

*Combcard* Lancaster, PA

## Pennsylvania Municipal
## Police Officers'
## Education & Training
## Commission



This certifies that

BEARD,  DORI  L.

is employed as a Police Officer by the following Police Dept.

PENN STATE POLICE SERVICES

| Certification Number | Issue Date | Expiration Date |
|---|---|---|
| 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 | 02/22/97 | 03/31/99 |

26



COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF LABOR AND INDUSTRY

BUREAU OF WORKERS' COMPENSATION

HARRISBURG

\* \* \* \* \* \* \* \* \*

DORI BEARD,                    \*

 Claimant              \*   S.S. # 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

  VS.                    \*   CLAIM

PENN STATE HARRISBURG,    \*

 Employer             \*

\* \* \* \* \* \* \* \* \*

Before: Elizabeth Crum

   Appearing for H.V. Knighton

   Workers' Compensation Judges

Hearing: January 29, 1998

   Third Floor

   Eastgate Center

   1010 North Seventh Street

   Harrisburg, PA  17102

\* \* \* \* \* \* \* \*

REPORTER: KAREN BEMILLER

\* \* \* \* \* \* \* \*

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

```
                                                              5
 1              P R O C E E D I N G S

 2   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3              JUDGE CRUM:

 4              This is a hearing in a Claim

 5   Petition of Dori Beard.  We've had a brief off-

 6   the-record discussion.  Appearing on behalf of

 7   the Claimant is Cathi Radner.  And on behalf of

 8   the Defendant is Joseph Phillips.  We're going

 9   to proceed slightly out of order in terms of

10   testimony, deferring Cross Examination of the

11   Claimant until after the fact witness.  If you

12   could call your witness, Mr. Phillips.  His

13   name, please?

14              ATTORNEY PHILLIPS:

15              It's Leonard Supenski,

16   S-U-P-E-N-S-K-I, I think.

17              MR. SUPENSKI:

18              Yes.  S-U-P-E-N-S-K-I.

19              JUDGE CRUM:

20              Off the record for a second.

21   OFF RECORD DISCUSSION

22              JUDGE CRUM:

23              Mr. Supenski, could you raise

24   your right hand, please.

25   LEONARD SUPENSKI, CALLED AND SWORN TO TESTIFY
```

6

1          JUDGE CRUM:

2              Mr. Phillips.

3    DIRECT EXAMINATION

4    BY ATTORNEY PHILLIPS:

5    Q.   Will you state your full name, please.

6    A.   My name is Leonard J. Supenski.

7    Q.   And where are you currently employed, sir?

8    A.   I'm the chief of police of the City of

9    Ypsilanti, Michigan.

10   Q.   And that particular police department, how

11   many members do you have in your police

12   department?

13   A.   A little less than 100.

14   Q.   Now, you were employed as chief of police

15   at the Penn State Capital Campus for a period

16   of time; is that correct?

17   A.   Yes.   From February '96 to April of '97.

18   Q.   Now, prior to your tenure at the Capital

19   Campus of the Pennsylvania State University,

20   were you employed as in the profession of

21   police work?

22   A.   Yes, prior to coming on board with Penn

23   State, I retired from the Baltimore County

24   Maryland Police Department.   It's a 2,300

25   person police agency.   I retired there with the

7

1   rank of colonel, which is equivalent to the

2   deputy chief.  I was there for 30 years.  Prior

3   to that I was with the Baltimore City Police

4   for two years.  And prior to that I was with

5   the United States military for three years.

6   Q.   So your entire working life history then

7   has been involved with the police department?

8   A.   Yes.

9   Q.   Now, before coming to Penn State and

10  accepting the position of chief of police

11  there, did you have occasion to visit the

12  Capital Campus and look at the operation and so

13  forth?

14  A.   Several times when I was in the process of

15  making the determination as to whether I was

16  going to work there.  The selection process is

17  always a two-pronged issue, one is to decide

18  whether the department wants to hire you and

19  then the other thing is whether you want to

20  work there.  So in the process of determining

21  that I had visited the campus several times,

22  talking to the administration, talking to

23  police officers actually did a ride-along,

24  talked to my potential supervisor which was Dr.

25  Sowel (phonetic), to get a background history

8

1    and a feel for what they needed from the

2    conditions at that point.

3    Q.   All right.  In February of 1996, could you

4    describe for Judge Crum the size of the police

5    department at the Penn State Capital Campus?

6    A.   I believe at that time they were in

7    transition.  I was told that basically they

8    wanted to take it into the next step of a full

9    service police agency.  They had four --- I

10   remember they had four full-time and three

11   part-time officers at that time.  And they were

12   looking to expand it.

13   Q.   Now, given your visits to the Capital

14   Campus to look at the police department and

15   look at the operation, when you came on in

16   February of 1996, did you have some sort of

17   idea in your own mind how this department was

18   operating at that time and what, if anything,

19   needed to be done in the department?

20   A.   Oh, yeah.  I mean, it was quite obvious

21   when I first got there, there had been a

22   multitude of problems prior to my arrival.  The

23   problems --- the largest problems outside of

24   just the normal like the resources and the

25   normal administration of the organization,

9

1    there was a great deal of contention in the

2    organization.  History of some litigation by at

3    least one of the officers, Officer Beard.

4    There was some indications of a personality

5    complaint, sexual harassment, a number of other

6    kinds of issues that had surfaced.  So much so

7    that that became my first priority.

8    Q.   All right.  That was going to be my next

9    question.  When you got there then in February

10   of 1996, what was the first thing that you did

11   given this prior history that you had been

12   aware of?

13   A.   To address the officers both individually

14   and collectively to set the ground rules for

15   what I was going to do, what I expected out of

16   that department.  There were certain things

17   that were not going to exist at least while was

18   I running the place.  The general message was

19   that history starts today and moves forward.

20   And that each of the officers has a clean

21   slate, they start with me from this point

22   forward.

23       I was aware of the conditions that were

24   existing previously, some of the complaints and

25   the behaviors.  They were told quite directly

10

1   and unequivocally that I would not tolerate

2   that kind of behavior.  That in addition to the

3   university's policies on sexual and racial

4   harassment, that I had my own version of that,

5   it was a zero tolerance policy.  I explained

6   that in detail.  And it went from there.

7   Q.   Excuse me.  Would you tell the Judge what

8   you had explained to them as your zero

9   tolerance policy of sexual or racial

10   harassment?

11   A.   Zero tolerance as I explained it is

12   twofold.  One, if you engage in the behavior

13   that the law in the case law clearly indicates,

14   it constitutes --- either sexual or racial

15   harassment.  If you engage in that behavior, I

16   will do an investigation.  If my determination

17   is that you are a wrongdoer, I'm going to make

18   a recommendation for termination, period.

19   Q.   And you told them that?

20   A.   I told them that.  On the other hand, if

21   you weren't engaged in that behavior but you

22   knew about that behavior and failed to come

23   forward and failed to report it, you in effect

24   then tolerated that behavior.  That was a

25   violation of my zero tolerance policy and I

11

1   will also make an investigation.  And if it's

2   found that you did that, then I would make a

3   similar recommendation for your termination,

4   period.

5   Q.   All right.  And you say that you explained

6   that to the existing officers collectively as

7   well as individually.

8   A.   I backed it up in writing also.

9   Q.   Did you identify early on any other issues

10  other than this prior history of

11  contentiousness in the department that you felt

12  that would need addressed at some point in

13  time?

14  A.   Oh, there were so many --- the lack of

15  policies and procedures other than the

16  glimmering of some --- had brought down one of

17  the personnel from UP to actually develop some

18  basic policies.  A lot of the risk management

19  types of things, pursuit policies, arrest

20  policies, all the normal kinds of things that

21  you would find in an organization were missing,

22  policies on scheduling, overtime, shift

23  assignments.  I mean, they were dismal or

24  lacking completely.  In fact, one of the first

25  problems that I saw that was the scheduling in

12

1   who works what shift, what days, how they mark

2   them and that was completely out of hand.

3   Q.   Tell the Judge how the scheduling was

4   being done when you arrived there.

5   A.   When I got there, it was basically set up

6   along three shifts, a p.m. shift, a midnight

7   shift and an a.m. shift, usually eight hours

8   apiece.  The officers were assigned to it by

9   the officers being assigned to day work and

10  then 3:00 to 11:00 and then midnight.  As far

11  as who worked what days and how they got around

12  their normal cycle, there was a lot of trading

13  of days, very little accountability as to who

14  got what, there was too much playing around

15  with it.

16       If I didn't want to be here I'd, you know,

17  work this day, somebody came in, bingo, you

18  were in an overtime situation.  We were paying

19  overtime when we should have been paying

20  minimal time for the part-time people.  The

21  budget was bleeding, because there was

22  absolutely no control on it.

23       That's one of the --- the second thing I

24  did, was to institute control over who gets the

25  shifts, how the shifts are scheduled.  I took

13

1    over responsibility for doing that.  I gave

2    that to my secretary to actually set up a

3    configuration to have an accountability for it.

4    With an understanding that down the road I

5    would look at this entire issue of shift

6    configuration to see whether or not that was

7    giving us the best bank for actually providing

8    coverage.  That was again --- that was just

9    part of the kinds of things that were --- there

10    was a lot, a lot that needed to be done.

11    Q.  All right.  Now, you said that there was

12    this scheduling system that was in existence

13    when you arrived, is that something that you

14    immediately addressed insofar as looking at

15    ways to actually change the shift configuration

16    and so forth?

17    A.  No.

18    Q.  Why not?

19    A.  As I said, there was a host of other

20    problems that was more important.  And

21    stability was the first issue, them going out

22    and actually hiring people because we were

23    probably at half strength.  We had nowhere near

24    the part-time officers that we needed to stem

25    the tide and keep the costs down.  I went on a

14

1   major hiring program for full time as well as

2   part-time individuals.

3       When you have so many problems, you have

4   to start prioritizing the problems.  My main

5   problem, my main effort in the beginning with

6   the shift configurations and the scheduling was

7   to get control of the scheduling first so that

8   I could reduce the overtime process, so that we

9   could better utilize the limited dollars that

10  we had in the budget.  And down the road that

11  would become an issue.

12      The next most important thing was to get

13  enough people in there, so that we could also

14  reduce the drain on the budget.  And that took

15  a great deal of my time.

16  Q.  All right.  Now, from February of 1996 up

17  until the latter part of 1996, had you taken

18  any steps in that several month's interim to

19  actually start looking at different

20  configurations and things like that?

21  A.  At the latter part of '96, around November

22  and December, because we were now starting to

23  put policies and procedures in place.  We went

24  on an accelerated hiring program.  We had just

25  about exceeded all of our --- filled all of our

1   full-time positions.  We went from part-time

2   officers of three up to nine at one point.  We

3   were able to control that.  It was now time to

4   look at the shift configuration.  The reason

5   for that, if I may ---?

6   Q.   Please.

7   A.   It was now that I had the full-time staff

8   and the part-time staff that I was able to

9   provide full-time coverage.  Now I had to look

10  at how I was providing the full-time coverage.

11  And as I was starting to understand the

12  community, the campus community, the needs of

13  the campus community, it became clear to me

14  that what we were doing is we were staffing

15  equally across the shifts, which was not the

16  best way.  We were in a position where a bulk

17  of our police service demand was between the

18  hours of 7:00 a.m. and roughly 11:00 p.m.

19  Monday through Friday.

20  Q.   And why was that?

21  A.   Because that's when most of the students

22  and the employees of the campus were busy.

23  That's when most of the people were there.

24  With the configuration that we had it only

25  allowed us to have one person in an eight-hour

16

1    time.  What I needed to do now that I had the

2    resources was make sure that I was utilizing

3    the resources in the best possible fashion.  We

4    were staffed on midnight too heavy, we were

5    staffed on the weekends too heavy, when there

6    were no demands, when the minimal coverage

7    would have sufficed.  Now, I had to take a look

8    at the public safety needs and put the majority

9    of the officers in that campus community when

10   they were needed.  And there were a number of

11   ways you could do that.  To do that what I did

12   was have one of my officers take on the project

13   of going out and doing some research.

14   Q.   Now, who was that that you asked to

15   research different shift configurations?

16   A.   An officer by the name of Anthony

17   Kuklinski.

18   Q.   And when was Mr. Kuklinksi hired?

19   A.   I believe he came along in November ---

20   Q.   Of '96?

21   A.   --- of '96.

22   Q.   Now, why did you select Officer Kuklinski

23   to do this research project of different types

24   of shift configurations that may be available?

25   A.   Officer Kuklinski came to Penn State with

17

1   a background of supervision from Cabrini

2   College in Pennsylvania.  And he also came with

3   staff background from a prior Lower Providence

4   Police Department, a municipal police

5   department.  He had had 10 or 11 years of

6   experience on the job itself.  And he had done

7   a number of staff projects.

8       One of the staff projects that he had done

9   had had to do with the development of

10  specifications for emergency call back systems

11  at Cabrini College.  I actually had a copy of

12  that, I saw the quality of the work.  It was

13  clear to me that he was the best officer to be

14  able to do that kind of staff work.  And I

15  assigned that task to him.

16  Q.   Now, when you assigned this task to him,

17  was he then the scheduling officer, or was he

18  simply doing a research project for you?

19  A.   No, he was doing staff work for me.

20  Q.   All right.

21  A.   The specific task that I gave him was to

22  take a look at various scheduling models, and

23  there's a number of models in existence today.

24  There's the standard shift that we had, eight

25  hours, eight hours, eight hours, and you either

18

1    rotate forward on your shift or you rotate

2    back, there was eight hours permanent shift.

3    There was eight hours with semipermanent shift.

4    There was a 10 and 4 system.  There are four

5    ten-hour days and then you were off.  There was

6    a 12 and 12 system, you actually work 12-hour

7    days.  There's all kinds of variations between

8    that.

9        What I asked him to do was to take a look

10   at the staffing of one of the other

11   universities of a similar size, because I

12   wanted to make sure we were comparing apples

13   with apples.  Also take a look at how well

14   those various shift configurations were

15   working, both in a municipal mode and in a

16   campus mode, because there are differences.

17   Q.  I understand.

18   A.  And he was given the task to do another

19   thing for me.  Do that research, come back to

20   me and we'll take a look at what we have to

21   reach out to each individual officer and get

22   their input on this particular coalition of

23   shift configuration, what their thoughts were,

24   what they thought would work.  And then we

25   developed a set model.

19

1          If we were going to go to configuration A,

2     which was 10 and 4, what would that look like

3     here at Penn State?  If we were to go to a 12

4     hour 12 off --- 12-hour shift configuration,

5     what would that look like here?  Actually plug

6     in the numbers.  If we were going to go with

7     the three eight-hour shifts rotating forward,

8     what would that look like here?

9          Plug in the numbers, bring those models

10    back to me, and then from that we were going to

11    --- my intention was I would take those, I

12    would call a departmental meeting, I would give

13    as much input as I possibly could, I would give

14    them the information and the facts.  I would

15    see if there was consensus.  If there was

16    consensus and the consensus was such that we

17    would work a shift that met my criteria ---.

18    Q.   Meaning the coverage and the efficiency?

19    A.   The coverage and the efficiency.  If that

20    consensus met with the standards that I had

21    basically set out, then I would listen to where

22    they were coming from and adopt that system.

23    If it didn't, then I was going to adopt the

24    system anyway and it was going to be the one

25    that would give us the best patrol coverage for

20

1    the times that they were needed.

2    Q.   So as far as ultimately who would decide a

3    shift configuration and scheduling, that was

4    ultimately going to fall on your shoulders?

5    A.   Oh, absolutely.

6    Q.   And I take it that's your responsibility

7    as chief of police?

8    A.   Absolutely.

9    Q.   Now, you gave Kuklinksi this research

10   assignment to put together these various models

11   for you sometime in the latter part of 1996.

12   Were you giving other projects to address

13   departmental needs and concerns to other

14   officers?

15   A.   Yes.

16   Q.   Did you give the Claimant in this case,

17   Dori Beard, a project to work on?

18   A.   She had several projects.  She was

19   responsible for all the alarm maintenance and

20   testing of the program.  She was the individual

21   that I picked to be the person who would help

22   design some crime protection and community

23   outreach programs.

24   Q.   Now, why did you pick her?

25   A.   Because quite frankly I thought she was

21

1    the best person to do that job.

2    Q.   Had there been somebody else doing that

3    job previously?

4    A.   It was being done on a catch as catch can

5    --- you know, basis.  I had had at least one

6    other officer who thought that they ought to

7    have been that individual assigned to that

8    particular role, I didn't feel that that person

9    met the --- he just didn't have the type of

10   personality that is necessary for that kind of

11   position.

12   Q.   What I gather then it was your intent in

13   assigning projects to work on improving the

14   department, you were assigning projects based

15   upon what you felt officers' abilities ---

16   where their abilities lie or where they best

17   matched up with the project?

18   A.   Well, it was twofold.  First of all, there

19   was a host of administrative tasks that had to

20   be taken care of.  Because of the size of the

21   department and the limited resources of that

22   department, there was no staff command

23   individual, no adjutant, no executive

24   assistant.  The secretary was pretty much

25   tapped up doing the kind of things she was

22

1   doing.  So we needed to spread the work load

2   around.  So that was the first reason for doing

3   it that way.

4   Q.  All right.

5   A.  The second thing was that we take and try

6   to match the work load to the individuals where

7   possible, and also to spread it out so that

8   you're not thumping on one individual but

9   you're sharing the extra responsibility.

10  Q.  Did Kuklinksi undertake the research

11  project that you assigned to him?

12  A.  Yes.

13  Q.  And by January had there been any

14  preliminary results of that?

15  A.  He had done a --- by January he had come

16  back with some research that indicated that he

17  had spoke with individuals on a number of

18  college campuses, municipal departments, looked

19  at a number of configurations.  And by mid ---

20  by the beginning of January, he still wasn't

21  there, I mean, he was still doing research.  By

22  mid-January, I think my recall of that is that

23  he at least had some working models, but wasn't

24  ready as in --- if I remember correctly, I know

25  it's been a while, we weren't ready for a

23

1    departmental meeting at the end of January.

2    Q.   All right.  With the working models that

3    he came up with, was there any one in

4    particular that you felt looked promising to

5    accommodate the needs?

6    A.   There was actually a couple that looked

7    fairly promising, there was the 10 and 4 shifts

8    that had some potential.  My problem there was

9    like the current configuration we were in, it

10   still provided too much coverage on midnight

11   and especially on the weekend, more so on the

12   weekend than the midnight.  The 12-hour shift

13   had some promise because it gave us some

14   flexibility with light staffing and also to put

15   some extra staffing in the shift in the

16   daylight hours that we needed --- it was during

17   the day hours that we needed people.  So those

18   two looked promising.  Of the two the 12-hour

19   shift looked probably the most promising.

20   Q.   All right.  Did it come to your attention

21   in mid-January that the Claimant in this case,

22   Dori Beard, had some concerns about 12-hour

23   scheduling or any change in the scheduling as

24   it had existed when you arrived at the campus?

25   A.   Yes, the 14th, I believe, of January.

24

1    Q.    January the 14th?  Did you meet ---?

2    A.    I met with her.

3    Q.    You met with her?

4    A.    Yes, I met with her for an hour and a

5    half.

6    Q.    What was the purpose of meeting with her

7    on January the 14th?

8    A.    Well, Dori expressed some concerns, she

9    actually came to me and asked me to ---

10   expressed some concerns about permanent shifts,

11   that we were leaving permanent shift and the

12   fact that she would be leaving a permanent

13   daylight shift, if we wanted to rotate the

14   shifts.  At that point ---.

15   Q.    What was her concern about that?

16   A.    Basically, as I recall it, she said she

17   couldn't work anything but permanent daylight.

18   Q.    So what did you --- tell the Judge what

19   happened at that meeting.

20   A.    Well, basically, what it was, she told me

21   the same things that I wanted to hear, why we

22   were doing it, what we were going to do, the

23   fact that it was not a done deal by any stretch

24   of the imagination.  Even if we went to a 4-10 -

25   or we went to a 12-hour shift, I still hadn't

25

1    decided as to whether or not I was going to use

2    it as a permanent shift, that is leave it

3    assigned like they were, one officer to a

4    permanent block of hours.  For example, if we

5    went to 12-hour shifts where you have like a

6    7a-7p, 7p-7a, who was going to work which, I

7    hadn't gone through that.

8         I hadn't decided at that point whether or

9    not I was going to make it semipermanent.  In

10   other words, you would take a block of time and

11   you would work that for a set period of two to

12   three months and then you would rotate

13   quarterly with flip flop back and forth or flip

14   flopping between those two and the power

15   (phonetic) shift.  I hadn't decided whether I

16   was going to do that or not.

17   Q.   Did you explain all of that to her?

18   A.   Yes.  In fact, I told her that her

19   concerns at that point were premature.

20   Q.   And I take it that's because by January

21   14th there had been --- you had not even

22   decided on a shift configuration?

23   A.   No.  No.

24   Q.   Now, after that meeting on January the

25   14th, did something occur?

26

1   A.   A lot occurred, but the most significant

2   issue that occurred is that I heard the

3   following day of a confrontation between

4   Officer Kuklinski and Officer Beard ---.

5   Q.   Over what?

6   A.   Over this whole issue of the scheduling

7   and the 12-hour shifts.  I talked to Dori again

8   the following day, the 15th of January.

9   Q.   And what took place on January the 15th?

10  A.   Pretty much the same thing that occurred

11  on the 14th.  I went back over the same ground

12  and repeated that, you know, we're in a

13  project, I haven't particularly made any

14  decision as to how we're going to do this, what

15  the shift configuration would finally look

16  like.  I explained to her why Officer Kuklinski

17  was doing what he was doing.

18  Q.   What did he tell her exactly as to why

19  Officer Kuklinski was working on this project?

20  A.   Primarily that he was the doing the staff

21  work on it, the decision was going to be mine

22  in concert with the department and the

23  departmental meeting.  But if we could not

24  reach consensus --- again the same thing, if we

25  couldn't reach consensus, then that's still my

27

1    --- overall that's my responsibility.  I would

2    do whatever we had to do.  Hopefully, we could

3    reach consensus, but if we couldn't, then I'd

4    have to do what I had to do.  Again, it was

5    premature.

6    Q.   All right.  After the January 15th

7    meeting, did you then schedule a departmental

8    meeting to discuss issues relative to

9    scheduling?

10   A.   Yeah.  Somewhere near the end of January,

11   I believe.  I don't know the exact date, it may

12   have been in the beginning of February.  We did

13   have a departmental wide meeting.

14   Q.   Were all officers that were members of the

15   department notified of the departmental wide

16   meeting to discuss scheduling?

17   A.   Yes.

18   Q.   Including Dori Beard?

19   A.   Yes.

20   Q.   Did she attend the meeting?

21   A.   No.

22   Q.   Now, prior to January 14th, 1997, had you

23   personally ever had any discussions with Dori

24   Beard relative to her feelings towards Officer

25   Kuklinski?

49

1    Q.    Would you have tolerated that type ---?

2    A.    I would have counseled somebody on that.

3    Q.    She said she was riding in the car one day

4    and an Officer Buckwash (phonetic) slammed on

5    the brakes and she hit the plexiglas of the

6    patrol car.  Did that occur while you were

7    there?

8    A.    No.  I wasn't aware of that one.

9    Q.    Now, she said that an Officer Nigretti

10   (phonetic) had called her an idiot in front of

11   four or five people and a verbal confrontation

12   between she and Officer Nigretti ensued.  Did

13   that incident occur at any time from February

14   of '96 on?

15   A.    No, that was just prior to my arrival.

16   Q.    Did you deal with that one?

17   A.    I would have dealt with it.  I dealt with

18   it in the sense that --- there's nothing I

19   could do about an incident that occurred

20   before.  I did talk to Officer Nigretti.  I had

21   passing conversation with Officer Beard on that

22   issue.  Officer Beard, if I remember --- if my

23   memory serves me correct, on the basis of that

24   one, either filed or was in the process of

25   filing a complaint.  I don't know if it was the

50

1    human relations commission or personnel issues.

2    That was one of those that was out there.  My

3    conversation to both of those individuals was

4    if that occurred when I was there, I would have

5    disciplined them both.

6    Q.  All right.  And did she do anything about

7    that after you had had that conversation with

8    Nigretti as well as her about this particular

9    complaint?

10   A.  Somewhere in '97 in mid year or ---.

11   Q.  You said '97.

12   A.  I'm sorry, '96.  It came to my attention

13   that she withdrew that complaint and was not

14   going to pursue that complaint.  She had said

15   something to me to the effect that she was

16   satisfied with the way things were going and

17   she felt she was getting a fair shake and she

18   was willing to do that.  I said that was very

19   good, I'm glad that this is occurring.  I was

20   looking forward to team work within the

21   department.  I thought that was a very good

22   step on her part in doing that, putting that

23   behind her and we could move forward.

24   Q.  Now, she also references in here something

25   about notes being written and about the amount



# RICCI & TANEFF

### ATTORNEYS AND COUNSELLORS AT LAW

*4*

Gregory J. Ricci
Paul Taneff*

4219 Derry Street
Harrisburg, PA 17111
Tel: (717) 564-5833
Fax: (717) 564-8683

February 5, 1997

LEONARD J SUPENSKI
CHIEF
PENNSYLVANIA STATE UNIVERSITY
DEPARTMENT OF SAFETY AND POLICE SERVICES
777 WEST HARRISBURG PIKE
MIDDLETOWN PA 17057

       RE: <u>EMPLOYEE-DORI L. BEARD</u>

Dear Chief Supenski:

     Our client, Dori L. Beard, has asked us to contact you relative to
certain matters concerning her employment at Pennsylvania State
University ("PSU").

     It is my understanding that the past policy of permitting officers
with the longest period of employment in the Department of Safety and
Police Services ("Department") to pick his or her assignment of
workdays on and days off and/or shifts has been abruptly and suddenly
changed. In view of the fact that Ms. Beard is the most senior office
in the Department by several years, the elimination of the shift
preference has adversely affected our client's work and home
environments.

     According to Ms. Beard, she was hired as a Police Officer
("Officer") by PSU in 1989. At the time of her hire, she was told and
assured by the then Chief, Charles Alesky, that shift assignments were
based upon seniority. Thus, through normal employee attrition any
Officer who remained in the Department's employ long enough would
eventually accrue sufficient seniority to enjoy the benefit of the
shift preference policy.

     In reliance upon Chief Aleksy's representations, Ms. Beard
accepted PSU's offer of employment in 1989. Because of the shift
preference policy, Ms. Beard has remained in the employ of PSU despite
the fact that her education, training and experience these past eight
years would have permitted her to seek employment elsewhere as a
police officer. In fact, over the past eight years many of her fellow
officers have left the Department to seek employment with municipal
police departments and other similar law enforcement organizations.
Apparently, many of the officers who go to work for PSU view their
employment in the Department as an apprenticeship to "real police
work". Despite the many opportunities that Ms. Beard could have
pursued as a woman and experienced police officer, she chose to remain
in PSU's employ because of the shift preference benefit that was
promised to her at the time of her hire and which would probably not
be made available to her by another employer.

*53*

* also admitted in Illinois

Letter to L.J. Supenski, Chief
Re: D.L. Beard
February 5, 1997
Page 2

According to Ms. Beard, you have advised her that management reserves the right to change past policy.  If at the time of her hire, such a reservation was explained to her, then I might agree that such a policy change is within the province of management, provided that proper and reasonable notice was given to Ms. Beard.  However, where a shift preference was made a condition of the employment and the employee relied upon the condition in accepting the employment, it is my opinion that PSU must honor this condition of Ms. Beard's employment.  For to do otherwise, constitutes a breach of the employment relationship.

Apart from what I believe is a breach of Ms. Beard's employment contract, this sudden and abrupt change in policy appears suspiciously discriminatory.  According to our client, you allegedly told her that the policy change was being made because it was unfair to the other junior officers in the Department.

Interestingly, this policy change wasn't announced until after Officer Philip Negretti left the Department to assume a position with the Swatara Township Police Department.  It is my understanding that Mr. Negretti was junior in seniority to Ms. Beard by about one year.  Thus, if my math is correct, Mr. Negretti had about seven years seniority with PSU prior to his departure in January 1997.

Just prior to Mr. Negretti's resignation and departure, our client was the only woman in the Department and the shift preference policy was alive and well.  Apparently, during Mr. Negretti's tenure the shift preference policy was not suspect.  I find it difficult to understand how a policy which was perfectly fine during Mr. Negretti's tenure has now become unpatently unfair to the Department officers, all of whom are now junior to Ms. Beard.  It is my opinion, that this change in policy is patently discriminatory and is intended to harm Ms. Beard, now that she is the oldest employee in the Department and the only woman officer.  On its face, it appears that the shift preference policy was entirely fair when the Department had one or any number of male officers who were senior to Ms. Beard.  However, now that Ms. Beard has surfaced as the most senior person in the Department, it now appears that the policy has suddenly become unfair.

Finally, I wish to mention to several other matters were discussed with Ms. Beard during the course of her consultation.  What she described to us may implicate an earlier EEOC complaint that was settled between our client and PSU almost two years ago.  Apparently there is a certain member of the Department whose conduct may be inappropriate and which may constitute a violation of the settlement agreement referenced herein.  Should this inappropriate conduct continue, I will recommend that our client revisit the settlement agreement with the Pennsylvania Human Relations Commission.

54

Letter to L.J. Supenski, Chief
Re: D.L. Beard
February 5, 1997
Page 3


Please be aware that I have discussed with Ms. Beard her rights and remedies relative to the shift preference problem in the context of a breach of contract action as well as a Title VII action under Civil Rights Act of 1964. However, neither our client nor, I am sure, PSU wishes to become embroiled in litigation of any sort. Rather, the shift preference problem can be easily resolved by continuing to honor the very condition upon which she accepted employment at PSU at the time of her hire.

I trust that you and the person copies on this letter will give this matter your most careful and thoughtful consideration. However, should you wish to discuss this matter with the undersigned, I would be more than happy to do so.

Very truly yours,

Paul Taneff

PT/lmp

cc: Dori L. Beard
    9148 Joyce Lane
    Hummelstown, PA 17036

    Sandra Jackson
    Department of Personnel
    Pennsylvania State University
    777 West Harrisburg Pike
    Middletown, PA 17057

    Pamela L. Kornasiewicz
    Department of Human Resources
    Pennsylvania State University
    120 South Burrows Street
    University Park, PA 16801-3857

    Linda R. Gonzalez
    Affirmative Action Specialist
    Pennsylvania State University
    201 Willard Building
    University Park, PA 16802-2801

55



PENN STATE

Harrisburg

Safety/Police Services

(717) 948-6232

777 W. Harrisburg Pike
Middletown, PA 17057-4898

# *All Officers/All Shifts*
# *Seniority*
# *January 23, 1997*

*With the recent departure of a veteran officer and the influx of newly-hired officers, the issue of "seniority" has once again surfaced, especially as it applies to assignments, leave, vacation, and details.  Be advised, the following is the Department policy with regards to seniority:*

o    *At this time, the ONLY consideration given to seniority is in the preparation of Work Schedules with respects to officers assigned to "permanent shifts."  This notwithstanding, when such schedulling has negatively impacted the Chief's ability to provide public safety on campus, management has historically assigned officers to work when and where needed. This will remain in effect unless or until changed.*

o    *As usual, management reserves the right to retain, modify, eliminate or change the existing leave schedules and shift assignments as well as to schedule and assign any and all members of the Department.  If and when changes are made,*

56

An Equal Opportunity University

management will provide both timely notice and a
transition process.

o    Management reserves and retains the right to
     assign its personnel to any and all patrol and non-
     patrol tasks as is deemed in the best interest of
     campus public safety.  A variety of factors (interest,
     knowledge, skill and abilities, experience, and
     demonstrated overall quality performance) will be
     considered in such assignments.  Seniority will not.

*If you have any additional questions, please see me for
clarification.*

L. J. Supenski
Chief

1989 SENIORITY -
DAVID BUCKWASH (W/M)
JOHN LESCISKO (W/M)
LOUIS LAGUNA (W/M)
DORI BEARD (W/F)
PHILIP NEGRETE (W/M)

1996 SENIORITY  PRIOR TO OFFICER PHILIP NEGRETE'S DEPARTURE -
DORI BEARD (W/F)
PHILIP NEGRETE (W/M)
MATTHEW HATHAWAY (W/M)
TIMOTHY RINE (W/M)
KEITH FARREN (W/M)
TONY KUKLINSKI (W/M)

JANUARY 26, 1997
APPROXIMATELY 2115 HOURS
OFFICER TIMOTHY RINE (W/M) CONTACTED MY RESIDENCE VIA TELEPHONE.
HE STATED HE WAS EXPERIENCING A "PROBLEM" I COULD POSSIBLY ASSIST
HIM WITH.  HE WENT ON TO STATE THAT HE IS "GETTING HEAT FROM THE
CHIEF (W/M) AND TONY (W/M) REGARDING THE MISSING MASTER KEYS".
HE CONTINUED BY SAYING "I KNOW YOU DON'T LIKE TONY (W/M) AND I WAS
WONDERING IF YOU POSSIBLY HID THE KEYS".  IMMEDIATELY I ADVISED
OFFICER TIMOTHY RINE (W/M) THAT I DID NOT APPRECIATE WHAT HE WAS
IMPLYING.  I TOLD OFFICER TIMOTHY RINE (W/M) THAT I MIGHT NOT LIKE TONY;
HOWEVER, I AM NOT "THAT STUPID".  THE DISCUSSION CONTINUED FOR SEVERAL
MINUTES.  OFFICER TIMOTHY RINE (W/M) ADVISED HE HAD TO DISCONTINUE THE
TELEPHONE CALL DUE TO THE FACT THAT HE WAS UTILIZING HIS CELLULAR
TELEPHONE.

JANUARY 27, 1997
1445 HOURS
I HAD AN APPOINTMENT WITH COWLEY MEDICAL ASSOCIATES
REGARDING MY HEALTH (CHEST PAIN, ANXIETY ATTACKS, DEPRESSION
AND HAVING THE FEELING I WAS "GOING TO HAVE A BREAKDOWN").
I ADVISED DR. DENISE MONTISANO THAT I WAS AGAIN EXPERIENCING
HARASSMENT AT MY PLACE OF EMPLOYMENT (PENN STATE HARRISBURG
DEPARTMENT OF POLICE SERVICES).  DR. DENISE MONISANO ASKED
IF SHE HAD TO COMMIT ME TO A MENTAL HEALTH FACILITY.
THE ABOVE WAS DISCUSSED AND IT WAS AGREED THAT I WOULD NOT
REPORT FOR WORK FOR THE NEXT TWO DAYS FOR THE PURPOSE OF
DISTANCING MYSELF FROM THE HOSTILE WORK ENVIRONMENT.

JANUARY 27, 1997
2015 HOURS
I CONTACTED PENN STATE HARRISBURG POLICE SERVICES AND INITIALLY
SPOKE WITH STUDENT PATROL OFFICER JOHN JERBI (W/M) WHO IN TURN
TRANSFERRED THE LINE TO CHIEF LEONARD SUPENSKI (W/M).  I ADVISED
CHIEF LEONARD SUPENSKI (W/M) THAT I WAS EXPERIENCING EITHER HEALTH
OR MEDICAL (I CANNOT RECALL WHICH TERM I USED)  PROBLEMS  AND I
NEEDED TO BE EXCUSED FROM WORK FOR THE NEXT TWO DAYS.  CHIEF
LEONARD SUPENSKI (W/M) REPLIED SARCASTICALLY "YOU HAVE A HEALTH
PROBLEM.  I HAVE NOBODY TO WORK YOUR SHIFTS.  I GUESS I WILL HAVE TO
CALL A PART-TIMER."  CHIEF LEONARD SUPENSKI (W/M) WENT ON TO STATE
"YOU CAN'T WORK A FULL DAY BUT YOU CAN COME IN FOR A MEETING.

0349

58

I NEED TO TALK TO YOU. I HAVE A MEETING SCHEDULED WITH YOU
AT ELEVEN O'CLOCK TOMORROW MORNING AND I EXPECT YOU TO BE
HERE."

JANUARY 27, 1997
AT APPROXIMATELY 2300 HOURS I HAD MY HUSBAND TRANSPORT
ME TO THE MILTON HERSHEY MEDICAL CENTER FOR THE PURPOSE
OF COMMITTING MYSELF TO THE PSYCHIATRIC WARD. I SPOKE WITH AN
EMERGENCY ROOM PHYSICIAN AND LATER A RESIDENT PSYCHIATRIST.
IT WAS DECIDED THAT I WOULD CONTACT MAINSTAY (731-4108)
TOMORROW MORNING FOR THE PURPOSE OF RECEIVING PSYCHOLOGICAL
COUNSELING.
AT 0200 HOURS I LEFT THE HOSPITAL EMERGENCY DEPARTMENT AND WAS
TRANSPORTED TO MY RESIDENCE.

JANUARY 28, 1997
APPROXIMATELY 1100 HOURS
I CONTACTED MAINSTAY VIA TELEPHONE. MAINSTAY REFERRED
ME TO THE MILTON HERSHEY MEDICAL CENTER PSYCHIATRIC UNIT
FOR COUNSELING.

JANUARY 28, 1997
APPROXIMATELY 1340 HOURS
I CONTACTED THE MILTON HERSHEY MEDICAL CENTER DEPARTMENT OF
COUNSELING VIA TELEPHONE AND SCHEDULED AN APPOINTMENT FOR
EVALUATION THIS THURSDAY AT 1300 HOURS.

JANUARY 28, 1997
1620 HOURS
CHIEF LEONARD SUPENSKI (W/M) CONTACTED ME VIA TELEPHONE. HE
STATED THAT HE RECEIVED MY HUSBAND'S MESSAGE AND IS RESCHEDULING
OUR MEETING FOR 1800 HOURS ON FEBRUARY 3RD. HE CONCLUDED THE
CONVERSATION BY ADVISING I WOULD RECEIVE A LETTER CONFIRMING
THE ABOVE.

JANUARY 28, 1997
1650 HOURS
I SPOKE WITH DR. DENISE MONTISANO VIA TELEPHONE. I ADVISED HER
ABOUT MY VISIT TO THE EMERGENCY DEPARTMENT. ALSO, I STATED THAT
MY ATTORNEY MENTIONED POSSIBLY FILING A WORKMAN'S COMPENSATION
CLAIM AND ASKED IF SHE WOULD BE WILLING TO ASSIST US. SHE TOLD ME
TO SIGN A RELEASE GIVING MY ATTORNEY PERMISSION TO OBTAIN MY
MEDICAL RECORDS. DR. DENISE MONTISANO WENT ON TO STATE THAT SHE
WOULD BE SUPPORTIVE AND ASSIST WITH FILING A WORKMAN'S COMPENSATION
CLAIM.

JANUARY 31, 1997
1630 HOURS
HUMAN RESOURCES REPRESENTATIVE DOROTHY GUY (B/F) CONTACTED ME VIA
TELEPHONE. I SPOKE WITH HER REGARDING CHIEF LEONARD SUPENSKI'S (W/M)
TELEPHONE CALLS AND CERTIFIED LETTER. ALSO, I ASKED HER IF SHE WAS AWARE
OF THE TELEPHONE CONVERSATION WHICH TOOK PLACE BETWEEN OFFICER TIMOTHY
RINE (W/M) AND I ON 01/26/97 AT APPROXIMATELY 2115 HOURS. SHE STATED SHE DID
NOT KNOW WHAT TRANSPIRED. I BRIEFLY EXPLAINED WHAT OCCURRED. I WENT ON
TO STATE THAT I AM IN THE PROCESS OF FORMALLY REQUESTING EEOC TO RE-OPEN A
COMPLAINT I FILED AGAINST PENN STATE HARRISBURG POLICE SERVICES AND LATER
WITHDREW DUE TO THE FACT THAT MY EMPLOYER (PENN STATE POLICE SERVICES)
PROMISED TO CEASE AND DESIST ALL FORMS OF HARASSMENT AND CREATE A

NON-HOSTILE WORK ENVIRONMENT.  I TOLD DOROTHY GUY I BELIEVED PENN STATE HARRISBURG POLICE SERVICES WOULD FOLLOW THROUGH WITH THE ABOVE; HOWEVER, I WAS WRONG.  ALSO, DOROTHY GUY WAS ADVISED I WILL BE FILING  A THIRD COMPLAINT AGAINST PENN STATE HARRISBURG POLICE SERVICES WITH THE PENNSYLVANIA HUMAN RELATIONS COMMISSION ON FEBRUARY 6, 1997.  DOROTHY GUY RESPONDED BY STATING THAT SHE MUST REMAIN NEUTRAL AND ADVISED ME TO "TAKE CARE OF MYSELF" PRIOR TO CONCLUDING THE TELEPHONE CONVERATION.

0351

60

MARCH 5, 1996
MEMO REGARDING MONTHLY SCHEDULES
"THE CURRENT ROTATION OF LEAVE DAYS WILL REMAIN IN EFFECT."
"OFFICERS WILL THEN PUT IN THE PERMANENT SHIFT THEY HAVE SELECTED
(THE CURRENT PRACTICE OF PICKING SHIFTS (TOURS OF DUTY) BASED ON
SENIORITY WILL REMAIN IN EFFECT."

MARCH 8, 1996
MEMO REGARDING NEW SCHEDULE ASSIGNMENTS
"I WILL OFFER THE SLOTS TO FULL-TIME OFFICERS ON THE BASIS OF
SENIORITY."
"I WILL CONTINUE THE POLICY OF "PERMANENT SHIFTS" (TOURS OF DUTY)
WITH THE PICK OF TOURS BASED UPON SENIORITY."
"SENIORITY WILL ALSO BE USED IN PICKING VACATION, HOLIDAYS,
SUBSTITUTE DAYS, PERSONAL DAYS AND "EXTRA DAYS".

MARCH 14, 1996
MEMO REGARDING ASSIGNING OVERTIME
"FIRST PICK OFFERED BY SENIORITY AS IS THE CURRENT PRACTICE."

JANUARY 2, 1997
SCHEDULE FOR FEBRUARY, 1997
DORI BEARD (W/F) ASSIGNED TO WORK 0700 HOURS TO 1500 HOURS.

JANUARY 12, 1997
APPROXIMATELY 1445 HOURS
I ATTEMPTED TO SPEAK WITH OFFICER TONY KUKLINSKI (W/M) REGARDING
THE SCHEDULING DUE TO THE FACT THAT I WAS ADVISED BY CHIEF LEONARD
SUPENSKI (W/M) HE IS NOW THE INDIVIDUAL RESPONSIBLE FOR SCHEDULING.
I ATTEMPTED TO VOICE MY CONCERNS AND OPPOSITION TO ROTATING SHIFTS
FOR THE FOLLOWING REASONS:
1.   I FINALLY REACHED MY GOAL OF BECOMING SENIOR OFFICER AND COULD
     PICK THE SHIFT I WANTED TO WORK.
2.   AS A RESULT OF MY FAMILY KNOWING I WOULD BE SCHEDULED PERMANENT
     DAYLIGHT, MY HUSBAND ACCEPTED A PROMOTION WHICH INCLUDED A
     SUBSTANTIAL RAISE IN PAY AND TRAVELLING.  ALSO, MY MOTHER
     SOUGHT PART-TIME EMPLOYMENT DURING THE EVENING HOURS.
     NOTE:  MY MOTHER PROVIDES FREE DAYCARE FOR MY CHILDREN.
3.   IF MY SCHEDULE IS SUBSTANTIALLY ALTERED THEN I WILL HAVE
     SERIOUS PROBLEMS LOCATING AND PAYING A PERSON TO WATCH MY 4
     YEAR OLD DAUGHTER SIX YEAR OLD SON.
OFFICER TONY KUKLINSKI (W/M) STATED "IT IS NOT FAIR TO THE OTHER
OFFICERS (W/MALES) IF YOU WORK PERMANENT 0700 HOURS TO 1500 HOURS."
OFFICER TONY KUKLINSKI BECAME ARGUMENTATIVE AND TOLD ME "THERE'S
THE DOOR" IF I DO NOT LIKE THE NEW SCHEDULING PROCEDURE.

JANUARY 15, 1997
1440 HOURS - 1540 HOURS
MET WITH CHIEF LEONARD SUPENSKI (W/M) REGARDING SCHEDULING.

61

JANUARY 14, 1997
MEMO REGARDING VACATION, EXTRA LEAVE DAYS
"IT WILL ALSO GIVE ME TIME TO ASSIGN OVERTIME TO OUR FULL-TIME
PERSONNEL (FIRST PICK OFFERED BY SENIORITY AS IS THE CURRENT
PRACTICE) SO YOU CAN EFFECTIVELY PLAN YOUR WORKING AND PERSONAL
LIVES."

JANUARY 14, 1997
MEMO REGARDING SHIFT SCHEDULES
"THE RECENT DEPARTURE OF OFFICER PHILIP NEGRETE (W/M) NECESSITATES
A CHANGE IN THE JANUARY 1997 WORK SCHEDULES.   WHILE THIS IS
SOMEWHAT DISRUPTIVE, IT IS NECESSARY TO PROVIDE PROPER COVERAGE TO
THE CAMPUS COMMUNITY."
"IN THE VERY NEAR FUTURE, WE WILL BE REVISING SCHEDULES.   I HAVE
ASKED OFFICER TONY KUKLINSKI (W/M) TO ASSIST ME ON THIS PROJECT.
I HAVE ASKED HIM TO SPEAK WITH EACH OF YOU AND SEE IF THERE IS A
CONSENSUS REGARDING THE TYPE OF SCHEDULING YOU PREFER.   IF THERE IS
NOT, I WILL IMPOSE ONE.   PLEASE WORK WITH HIM. I WANT YOUR INPUT."
"IF WE GO TO ROTATING SHIFTS, ALL OFFICERS WILL BE INCLUDED IN THE
ROTATION."

JANUARY 14, 1997
MEMO REGARDING "SCHEDULE CHANGE NECESSITATED BY PHIL'S RESIGNATION.
DORI BEARD (W/F) (SENIOR OFFICER) - SCHEDULE CHANGED FROM 0700
                                    HOURS TO 1500 HOURS TO NUMEROUS
                                    1500 HOURS TO 2300 HOURS
                                    SHIFTS.
TONY KUKLINSKI (W/M) (LEAST SENIOR OFFICER) - ASSIGNED TO 0700
                                    HOURS TO 1500 HOURS
                                    ON DAYS SENIOR
                                    OFFICER DORI BEARD IS
                                    IS ASSIGNED TO WORK
                                    1500 HOURS TO 2300
                                    HOURS

JANUARY 16, 1997
0900 HOURS - 1000 HOURS
MET WITH HUMAN RESOURCES REPRESENTATIVE DOROTHY GUY (B/F) REGARDING
SCHEDULING AND NUMEROUS PROBLEMS I HAVE BEEN EXPERIENCING WITH
OFFICER TONY KUKLINSKI (W/M) (FOR EXAMPLE: STATING IF YOU LOVE
ANIMALS SO MUCH THEN WHY DO YOU EAT MEAT?", DESCRIBING HOW A LATE
TERM ABORTION IS PERFORMED EVEN THOUGH I TOLD HIM I DID NOT WANT TO
KNOW, LISTENING TO OFFICER TONY KUKLINSKI (W/M) MOCK AFRICAN
AMERICAN PEOPLE, ETC.).

JANUARY 18, 1997
HUMAN RESOURCES REPRESENTATIVE DOROTHY GUY (B/F) MET WITH ME AT THE
DEPARTMENT OF POLICE SERVICES DURING MY TOUR OF DUTY (0700 HOURS TO
1500 HOURS) AND ASKED IF I WAS NOTIFIED REGARDING THE SCHEDULE
CHANGE.   I REPLIED "YES".  DOROTHY GUY (B/F) WENT ON TO STATE CHIEF
LEONARD SUPENSKI (W/M) COULD NOT ABRUPTLY CHANGE MY SCHEDULE
WITHOUT TIMELY NOTICE; HOWEVER, MANAGEMENT RESERVES THE RIGHT TO
CHANGE SCHEDULING.   PAST PRECEDENCE HAS NO BEARING REGARDING
SCHEDULING.

62

JANUARY 18, 1997
I WAS NOTIFIED BY OFFICER MATTHEW HATHAWAY (W/M) TO "CHECK SCHEDULE
FOR WEEK OF 22ND ON - IT HAS CHANGED FOR YOU!"

JANUARY 23, 1997
MEMO
ALL OFFICERS / ALL SHIFTS
SENIORITY
"WITH THE RECENT DEPARTURE OF A VETERAN OFFICER AND THE INFLUX OF
NEWLY HIRED OFFICERS, THE ISSUE OF SENIORITY HAS ONCE AGAIN
SURFACED, ESPECIALLY AS IT APPLIES TO ASSIGNMENTS, LEAVE, VACATION,
AND DETAILS. BE ADVISED, THE FOLLOWING IS THE DEPARTMENT POLICY
WITH REGARDS TO SENIORITY:"
"AT THIS TIME, THE ONLY CONSIDERATION GIVEN TO SENIORITY IS IN THE
PREPARATION OF WORK SCHEDULES WITH RESPECT TO OFFICERS ASSIGNED TO
"PERMANENT SHIFTS". THIS NOTWITHSTANDING, WHEN SUCH SCHEDULING HAS
NEGATIVELY IMPACTED THE CHIEF'S ABILITY TO PROVIDE PUBLIC SAFETY ON
CAMPUS, MANAGEMENT HAS HISTORICALLY ASSIGNED OFFICERS TO WORK WHEN
AND WHERE NEEDED.  THIS WILL REMAIN IN EFFECT UNLESS OR UNTIL
CHANGED."
"AS USUAL, MANAGEMENT RESERVED THE RIGHT TO RETAIN, MODIFY,
ELIMINATE OR CHANGE THE EXISTING LEAVE SCHEDULES AND SHIFT
ASSIGNMENTS AS WELL AS TO SCHEDULE AND TO ASSIGN ANY AND ALL
MEMBERS OF THE DEPARTMENT.  IF AND WHEN CHANGES ARE MADE,
MANAGEMENT WILL PROVIDE BOTH TIMELY NOTICE AND A TRANSITION
PROCESS.
NOTE:  VETERAN OFFICER - PHILIP NEGRETE (W/M)
       NEWLY HIRED OFFICERS - TIMOTHY RINE (W/M)
                              KEITH FARREN (W/M)
                              TONY KUKLINSKI (W/M)


JANUARY 24, 1997
INTERIM SCHEDULE
LESS SENIOR OFFICERS (WHITE/MALES) ASSIGNED 0700 HOURS TO 1500
HOURS ON DAYS SENIOR OFFICER DORI BEARD (W/F) IS WORKING.

JANUARY 23, 1997
MEMO REGARDING OFFICER ASSIGNMENTS / LIST OF DUTIES
OFFICER DORI BEARD (W/F) (SENIOR OFFICER) - CRIME PREVENTION
                                            PROGRAMS, CHILD
                                            SAFETY PROGRAMS, PRESS
                                            LOGS, ALARM TESTING AND
                                            DOCUMENTATION.

OFFICER TONY KUKLINSKI (W/M) - PROJECT WORK AS DIRECTED BY THE
     (LEAST SENIOR OFFICER)      THE CHIEF, TRAINING OFFICER FOR THE

                                 DEPARTMENT, CRIMINAL INVESTIGATIVE
                                 ASSISTANCE TO ALL OFFICERS (VIZ
                                 OFFICER NEGRETE'S DEPARTURE).

63

Date: Fri, 8 Mar 1996 16● EST
To: BEARD.DORI <DQB4@PSUADMIN>,
    NEGRETE.PHILLIP <PAN2@PSUADMIN>,
    HATHAWAY.MATTHEW <MAH17@PSUADMIN>,
    PICCOLO.VERA.MAE <VMF1@PSUADMIN>
From: LZS9@PSUADMIN      (SUPENSKI.LEONARD)
Subject: New Schedule Assignments

I am sending you the new,computerized schedule format for your information.
You will notice that one copy lists the leave/work schedule for all personnel,
full-time and part-time. The second copy lists all regularly scheduled days
off in the normal rotation (7-2-8-4). This represents your normal leave and
holidays.  It does not include your personal days and vacation.

Next week I will setup the schedules for April and May.  That will be the
official work schedule for PS-H Police Services.  When received, review,
initial and return to Vera Mae.

If there are any requests for ADDITIONAL time off (an extra day, personal day,
vacation day or days owed due to working holidays) that does not appear on the
schedule, these will be made to me IN WRITING.  Once the schedule is "posted"

PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      EMCC0000


no changes will be made unless personnel shortages
require me to fill in open shifts.  In that case, part-time officers will be
called FIRST.  If it is necessary to assign overtime to fill in a shift due
to the unavailability of part-time officers, I will offer the slots to full-
time officers on the basis of seniority or,if no takers, assign them.

A practice of informal swapping of leave/work days has crept in to the
leave schedulling process. This practice has been discontinued as of this
month.  I will assign ALL work days and leave time.  I will continue the
policy of "permanent shifts" (tours of duty) with the pick of tours based
upon seniority.  Seniority will also be used in picking vacation, holiday
substitute days, personal days and "extra" days.  These must be REQUESTED
in writing or by E-Mail and approved prior to being entered on the leave
schedule.  Officers working the 1st Shift (2300-0800 hours) will be rotated
after two months to either the daylight or evening tours in order to re-
integrate them into the campus community.

The addition of a computer-based scheduling system means that officers will
now well in advance when they are due to work and when they are off.  It
will stablize the work schedule and allow for proper coverage of the campus.
Finally, it will reduce our overtime costs possibly freeing up funds needed

PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      EMCC0000


or other critical purchases.

If you have any questions about how this will work, see me.
-----------( end of letter )-------------------------------------------

64

Date: Thu, 14 Mar 1996 16:08 EST
To: BEARD.DORI <DQB4@PSUADMIN>,
    NEGRETE.PHILLIP <PAN2@PSUADMIN>,
    HATHAWAY.MATTHEW <MAH17@PSUADMIN>,
    PICCOLO.VERA.MAE <VMF1@PSUADMIN>
From: LZS9@PSUADMIN      (SUPENSKI.LEONARD)
Subject: Vacation, Extra Leave Days

As stated earlier this month, I have computerized the scheduling process.
Schedules will be made two (2) months (60 days) in advance.  All requests
for days in April and May of 1996 should be made, in writing, now.

Because of the personnel shortage, I am reserving the use of overtime for
primary shift assignments, scheduled vactions, personal days and sick leave
situations.  These are days you are entitled to or are unplanned absences
necessitating coverage.  If you want the time off, SCHEDULE IT NOW.

By the end of the month, I hope to have two more part-time officers on our
rolls.  That should make it possible for you to take the time off you have
coming: in an orderly and predictable fashion.  It will also give me time
to "assign" overtime to our full-time personnel (first pick offered by

  PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward       EMCC000

                                          oas.psu.edu  07:49:54


seniority as is the current practice) so you can effectively plan your
working and personal lives.

Remember.  Get the days into me NOW. ----------------------------------------
 ------------( end of letter )-----------------------------------------------


  PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward       EMCC00

                                          oas.psu.edu  07:49:56

65                                                    0331



PENNSTATE
Harrisburg

Safety/Police Services

(717) 948-6232

777 W. Harrisburg Pike
Middletown, PA 17057-4898

*February 27, 1997*

*Mrs. Dori Beard*
*9148 Joyce Lane*
*Hummelstown, PA 17036*

*Re: Suspension of Police Powers*

*Dear Officer Beard:*

*Based upon a review of the Worker's Compensation form you have submitted (wherein you state that on 02-08-97 you were transported to the Hershey Medical Center and admitted to the Psychiatric Unit), along with the information you provided in the February 24, 1997 telephone conversation with Mrs. Dorothy Guy and I (wherein you advised that you where under the care of a psychologist and under medications which, in your words, "affect your mind"), I am hereby notifying you that, EFFECTIVE IMMEDIATELY, YOUR POLICE POWERS HAVE BEEN SUSPENDED. I am taking this step in the interest of public safety. Accordingly:*

    o    *You are ordered to immediately surrender your issued badges, your police identification card, your Pennsylvania Municipal Police Officer Training and Education Commission (MPOTEC) Certification Card, and your Department of Education Police Certification. I would suggest that you do this in person. If this is not possible, you are to call us and we will will have an official from the University pick these items up at your residence. If you wish to make other arrangements to surrender these items, you are to call me and I will work with you to arrange acceptance of these articles. Again, THESE ITEMS ARE TO BE SURRENDERED IMMEDIATELY UPON RECIEPT OF THIS NOTIFICATION.*

    o    *A "Change of Status" form will be sent to MPOTEC notifying them that your police powers have been suspended until the issue of your fitness for duty is evaluated and you are determined fit to return to duty without restrictions. In that event,*

66

notice to reinstate your certification will be sent to the Commission by the Department.

o *The Dauphin County Sheriff's Office will be notified* of the suspension of you police powers *and a request made to temporarily suspend your concealed weapons carry permit* until which time your case has been evaluated and you are determined fit to return to full duty without restrictions. When you are deemed fit to return to full duty, the Sheriff's Office will be notified to reinstate your permit.

During this time, *YOU ARE NOT TO*, a) *identify your self as a police officer with this University*, b) *carry a firearm under the Commonwealth provision which allow sworn police officers to possesss and carry firearms*, or c) *engage in any activity wherein any police power (detain, arrest, investigate, enforce regulations of the Commonwealth or this campus, etc.) may be envoked.*

*You are hereby ordered to comply with this order immediately upon receipt of this notification. Failure to comply with this order will, in addition to any legal sanctions, result in Department charges for insubordination being filed.*

Further, failure to abide by any request of the Dauphin County Sheriff's Office related to the surrender of your concealed weapons carry permit will, in addition to a legal sanctions, will result in Departmental Charges for insubordination being filed.

Nothing in this action is to be construed as, 1) a suspension from employment (you will remain an employee of Penn State while your medical case is being evaluated) or, 2) disciplinary in nature (such actions are subject to Department Rules and Regulations).

*This suspension will remain in effect until* which time a) *your physician/psychologist provides us with a full, unrestricted release to duty* and, b) *our physician/psychologist concurs with that opinion.* When both your medical providers and ours agree you are ready to come back to work in an unrestricted capacity, your police powers will be restored.

If you have any questions, please feel free to call me during regular business hours at 948-6234.

L. J. Supenski
Chief

67

0364

# PENN STATE
## Harrisburg

Safety/Police Services

(717) 948-6232

777 W. Harrisburg Pike
Middletown, PA 17057-4898

*March 5, 1997*

*Mrs. Dori L. Beard*
*9148 Joyce Lane*
*Hummelstown, PA 17036*

*Re: FAX Message to Mrs. Guy/Chief Supenski Dated 03-03-97*

*Dear Officer Beard:*

*I am in receipt of your FAX of 03-03-97 "Disaffirming Contract Signed of February 8, 1997." In this FAX you mentioned that this "contract" was placed in front of you "...after approximately 4 hours of interrogation and threats." Please be advised of the following:*

> *First, the complaint you made (through Officer Keith Farren and Mr. Herman Manning) against Officer Anthony Kuklinski is currently being investigated. Once you made that accusation and it came to my attention, it was incumbent upon me to investigate it thoroughly.*

> *Second, the complaint filed against you by Officer Keith Farren likewise is being investigated. And, for the same reason.*

> *Third, all of these actions will be handled as would any such inquiry. You were not treated any differently than any other individual involved. All were interviewed, at length. All interviews were recorded. Further, all individuals were advised not to discuss the case with anyone outside of the University (excluding family, legal representative, or anyone from the University empowered to handle such matters). Likewise, the*

An Equal Opportunity University

68

0365

directive given them not to do so was done both verbally and in writing.

Fourth, you were neither "interrogated" nor threatened. You were interviewed. Your interview was conducted the presence of a representative of Penn State - Harrisburg's Human Resources Office. Further, that interview was tape recorded and speaks for itself.

While your interpretation of what constitutes a "contract" is interesting, it has no applicability in this matter. You were given was a "direct order" wherein you were specifically told not to discuss this case with anyone other than those excluded in the order. A direct order is not a contract. A contract is a mutual transaction involving offer and acceptance voluntarily entered into. A direct order is just that, an order. An order is unilateral and based on the authority of supervisor to direct the actions of a subordinate. Although you may choose to disregard that order, doing so places you in a position to be charged with insubordination (i.e., disobeying a direct order).

The issue of your mental stability is not mine to consider. I am neither trained or qualified to make such clinical assessments. However, my authority to give you a direct order is not in dispute. What you signed was a receipt acknowledging that I had given you a direct order not to discuss this case. There was no contract. In light of the fact that the interview was recorded and conducted in the presence of a representative of the Human Resources Office, your signature at that point was only a formality. The order had already been given to you verbally and was witnessed. The order still stands.

Sincerely,

*L. J. Supenski*

L. J. Supenski
Chief

0366

69



# PENNSTATE
## Harrisburg

Safety/Police Services

(717) 948-6232
777 W. Harrisburg Pike
Middletown, PA 17057-4898

*March 5, 1997*

*Mrs. Dori L. Beard*
*9148 Joyce Lane*
*Hummelstown, PA 17036*

*Re: Contact at Official Address of Record*

*Dear Officer Beard:*

*On March 3, 1997 I received a faxed copy of a letter from your husband, Jeffery S. Beard, which stated the following. "All communications between University employee's [sic]...and my wife shall be conducted through certified mail or by utilizing her personal pager. Any calls to 566-3821, which is registered to Jeffery S. Beard and listed under "J. Beard" only, originating from the University itself or any employee thereof, will be reported to Bell Security until the termination date of your "Notice of Trespass".[sic].*

*You are still an employee of the Penn State - Harrisburg Department of Police and Safety Services. Your files list an address of record as 9148 Joyce Lane, Hummelstown, Pennsylvania 17036. Your telephone number is listed as 566-3821 (the Joyce Lane address). Your husband, Jeffery S. Beard, is listed as your next of kin and the individual to contact in an emergency.*

*Therefore, it is reasonable to infer that this is your residence. Until such time as you advise the Department that you personally reside somewhere*

other than this address, or apart from your husband, <u>it will consider this your address of record. Accordingly, if and when necessary, in the course of your employment with the Department, we will continue to contact you at this address, either in writing or by telephone.</u>

Your husband's "request" to contact you via your personal pager or certified mail is reasonable. We will endeavor to comply with this request unless time is of the essence and we have a need to contact you quickly and directly. In that case, we would do what we would do with any employee of the Department, place a telephone call to their residence.

For the record, <u>this is now the second time I have personally advised you that it is YOU who is employed by the University's Police Department.</u> While I would be most happy to work with you while you are under treatment, <u>University regulations require that certain employee/employer transactions be conducted through your supervisor. Therefore, my transactions in such matters will not be conducted through surrogates, be they your relatives or otherwise.</u> Certain issues can and will only be handled directly with you as the employee and I as your supervisor. You have been advised of this requirement by Mrs. Guy at least once, and twice by me. Again, I will be most happy to work with you but some business can only be handled between us.

I trust this clarifies the issue raised by your husband.

Sincerely,

L. J. Supenski
Chief

71

0368

# PENN STATE
## Harrisburg

Safety/Police Services

(717) 948-6232

777 W. Harrisburg Pike
Middletown, PA 17057-4898

March 14, 1997

Mrs. Dori L. Beard
9148 Joyce Lane
Hummelstown, PA 17036

Re: Missing PSU Harrisburg Police Badge/ D.O.E. Certification Card

Dear Mrs. Beard:

On March 3, 1997 at 1240 Hours, you father, Mr. Dennis Pletz, came to the Department of Police & Safety Services and turned in the controlled police equipment (badge, PSU DPSS Identification Card, MOPTEC Certification card) which you were directed to surrender when your police powers were suspended.

He explained that after talking with you, he was informed by you that you gave him two (2) badges. He recontracted us and informed us of the discrepancy in the number of badges. He then told us that his son-in-law, Jeffery Beard (your husband), put all of the items to be dropped off in his (your father's) truck on the morning of March 3, 1997. Mr. Pletz stated that he worked most of the morning and dropped off the items to us after Noon on that Monday. Your father stated he searched his truck and retraced all of his steps but could not locate the second badge. He said he would assume "total responsibility" for the missing badge

While your father has graciously assumed responsibility for the missing badge, he is NOT responsible for the missing badge, you are. It was

*your responsibility to turn in these items (these are controlled police property). It was your responsibility to either personally surrender these items or see to it that they were properly packaged and secured against loss or theft. According to your father, he received the items from your husband, Jeffery, who put the items in his vehicle that morning.*

*A police report was completed ("Lost or stolen badge" on report number 97-000179), and a NCIC/BOLO sent through Dauphin County Control.*

*While your husband, no doubt, was trying to assist you, it does not relieve you of your responsibility to ensure the equipment to be surrendered reached this Department intact. If you were unable to personally deliver these items, you should have personally had these items wrapped, secured, and properly prepared for delivery to this Department. Just having your husband put them in your father's vehicle, with no other thought of properly securing these items, is pure negligence on your part.*

*Accordingly, I am instructing you to make a diligent effort to locate the missing badge and return it to the Department. If you do, that will be the end of the issue. However, if you are unable to do so by the end of the business day on Wednesday, March 19, 1997, I will hold you personally responsible for the loss of the badge. A Written Reprimand for "failing to properly safeguard controlled police property" will be drafted and placed in your personnel file. You will be provided with a copy. That reprimand will then be taken into account with other pending performance issues when making a determination if a recommendation for dismissal is warranted. You will then be sent a bill for the replacement cost of the badge.*

*Please take this request seriously. I can assure you that the Department does. In the wrong hands, controlled police equipment (such*

**73**

Departmental badges) have great potential for misuse and serious harm to the public.

One more item of business. Your personnel records indicate that you received certification of police powers from the Department of Education (DOE). However, that certification card was not returned even though it was requested in the certified letter sent you. Please check your personal effects and return that card within the same time frame. Failure to return your DOE certification card will have the same consequences as failing to return your second badge.

If you have any additional questions, contact me at 948-6234.

Sincerely,

Leonard J. Supenski
Chief

cc:   Dr. James D. South
      Associate Provost/Administrative Operations
      Penn State Harrisburg

      Mrs. Dorothy Guy
      Office of Human Resources
      Penn State Harrisburg

      Mr. Dennis Pletz

      Employee Personnel File

0371

74



**PENN STATE**
**Harrisburg**

Safety/Police Services

(717) 948-6232

777 W. Harrisburg Pike
Middletown, PA 17057-4898

*March 15, 1997*

*Mrs. Dori L. Beard*
*9148 Joyce Lane*
*Hummelstown, PA 17036*

*Re: Missing Badge/ID Card*

*Dear Mrs. Beard:*

*Regarding you telephone calls to my office of 11:04 and 11:06 A.M. on Saturday, March 15, 1997, as this is not an urgent matter, per your request, I am responding to you in writing. Specifically:*

o   *Your personnel records indicate certification from the Department of Education. If either you do not have, or were never issued a certification card, please write me a letter to that effect and have it notarized. I will then place that letter in your file. That will be the end of that matter. I will check with the Department of Education to determine how to reissue that card but only when, and if, your MPOTEC Certification is restored. Your police powers continue to be suspended.*

o   *Neither of your telephone calls mentioned locating the missing badge, one of the primary concerns expressed in the letter recently sent to you via certified mail. You are still accountable for that badge. Please make every attempt to do so this week. Failure to locate and return that badge by the date specified (March 19, 1997) will result in the action referred to in my earlier correspondence.*

o   *With regards to your question, "What pending performance issues?", be advised that you were formally interviewed on February 8, 1997 regarding several issues of performance, including, but not limited to; having had numerous inappropriate conversations with coworkers in the workplace, bringing individuals from outside the agency into your personal differences with a coworker (which then brought that officer and the Department into disrepute), going through the personal files of coworkers without authorization, attempting to enter the private computer files of a coworker without permission, among others, including contradictory and deceptive*

An Equal Opportunity University

**75**

0372

statements during your interview as well as your demeanor during that interview. This list is not exhaustive. Several other performance issues are also being examined. These will be brought to your attention in the near future as will your future status as a member of this Department.

Additionally, the issue of your inappropriate personal conversations in the workplace with coworkers is strictly being examined as it pertains to your "performance" with the Department. Performance issues are not disciplinary issues. They pertain solely to whether or not your individual performance (i.e., how you go about your duties) meets the expectation of the Department or the University.

Accordingly, neither the University nor individuals involved in this complaint are precluded from seeking further action or individual redress of their complaint.

We will be contacting you in the very near future regarding the outstanding issues of our administrative inquiry.

Sincerely,

Leonard J. Supenski
Chief

cc:   Dr. James D. South
      Associate Provost/Administrative Operations
      Penn State Harrisburg

      Mrs. Dorothy Guy
      Office of Human Resources
      Penn State Harrisburg

76

---

**DAVE STORMER, 02:44 PM 10/17/97, Dori Beard**

X-PH: V4.1@r02n08
From: "DAVE STORMER" <stormer@safety-1.safety.psu.edu>
Organization: University Safety - Penn State Univ
To: mxj4@psu.edu
Date: Fri, 17 Oct 1997 14:44:16 EST
Subject: Dori Beard
CC: HARMON@safety-1.safety.psu.edu, KVS3@psu.edu, RLM1@psu.edu
Priority: normal

Peggy what is the status of Dori Beard. Do you and/or Dorthy Guy have
the report from Hostettler yet? Is is time for our attorney to talk
with her attorney?
I would like a weekly update on her status as she has been off for so
long and we are anxious to get her back or the position filled.



77

Date: Wed, 7 Feb 1996 09:52 EST
To: SOUTH.JAMES <JDS1@PSUADMIN>
From: SGJ2@PSUADMIN      (JACKSON.SANDRA)
Subject: leonard supenski
In-Reply-To: The letter of Tue, 6 Feb 1996 16:21 EST

Jerry, I already have shared with Dori and Vera Mae which you probably know
from the calls yesterday.
One matter troubles me however in this transition is the matter of Dori's
perception of unit and  the run in she had with Phil that has not been
responded to.
Dori is aware that Supenski has met with Phil and Matt but has not met with
her. Now he has schedule a meeting with the 3 of them.  He has not met
individually with Dori so I know he has a very distorted view of the
situation.
I even had a distorted view of the incident between Dori and Phil until I
spoke with Dwight Smith.  He said from the information I gave him that Phil
really handled the report ... poorly.  This needs to be shared with Leonard.
He should be appraised of the history with Dori so he does not step into
a land mine and cause all of us problems with the situation.
Also your notice made it seem like there was a problem with Business Services
budget when we talked yesterday it was about problems with the central budget.

78

EXHIBIT
50

Date: Wed, 7 Feb 1996 09:52 EST
To: SOUTH.JAMES <JDS1@PSUADMIN>
From: SGJ2@PSUADMIN     (JACKSON.SANDRA)
Subject: leonard supenski
In-Reply-To: The letter of Tue, 6 Feb 1996 16:21 EST

Jerry, I already have shared with Dori and Vera Mae which you probably know
from the calls yesterday.
One matter troubles me however in this transition is the matter of Dori's
perception of unit and  the run in she had with Phil that has not been
responded to.
Dori is aware that Supenski has met with Phil and Matt but has not met with
her. Now he has schedule a meeting with the 3 of them.  He has not met
individually with Dori so I know he has a very distorted view of the
situation.
I even had a distorted view of the incident between Dori and Phil until I
spoke with Dwight Smith.  He said from the information I gave him that Phil
really handled the report ... poorly.  This needs to be shared with Leonard.
He should be appraised of the history with Dori so he does not step into
a land mine and cause all of us problems with the situation.
Also your notice made it seem like there was a problem with Business Services
budget when we talked yesterday it was about problems with the central budget.

79                                                            50

Tony,
If there is anything I
should change, let me know.
It's on this disk as a'beard

80

EXHIBIT
26

03/21/1997  10:45    7176524    GUY                                      PAGE  01

Date:   March 21, 1997

To:    Jerry South

From:  Dorothy Guy

RE:    Update on Various Assignments

5.      Dori Beard:    Spoke with Dr. Tim Weyandt yesterday. He was at a conference in
Baltimore but wanted us (Jolaine and I) to contact him there after receiving his message. TW has
a copy of the FMLA Cetification Form and advised the next step is for us to have Dori sign an
authorization for release of medical information. I have that form and will call Dori to advise I am
sending it to her for her signature and to have her return it to us. This is just a thought, but Dori
may try to hold us hostage by not signing the form until/unless she receives copies of the
tapes/sworn statements. This is just a thought. TW advised that if she does sign the form, it gives
us access to information regarding her Workers' Comp claim.

81

EXHIBIT
11

6.    Dori Beard:    Spoke with Bob Maney and Jolaine regarding the seven separate letters that Len wants to send to Dori. Final Analysis: None of the seven letters alone or collectively are grounds for major acts of misconduct which can result in summary dismissal. While they are all grounds for discussion on performance, there's not enough there to move to dismiss her. The fingerprint piece was critical, but when that report came back as 'unable to prove or disprove,' that diminishes the likelihood that any of the issues related to keys will be substantiated. RM advised that the critical question would be how we have dealt with prior incidents similar to these and why it has taken so long to act on a **summary** dismissal.

harmon tom, 03:50 PM 11/18/99 -0500, Dori Beard

To: harmon tom
From: "Robert L. Maney" <rlm1@psu.edu>
Subject: Dori Beard
Cc:
Bcc:
Attached:

John Rideout sent a letter dated Aug 30, 1999 to Dori Beard saying that she was terminated.  As of this moment, she has not been terminated.  I understand that John was made aware of this by our Benefits Division today because of a retirement question that arose.  I wanted you to be aware in case you hadn't heard.  Needless to say, this is not helpful for us.



83

# PENNSTATE



Department of University Safety          (814) 865-1864

The Pennsylvania State University
Eisenhower Parking Deck
University Park, PA 16802-2116

October 4, 1999

Ms. Dori Beard
9148 Joyce Lane
Hummelstown, PA 17036

Dear Ms. Beard:

Thank you for returning the document that was inadvertently sent to you with other
correspondence.  I appreciate your concern.

Sincerely yours,

Thomas R. Harmon
Director, University Police

bc: R. L. Maney

84

August 24, 1999


Employment & Compensation Division
120 South Burrows Street
University Park, PA 16801


To Whom It May Concern:

On July 25, 1999 you advertised the position of Police Service Officer Penn State Harrisburg in
the Sunday Patriot News.  On July 29, 1999 I faxed my resume to the Employment &
Compensation Division.  On August 2, 1999 an employee of the Employment & Compensation
Division signed for a certified letter which contained my resume.  Enclosed is a photocopy of the
receipt.

As per your request, I went to your physician and was cleared to return to work.  As of this date,
I have not been contacted by any Penn State employee.  I am requesting to return to my position
as a Police Service Officer at Penn State Harrisburg.  If I do not receive a response from Penn
State University within 15 days of the date of this letter I will assume that the position has been
filled and will consider this an act of retaliation against me for filing previous Human Relations
Complaints and a Workmans' Compensation Claim.  If I am not reinstated I will again be forced
to go to the Pennsylvania Human Relations Commission and file a new complaint regarding this
matter.



Sincerely,



Dori Beard

0454

Z 273 829 860

PS Form 3800, April 1995

US Postal Service
Receipt for Certified Mail
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

| | |
|---|---|
| Sent to EMPLOYMENT & COMPENSATION DIV | |
| Street & Number 120 S. BURROWS ST | |
| Post Office, State, & ZIP Code UNIVERSITY PARK, PA 16801 | |
| Postage | $ 33 |
| Certified Fee | 140 |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | 125 |
| TOTAL Postage & Fees | $ |
| Postmark or Date 10/19 US 2.98 | |

HARRISBURG

86

0452

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *Return Receipt Requested* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

EMPLOYMENT & COMPENSATION Div.
120 S. BURROWS St.
UNIVERSITY PARK, PA 16801

4a. Article Number
Z 273 829 860

4b. Service Type
☐ Registered        ☑ Certified
☐ Express Mail      ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery
8/27/99

5. Received By: *(Print Name)*

8. Addressee's Address *(Only if requested and fee is paid)*

6. Signature: *(Addressee or Agent)*
X *[signature]*

PS Form **3811**, December 1994    102595-98-B-0229    Domestic Return Receipt

Is your RETURN ADDRESS completed on the reverse side?

---

PS Form 3800, April 1995

Postmark or Date

HARRISBURG

US $ $2.98

TOTAL Postage & Fees $

Return Receipt Showing to Whom & Date, & Addressee's Address

Return Receipt Showing to Whom & Date Delivered   1 25

Restricted Delivery Fee

Special Delivery Fee

Certified Fee   1 40

$   33
Postage

UNIVERSITY PARK, PA 16801
Post Office, State, & ZIP Code

120 S. Burrows St
Street & Number

Employment & Compensation Div
Sent to

Do not use for International Mail *(See reverse)*
No Insurance Coverage Provided.
**Receipt for Certified Mail**
US Postal Service

Z 273 829 860

87                                    0453

# STROKOFF & COWDEN, P.C.

ATTORNEYS AT LAW
132 STATE STREET
P. O. BOX 11903
HARRISBURG, PENNSYLVANIA 17108



ELLIOT A. STROKOFF
JAMES L. COWDEN
CATHI L. RADNER*
CHARLES M. COURTNEY

* Also Admitted in Maryland

TELEPHONE
(717) 233-5353

TELECOPIER
(717) 233-5806

January 7, 1998

Joseph C. Phillips, Esquire
Peters & Wasilefski
2931 North Front Street
Harrisburg, PA  17110

> **RE:  Dori Beard v. PSU**
> **Your File No. 1-2302**

Dear Joe:

I reviewed your offer of December 18, 1997, with my client. Not surprisingly, she directed me to reject your offer. Ms. Beard is unwilling to compromise her workers' compensation case, Human Relations action, as well as other substantial rights for the paltry sum of $25,000. Frankly, given the amount of time Ms. Beard has now been out of work and Penn State's unwillingness to return her to employment in any capacity, I think the offer is ridiculously low.

I discussed this matter at length with my client, and she did indicate a willingness to sign off on the non-workers' compensation related matters, foremost of which is the Human Relations complaint which is pending; however, she wishes to be adequately compensated for everything she is giving up. Ms. Beard has authorized me to extend an offer to you to settle this claim for $100,000. This would include her attorney fees and would include a withdrawal of her Human Relations complaints, resignation from Penn State and a waiver of the right to file any additional actions related to this matter. In addition, Ms. Beard requires payment of her work-related medical bills through the date of the settlement and reimbursement of litigation costs related to the workers' compensation claim.

*88*



Joseph C. Phillipes, Esquire
Page 2
January 7, 1998


        I hope this offer will be acceptable to your client.  If
it is not, we can proceed with taking Dr. Hostetter's deposition so
that we can move forward on the workers' compensation claim.

                        Very truly yours,


                        Cathi L. Radner

CLR/dms

cc:  Ms. Dori Beard



THE PENNSYLVANIA STATE UNIVERSITY
PSU @ HARRISBURG
INTER-OFFICE CORRESPONDENCE

DATE:   February 27, 1996

FROM:   Leonard Supenski - Chief, Police and Safety Services

TO:     Officer Dori Beard - Police Services Officer

SUB:    OFFENSIVE MATERIAL ON COMPUTER

Yesterday you brought me a disk and a print out of comment placed
in the "score box" section of three (3) computer games installed
on Police Services computers. These comments were discovered by
you while working this past weekend. These comments are, without
doubt, sexual in nature and offensive.

In direct response to the information you provided, I requested
that Ms. Terry Majlik, Coordinator of Computer/Information
Services, come to the Police Services facility and do two (2)
things:  check the directory and files to see if it were possible
to discover and to remove the games from the hard disk. She was
not able to do the former. She did remove the games.

It appears, from my inquiry, that the computer games were
installed some time ago with the express or tacit permission of
the former manager of Police and Safety Services. If not
actually approved, the practice was allowed to continue unabated.
Now that I am aware of it, that practice will stop. As of this
date I have written Directive 9603 prohibiting computer game
installation and use on Police Service computers. All such
programs have been removed from our computers. They do not pay
us to play games.

Further, I have written Directive 96-02 which mandates the
removal of any sexually offensive material from the Police
Services facility.

The gist of your complaint was that 1) the comments that were
found were offensive and 2) that you believed the comments were
directed at you. As to the first, I agree. The comments are
offensive and action has been taken to remove them. A directive
(96-2) emphasizing the inappropriate nature of such conduct (and
the consequences if it continues) was issued. The second part of
your complaint - that the comments were directed towards you - is
not at all obvious from the facts. I have determined that the
playing of computer games was a long standing practice. Many of
the officers (yourself included) played these games. Many of the
student patrol members (male and female) played these computer
games. The officers room (where the computer you found the
comments on is located) is never locked. It is readily
accessible to all sworn full and part-time officers as well as

anyone from Student Patrol who has access to the office.   3)
While you no doubt perceive such comments to be directed at you,
there is no proof that this is the case.   The fact that the
comments (in the "box score" section of three of the games) were
erased/deleted between the time you first observed them (and
copied it to disk) and brought this to my attention could be
construed, with equal validity, to be something they (other
users) did not want you to see.   (Given the history of your
problem, I can see why you would view it as personal.

In any event, the original act of displaying such lewd comments
on the computer, whether or not they are directed at you, is
sufficient to require on inquiry.   That, I have begun.   As I will
make inquiry of everyone who had access to the computer and the
games, this may take some time.   In the meantime, the two
directives issued today are an indication that I do not take
these issues lightly.

Without solicitation today, one employee and one student have
told me (one day after you brought the incident to my attention)
all about the details of what happened.   You do yourself no favor
by letting various and sundry people in on "the details".   You
reduce the significance of such conduct if you bring it down to
the level of casual conversation.   It becomes grist for the rumor
mill and a source of amusement for others rather than the serious
breach of policy it is.   Accordingly, I am requesting that you
limit your discussion of this matter while on campus to the
appropriate Human Resources representative or myself.   You are
free to discuss the issue with your attorney or any EEO
representative you contact outside the agency.   The problem is
that it is difficult to treat this as a serious issue if you
yourself handle it in such a casual and off handed manner.

I will get back to you when I am finished with my inquiry.


                                        L. J. Supenski
                                        Chief
                                        Police/Safety Services

91

Anthony M. Kuklinski, 03:2●●M 4/22/97 +0000, Tom Harmon Visit●             Page 1 of 2

X-Sender: amk14@email.psu.edu
X-Mailer: Windows Eudora Version 1.4.3
Date: Mon, 21 Apr 1997 20:26:54 -0400
X-PH: V4.1@r02n02
To: djg1@psu.edu
From: amk14@psu.edu (Anthony M. Kuklinski)
Subject: Tom Harmon Visit
Cc: topshield@aol.com



                    Just to keep
up to date ,
* spoke to Tom Harmon and gave him the scenario, Dori Beard caper past
history present history-

* he doesn't believe all of the charges and incidents involving this
employee, I think he finds it hard to believe  what she is capable of!

* will provide him with a copy of same as well as personnel file.

* doesn't feel there's enough to charge her with the theft- believes too
sketchy.
   will expand on this later

* advised him that I am perfectly capable to conduct this investigation

* I told him that I am going to install a camera and have DB's copier #
re-activated to
  catch her in the act.  Feels its a good idea

* asked me what kind of cop Beard is- was.....  I was sketchy ...didn't want
to say too much

* they are not going to pursue any further at this point.

* I don't know why everyone feels that it's a bad idea for me to continue
with this matter,

Do they fear retaliation?

After all wasn't I a victim of her nonsense - she started all of the
problems, not me.

I have been in this business too long , ( and my track record reflects this)
to lower myself to that type of child's play.

What do you think of the letters, return of equipment and restrict to campus
issues?

Sorry for venting!

# MEMO

*HOSTILE WORK*

*Tony's* **CONFIDENTIAL FILE**

**To:** Tony Kuklinski
**From:** Student Patrol
**Subject:** Info Regarding Officer Beard.
**Date:** April 21,1997

On the evening of April 21, 1997, I was visited by Putong Ratanamayala the female student who is a former student of Penn State Harrisburg, who is now living with Officer Beard. Pooh asked me directly if I had any knowledge of what went on in the Office concerning Officer Beard. I told her I had no specific knowledge of what transpired in the Office or knowledge of what is going on now. She then asked me if I wanted to know what happened to Officer Beard. I told her "go ahead tell me if you want, the short version only". At no time did I ask her any questions about it. She proceeded to tell me that Officer Beard is almost ready to return. She did tell me that Officer Beard was put in the hospital for four days. I was also told that Officer Beard was accused of being a thief, touching male Officers, describing sexual acts, positions, and inappropriate conversions. She also told me that Officer Beard claims that the Officers lied to get at her and the only Officer that didn't say anything against her was Matt Hathaway (I am assuming). She also described Kristen McGlennen as being a bitch with several other colorful words concerning Officer Beard about things that had happened in the office. I was also told about letters and phone calls made to Officer Beard by the Chief and the University concerning this office and this situation. It was also mentioned about the letter stating that Jeff Beard, Dori's husband is not allowed on campus under any circumstances. I was also questioned about the fact on how Tony Kuklinski was made Acting Chief of Police Services. My response to this was that decision was made higher up in the hierarchy University to make Tony the Acting Chief in the interim.

I also stated out right several time when she asked me questions that I made my presence in the Office was limited to times that I was working. I also stated that when I was working my time in the office was very limited and stayed out of the office, so as to restrict my knowledge of anything concerning the dealings with Officer Beard.

*(handwritten left margin)* Len's gone now she's ualy

*(handwritten right margin)* Back line to him, finds someone else on fishing trip ... not very hard to see where this is going

*(handwritten, circled)* 5

*(handwritten bottom)*
1 - how can she be able to return to duty

2 - now that Len is gone she's starting her old tricks.

3 - Beard has been directed not to discuss this issue. Violation of a direct order — Insubordination is termination.

4 - If we concede it will be an admission

*(handwritten bottom left)* JH

CONFIDENTIAL

FILE

"Officer" Beard has now resorted to using students or affiliates of this university to gather information for her defense. The morales involved in this type of motivation should be analyzed.

How can anyone that stoops to this level be trusted with being a police officer! This is positively ludicrous.

bring on part of the university.

There should be no margin for concession

Action should be immediate, without discussion, period.

(3) Look at the position she is setting me up into as acting chief. → she comes back she is untouchable!

94

X-Sender: amk14@email.psu.edu
X-Mailer: Windows Eudora Version 1.4.3
Date: Sat, 19 Apr 1997 19:07:30 -0400
X-PH: V4.1@r02n02
To: djg1@psu.edu
From: amk14@psu.edu (Anthony M. Kuklinski)
Subject: Dori Beard
Cc: jds1@psu.edu



Greetings:

This memorandum is to inform you that on April 15, 1997 at 1930 hrs, I was in the police station.

Dori Beard came into the police station and requested to remove her briefcase from her locker. I permitted her access to the locker room.

Her visit lasted 3 minutes. In that time she removed her briefcase as discussed and approved by me, however after she left I learned that she removed a metal patrol office binder , which is property of PSU PD. She further removed a crimes codes which is property of PSU PD as well as mail which was sent to her from varied state agencies which is to be used in performance with her duties as a police officer at PSH.

Initially , I did not know that she removed the items and further I did not give her permission to remove the items. This was in the presence of Officer Hathaway who has provided a memorandum concerning this matter.

I have also learned that she made a visit to the Lions Den . I have a memo concerning that matter as well.

I guess my questions are(food for thought)

1- If Dori Beard is well enough to come to the office, drive a motor vehicle, pick up her mail, spend time with other staff members , converse with students, knowing that officers have seen her on campus is it not time to have our doctors look into the fact that she is in fact healed.

2- shouldn't she be able to come back to work so we can proceed with the matter involving inappropriate actions of an employee.

3- If she can handle the stree of confronting Kuklinski, Farren, Hathaway , and Student Patrols one would think that she should be capable to report back to work.

4-I believe that she is under a direct order not to discuss the matter with anyone.

The information I am receiving is that her matter - suits, actions, etc,

Anthony M. Kuklinski, 02:07●● 4/20/97 +0000, Dori Beard   ●   Page 2 of 2

is the talk of the town.

On April 19, 1997 I received a memorandum from student patrol member John
Jerbi and Police Officer Matthew Hathaway that Dori Beard was on campus
during the
Spring Fling- Rite To Spring Affair.

She is making a mockery of the Penn State System as discussed earlier.

We need to address this issue immediately.

Tony.

REPUTATION

LJSUPENSKI@aol.com, 01:29 AM 4/18/97, Dori Beard                    1

From: LJSUPENSKI@aol.com
X-PH: V4.1@r02n07
Date: Fri, 18 Apr 1997 01:29:37 -0400 (EDT)
To: vmf1@psu.edu
Subject: Dori Beard

FYI your Email to me, I would suggest the following:

The incident of her coming to Police Services should be reported on a memo to
Dr. South.  A copy of that memo should go to Dorothy Guy with a memo from
Tony asking the following question.  "If Officer Beard is healthy enough to
come back to the office, pick up her mail, and spend time in the Lions Den
with students, knowing the officers have seen her and are on this campus, is
it not time to have our doctors ask her doctors if she is indeed 'healed'
sufficiently to be told to come back to work?"  If she can take the stress
of the confronting officers Farren, Hathaway and Kuklinskiat the office, why
can't she come back to work?

Also, as to the conversation in the Lions Den, if it involved anything about
the cases we are investigating, then that is a violation of a direct order
not to discuss the case with anyone.  that order is still in effect.  If her
conduct amounts to a violation, then that should be documented.  Failure to
obey a direct order is, in itself, sufficient to dismiss.

Also, ask Tony to call the Chief of County Detectives.  One of his
investigators, Joe Shoemaker interviewed Dori on another issue about a month
ago.  I heard that she complained about what Penn State had done to her in
front of Joe and a female intern.  If so, that should be documented
(statement from Shoemaker) and used as a basis for a charge of disobeying a
direct order not to discuss the case with anyone.  If verified, that should
go up as a "charge" with a recommendation to dismiss.

Thanks for setting the record straight for me.  You are right...she only
wishes i left because of her.  Word should get out that I will come back at
the request of Penn State in any future action against her.  If you hear
anymore such talk let me know.  I would be most happy to send her a letter
setting the record straight.

See ya.

Len



Topshield@aol.com, 09:22 PM 4/18/97, Officer Beard                          1

From: Topshield@aol.com
X-PH: V4.1@r02n07
Date: Fri, 18 Apr 1997 21:22:19 -0400 (EDT)
To: amk14@psu.edu
cc: jds1@psu.edu
Subject: Officer Beard

Got Emails and calls from Vee, Dr. South and Dorothy.  I heard about the
copying incident  with Officer Beard.  Also, about her removing printed
crime prevention materials from the Office.

Good that you did an electronic audit of the Dori account on the copier.
However, I strongly suggest you do the following:

1.  Match days copy made to her sick slip time.  When did she come in:"?  How
many days?  Were any of these days she was supposed to be under medication,
etc.

2.  Do a total costing out of the copy work (i.e., how many pages, average
cost per page, etc.) and come up with a total.  She was no supposed to be
here (stress ) from February 8th to the present.  Her police powers were
suspended and she would have neither the authorization to come here and copy
anything, nor anything related to the Department to copy.  Therefore, all
copies made must be presumed for her own personal use.  According to the
R&Rs, no officer is allowed to remove files from the University (copying is
the same as taking).  She should be charged for this (disciplinary action).
Also, when the amount of copies is costed out, you can...and
should...proceed to charge her with a theft of services.  We should proceed
with the District Judge and request that reimbursement (restitution) be apart
of the disposition as provided for in the Pennsylvania Criminal Code.  It is
time to stop playing around with her. I will make that recommendation to Dr.
South and Dorothy.  You should talk to Jerry about that course of action.
Her action in this instance only lends additional credibility to the charges
that she rifled files and entered desk drawers, etc.

2.  Removing materials sent to the Department but forwarded to her as crime
prevention officer is the same as a theft.  The materials are for the
department's use, not her personal use (e.g., I left what I ordered or had
sent to me at the department for its use).  Take a written statement from
Officer Hathaway who saw her take these materials.  Then, immediately send
her a letter demanding that she return any and all such materials within 24
hours of the receipt of the letter or face both disciplinary and criminal
charges.  If she returns the items, she should still be
charged departmentally.  If she does not, she should be charged both
criminally and departmentally.

Printed for amk14@psu.edu (Anthony M. Kuklinski)                            1

98

| 2

3. I sent word to you through Vee that you need to contact Det. Joe Shoemaker from county detectives.  He heard Dori discuss this case when he interviewed her on another issue.  He should provide a written statement to that effect.  When he does, she should be charged (disciplinary) with violating a direct order not to discuss this case.  Failure to obey a direct order is tanamount to insubordination.  You should recommend  to Dr. South that she be dismissed for this infraction.

4. Also, I am told that Student Patrol member Matt Fischer heard her discuss this case with a student and possibly, an employee, in the Lion's Den recently.  If that is the case, interview the student with the nickname " Poo" (Vee knows who she is) and the cafe worker ,Frank I believe.  Then interview Matt.  If any of those persons heard her discuss this case, she should be charged (again) with violation of a direct order and a recommendation for dismissal for insubordination should be forwarded to Dr. South.

5.  She should be requested to take a polygraph exam regarding the missing master keys.  You and Tim (before he leaves) should take the test.  When the new Chief comes in, he should request that she volunteer to take the test.  Failing that, she should be ordered.  If she refuses, she should be charged with disobeyal of a direct order and a recommendation to dismiss her made to Dr. South.

You have already taken extra steps to increase the security of the place.  That is good and long overdue.  I would take the extra step of sending her a letter stating that since she is off due to medical reasons, and since her police powers were suspended, she would be prohibited to visit the campus unless she FIRST clears this with the Chief/OIC and Dorothy Guy.  I believe we (myself included) have somewhat underestimated Mrs. Beard gile.

I have a telephone conference with Dorothy, Bob Maney, et al this coming Monday at 1300 hours.  I will reinforce this with them at that time.  I will also speak to Boband see exactly what type letter he wishes me to draft regarding my recommendations to terminate her.  I will Email those if it is quicker.

If you have any further information for me before Monday at 1300 hours, either fax or email it to me for the telephone conference with Maney et al.

You can Email me care of this address or "Topshield@aol.com" I check them both daily.


L.J.S.

X-Sender: lzs9@email.psu.edu
X-Mailer: Windows Eudora Version 1.4.3
Date: Thu, 20 Feb 1997 10:13:37 -0500
X-PH: V4.1@r02n05
To: djg1@psu.edu
From: lzs9@psu.edu (Leonard Supenski)
Subject: Officer Beard/Employment

*REPUTATION*

Been trying to reach you today to share some news regarding Dori Beard.  I
was told that Channel 27 (Harrisburg) News ran a piece last evening on the
Humane Society of Dauphin County wherein they announced, among other things,
that they were hiring two full time law enforcement officers on their staff:
Dori Beard being one of the two.

Of course, word of this went through the local police community like crap
through a goose and my phone has been ringing off the hook.  Also word of
this has now reached most of my folks.  To be frank, they look at this with
mixed feelings.  If it means she is leaving, no one will be too upset.
However, they are even more conviced that she has screwed the system again
and has come out on top.

Meanwhile, officially anyway, we do not know that she has been given another
full time job, we do not know the nature of her illness, we have not been
told whether or not she intends to resign, etc. etc. etc. (or as ole Yul
would say, "Is a puzzlement").

Call when you get in.

Leonard

**PART I          SUBMITTED TO**

SP 4-212 (7-91)

PENNSYLVANIA STATE POLICE
## REQUEST FOR FORENSIC ANALYSIS

REPRODUCTION

NAME OF LAB/TROOP
- [ ] BETHLEHEM
- [ ] ERIE
- [ ] GREENSBURG
- [x] HARRISBURG
- [ ] LIMA
- [ ] WYOMING
- [ ] TROOP _____ I.D. UNIT

TYPE OF ANALYSIS
- [ ] AFIS
- [ ] BALLISTICS
- [ ] CHEMISTRY
- [ ] DOCUMENTS
- [x] LATENT PRINTS

**FOR LAB USE**

DATE/TIME RECEIVED     LAB NO.

RECEIVED FROM

RECEIVED BY          EVIDENCE STORAGE

**FOR TROOP USE**

DATE/TIME RECEIVED     TROOP NO.

RECEIVED FROM

RECEIVED BY          EVIDENCE STORAGE

1. SUBMIT REPORT TO (INVESTIGATOR'S AGENCY ADDRESS)
PENN STATE UNIVERSITY – HARRISBURG
777 W HBG PIKE
HARRISBURG, PA 17057

2. INVESTIGATOR'S NAME (TYPE/PRINT)
LEONARD J. SUPENSKI   TELEPHONE NO. (717) 948-6234

3. INCIDENT NO. 1A-97-01

4. [ ] RESUBMISSION   PREVIOUS LAB NO. _____   5. PROP. INV. NO.

6. DATE OCCURRED 20 JAN 97

7. OFFENSE BURGLARY, THEFT, RSP.

8. DRUG REL. [ ]Y [ ]N   9. LOCATION (CITY-BOROUGH-TOWNSHIP) LOWER PENN STATE UNIV – SWATARA TWP

10. COUNTY DAUPHIN

11. VICTIM COMMONWEALTH OF PA

12. ACCUSED SUSPECT [x] DORI L. BEARD   DOB 12/27/66   SID NO.

**PART II        EVIDENCE INFORMATION** (FOR EVIDENCE SUBMITTED TO ANY SECTION OTHER THAN AFIS)

| ITEM NO. | 13. DESCRIPTION |
|---|---|
| 1 | 3 8½" X 11" SCHEDULE REPORTS / STAPLED - LEFT CORNER |
| 2 | 1 LETTER ADDRESSED TO AISHA LANEE MIBLEY COLE |
| 3 | + DISPATCH MAIL CARD ATTACHED W/ PINK PAPER CLIP |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |

14. REMARKS/ADDITIONAL INFORMATION

COMPARISON CARD ATTACHED / ENCLOSED

**PART III      AFIS INFORMATION** (FOR EVIDENCE SUBMITTED TO AFIS SECTION COMPLETE THE FOLLOWING)

15. DATE STATUTE OF LIMITATIONS EXPIRES   16. AGE OF ACTOR (IF KNOWN)   17. SEX OF ACTOR (IF KNOWN) [ ]M [ ]F   18. CHECK ALL OF THE FOLLOWING THAT HAVE BEEN COMPLETED
- [ ] ELIMINATION PRINTS SEARCH CONDUCTED
- [ ] LATENT ENTRY CRITERIA MET
- [ ] SKETCH SHOWING PLACEMENT OF LATENT ATTACHED

| 19. LATENT NO. | HAND R/L | FINGER IF KNOWN | COMMENTS | IDENTIFIED YES | NO | ULP REQ. |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |

20. REMARKS/ADDITIONAL INFORMATION

**EVIDENCE DISPOSITION** (FOR LAB/TROOP USE)

RELINQUISHED BY (SIGNATURE)   RELINQUISHED TO (SIGNATURE)   DEPT.   DATE/TIME

NOTE:  All evidence is available for pick-up upon receipt of Report of Analysis by the investigator and shall be retrieved within 30 days

James D. South, 10:29 AM 6/9/99 -0400, Fwd: Re: Dory Beard

*HUSTLE WORK*

X-Sender: jds1@email.psu.edu
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.0
Date: Wed, 09 Jun 1999 10:29:27 -0400
X-PH: V4.1@f04n07
To: jcgismondi@McQuaideBlasko.com, rlm1@psu.edu, bpo1@psu.edu,
djg1@psu.edu,
      mxj4@psu.edu
From: "James D. South" <jds1@psu.edu>
Subject: Fwd: Re: Dory Beard

also>X-Sender: kvs3@email.psu.edu
>X-Mailer: Windows Eudora Light Version 3.0.1 (16)
>Date: Wed, 09 Jun 1999 10:17:48 -0400
>X-PH: V4.1@f04n01
>To: "James D. South" <jds1@psu.edu>
>From: "Kevin J. Stoehr" <kvs3@psu.edu>
>Subject: Re: Dory Beard
>Cc: trh1@psu.edu
>
>I have only spoken with Ms Beard 2 times in the 2 years that I have been
>here.  Both times were concerning returning PSU equipment.  I have not
>spoken to her in well over a year.
>
>As we have discussed in the past, I do not believe she should return to the
>University as a PSO since the job has evolved so much during her absence.
>Any return to this department would also cause morale problems with a few
>employees who have been here during this entire situation.  I feel that the
>best option for the University and for Ms Beard is a final separation from
>each other, although, how we get to that point is what needs to be
>determined.
>
>
>At 03:30 PM 6/7/99 -0400, you wrote:
>>Bob Maney, Tom Harmon and I are trying to determine precisely where the
>>University stands vis-a-vis Ms Beard.  Would you please send us an update
>>about what you think is the current status.  We would also appreciate your
>>recommendations as to appropriate actions to take.  If you have had
>>correspondence from or to Ms beard, please make us aware of it.  It would
>>be most helpful if we could have your responses by noon on 6/9.  If you
>>have questions, please contact me.
>>
>>
>>
>

102

# THE STATUS OF WOMEN IN POLICING

Twenty years of exhaustive national and international research shows that women not only do the job of policing as well as men, but that increasing the numbers of women in police departments measurably reduces police violence and improves police response to domestic violence -- a crime which accounts for nearly half of all 911 emergency calls to police. Yet this record stands in stark contrast to women's dramatic under-representation in police departments where they make up less than 9% of sworn officers nationwide, are concentrated in the lowest ranks and endure widespread discrimination and sexual harassment.

### The Gender Gap in Policing



Source: NCJRS, 1994 male/female police officers in U.S. state and local agencies.

- Of the 604,000 police officers in the United States, only 49,840 are women.

- Of the 36 major city chiefs of police, only one is a woman. Women are still deployed differently from men; women are overrepresented in patrol and traffic, underrepresented in criminal investigation and vice; with the consequence that women are limited in the amount and type of experience they accrue, affecting promotion prospects.



## Discrimination and Harassment of Women Officers Pervasive

Study after study concludes that the single largest barrier to increasing the numbers of

women in policing is the attitudes and behavior of their male colleagues:

- A 1988 study of women in law enforcement by William Timmins and Associates found that open sex discrimination and sexual harassment was so pervasive that supervisors and commanders not only tolerated such practices, but were frequently perpetrators themselves.

- The 1991 Report of the Independent Commission on the Los Angeles Police Department found that women in the LAPD suffered regular discrimination based on their gender: "the bast majority of the female officers reported problems with 'not being judged on ability' (70%), 'sexist remarks' (76%), 'partner with negative attitude about personal competence passed on verbally' (55%)."

- A 1992 Los Angeles City Survey found that 48% of women in protective services jobs had been sexually harassed in the past year.

### Under-Representation and Discrimination Against Women in Policing Costly to Taxpayers

The heavy toll on taxpayers of the under-representation and discrimination against women in policing is illustrated by these Southern California examples:

- The City of Los Angeles has paid over $50 million to settle excessive force lawsuits against the LAPD since the early 1980s. Police excessive force lawsuits cost the City more than $20 million between 1986 and 1990 alone.

- In 1991, a jury awarded $3.1 million to two former Long Beach female police officers who sued for sexual harassment in their department.

- Following a class action sex discrimination lawsuit against the Los Angeles Sheriff's Department in 1991, L.A. County was ordered to spend $4.5 million to correct intentional sex discrimination and eliminate sexual harassment.

✰Return to Status of Women in Law Enforcement



JOIN | INDEX | FEEDBACK | SEARCH | HOME | STORE

Copyright 2000, The Feminist Majority Foundation

104

# SELECTED RESEARCH ON THE STATUS OF WOMEN IN EMPLOYMENT IN GENERAL, IN LAW ENFORCEMENT IN PARTICULAR

## SELECTED SEXUAL HARASSMENT STATISTICS:

- 50% to 85% of American women will experience some form of sexual harassment during their academic or working life (Hughes and Sandler, 1986, 1988; U.S. Merit Protection Board 1987).

- 60% of women surveyed reported being sexually harassed on the job, 26% reported that sexual harassment to their employer, 60% of those who reported it said charges were ignored or offenders were given token reprimands (*Working Woman Magazine*, 1987).

- 90% of women reported being sexually harassed on the job (Harvard/*Redbook Magazine* Survey, 1990)

- Women in professional positions, with higher educations, reported higher levels of sexual harassment than women in lower status positions (U.S. Merit Protection Board Study, 1987,).

- Sexual harassment cost the Federal Government $189 n-dllion in the two years between 1978 and 1980 (U.S. Merit Protection Board Study, 1987)

- Women are nine times more likely than men to quit jobs because of sexual harassment, five times more likely to transfer, and three times more likely to lose jobs (Konrad and Gutek, 1986)

- Sexual harassment costs a typical Fortune 500 company $6.7 million per year a cost of $282.53 per employee; meaningful preventive steps can be taken for $200,000 a cost of $8.41 per employee. It is 34 times more ex ensive to ignore the problem (Klein, 1988)

- A *Working Woman Magazine* analysis reported that almost 90% of the Fortune 500 companies surveyed had received sexual harassment complaints; over a third had been sued; nearly a fourth had been repeatedly sued (Klein, 1988)

- Most harassers are older than their victims (although some are younger), married (although some are single), and of the same race as their victims. Some harass many women, others harass only once (Fitzgerald, 1991)

- Only 1 - 7% of women who report sexual harassment in surveys actually file a formal complaint or seek legal help (Women's Legal Defense Fund, 1991)

- Few incidents are reported to employers; the formal complaint rate across all companies is 1.4 per thousand women employees per year (Klein, 1988)

- Only 5% of the government employees who indicated in the 1987 U.S. Merit Systems Protection Board survey that they had been harassed actually filed formal complaints or

Statistics on Women in Law Enforcement

requested investigations (Women's Legal Defense Fund, 1991)

- In most organizations, at least 90% of sexual harassment victims are unwilling to come forward for two reasons:fear of retaliation and fear of loss of privacy (Klein,1991).

- Among Los Angeles County employees, 85% of women and 55% of men thought sexual touching was sexual harassment (L.A. City Commission on the Status of Women, Survey of City employees, 1992).

- 96% of women suffering sexual harassment report emotional stress symptoms (nervousness, fear, anger, sleeplessness); 83% report interference with their job performance (loss of motivation, avoidance); 63% report physical stress symptoms (headaches, nausea, weight loss); 12% sought therapeutic help (Working Women's Institute Survey, 1992)

- Nearly all women police surveyed in England and Wales experienced sexual harassment from male police, at a significantly greater rate than that to which other women in police departments were subjected; 90% heard sexually explicit comments or jokes about women, 60% had offensive comments about themselves, their appearance, 30% were subjected to unwanted touching, 20% were pestered for unwanted dates (Anderson & Brown, 1993)

- Pilot study of two police forces in Great Britain found 1) in Force A: 53% of officers had experienced sexual harassment (49% "minor", 49% "serious"), 27% complained, 57% of those felt that their complaint was handed poorly, 29% did not complain, fearing reprisals, 29% did not complain, feeling the incident not serious enough 2) in Force B: almost all regularly hear suggestive jokes and comments about women's appearance, bodies, 35% reported being touched, stroked, pinched; 6% reported being sexually assaulted, 3% complained, 10% considered leaving the police because of sexual harassment (Anderson & Brown, 1993).

- Parallels exist between sexual harassment and family abuse where "escape may be impossible for the 'victim' without incurring severe penalties herself, and the perpetrators are intimates with whom she must continue to work and live. She has to learn to suppress her true feelings in order to survive in the workplace and ... by failing to resist or complain in an effective way, she finds herself implicated as a collaborator. This leads to an increase sense of guild and self-blame..." (Mezey & Rubenstein, 1992).

- Male-dominated police culture employs frequent sexual jokes and sexual harassment to limit women's behavioral options (Martin,1989).

- Males who are socialized with values of male superiority over women experience anxiety when faced with the reality of female competence. Masculinity has traditionally been associated with dominance over females, so the reality of female equality can generate anxiety in some men about their very masculinity. One way to diffuse the anxiety is to engage in gender stereotyping. Women in policing violate a cultural stereotype of women as non-aggressive, not tough, incapable of protecting men. Women who compete with men in this arena are seen by the threatened male as "unfen-linine". Women who do not complete the way men do, or who assert the importance of family

are considered "incompetent" or "uncomn-titted". So sex differentiation and discriminatory behavior causes women to have to choose between de-femininity or de-professionalism (Balkin, 1988).

- There are ten responses that women have to being the object of sexual harassment; 5 internal responses: 1) endurance, 2) illusionary control (taking responsibility for the behavior; if I do this it will stop) 3) denial., (it's not really happening), 4) detachment (making light of the behavior, its impact), 5) relabelling (he's just trying to be cute, didn't mean it); and 5 external responses: 1) avoidance, 2)seeking social support, 3) appeasement of the harasser, 4) assertion/confrontation, 5) systemic relief (fewer than 10% of women used systemic relief to address the problem) (Baker, 1988)

**THE STATUS OF WOMEN IN POLICING:**

STATUS OF WOMEN IN THE US.: (U.S. Department of Labor, 1992)

- Women were 37 % of the labor force in 1979, 45% by 1992
- Women hold less than 5% of all senior management jobs across the US.
- Women's representation in municipal police departments serving populations over 50,000 has grown from 3.4% in 1978 to 9% in 1986 - Women are currently 3.7% of sergeants, 2.5% of lieutenants, 1.4% of command staff

STATUS OF WOMEN IN GREAT BRITAIN: (Anderson & Brown, 1993)

- Women were 30% of labor force in 1961, 47% of the labor force in 1990
- Women were 10% of police departments in 1993
- Though 90% of women with children return to the general workforce, only 1.6% of women in policing intend to return

STATUS OF WOMEN IN CANADA: (Walker, 1993)

- Women were 40.8% of the labor force in 1989
- Women were 7.5% of police officers in 1992 (up from 4% in 1985 and 2% in 1980)
- Women police are concentrated in the lowest ranks, a small minority are mid-level supervisors, and are virtually absent from command staff
- Despite 20 years as sworn personnel, women are still deployed differently from men, with women overrepresented in patrol and traffic, underrepresented in criminal investigation and vice; differential deployment practices are widespread and systematic, with the consequence that women are limited in the amount and type of experience they accrue, affecting job satisfaction and promotion prospects – fewer women promoting reinforces male stereotypes about women's abilities (Jones, 1987).

☆ Return to Status of Women in Policing

*107*

*Changing
the Face
of Policing*

## NATIONAL CENTER FOR
## WOMEN & POLICING

# EQUALITY DENIED
## *The Status of Women in Policing:  1999*

n order to monitor the growth of women in law enforcement, the *National Center for Women & Policing* has completed its third annual study on the status of women in the largest law enforcement agencies in the country.  This report examines the gains and gaps in the numbers of women in policing, and provides a picture of where women are in law enforcement today.  The report examines the major barriers preventing women from increasing their numbers in law enforcement and the adverse effects of the continued under-representation of women in police departments.

Since its inception in early 1995, the *National Center for Women & Policing* has been a leading force behind increasing the numbers of women in law enforcement.  Studies have illustrated the positive impact of women in policing, including the reduction of police brutality, the increased efficacy in police response to violence against women, and the increased emphasis on conflict resolution over use of force.  These conclusions mandate that we strive for gender balance in policing.

Yet, our research shows that the increase of women in law enforcement continues at an alarmingly slow rate.  Women comprise only 14.3% of all sworn law enforcement positions nationwide – a meager increase of one-half of one percent from 1998 and only 5.3 percentage points higher than in 1990, when women made up 9% of officers.  The data are clear: at the present rate of growth, women will not achieve equality in law enforcement agencies for several generations.

**KEY FINDINGS**[1]

- Women comprise 14.3% of all sworn law enforcement positions among municipal, county, and state law enforcement agencies in the United States with 100 or more sworn officers.  Women of color hold 6.8% of these positions.

- Over the last nine years, the representation of women in sworn law enforcement ranks has increased by 5.3% percent, from 9% in 1990 to 14.3% in 1999.

- The gains for women in policing are so slow that, at the current rate of growth, it will take several generations for women to reach equal representation or gender balance in law enforcement agencies.

- Women currently hold 5.6% of sworn Top Command law enforcement positions, 9.2% of Supervisory positions, and 15.6% of Line Operation positions.[2]  Women of color hold 1.1% of sworn Top Command law enforcement positions, 2.8% of Supervisory positions, and 7.8% of Line Operations positions.

- More than 65% of the agencies surveyed reported no women in Top Command positions and 91% of the agencies reported no women of color in the highest ranks.  This is a clear indication that women continue to be largely excluded from the essential policy making positions in policing.

- State agencies trail municipal and county agencies by a wide margin in hiring and promoting

women.  Specifically, state agencies report 6.2% sworn women law enforcement officers, which is significantly lower than the percentages reported by municipal agencies (16.6%) and county agencies (11.1%).

- Women continue to hold a majority (66.1%) of lower-paid civilian law enforcement positions. Women of color hold 25.7% of civilian positions.
- Although women continue to hold a majority of civilian law enforcement positions, they are not equally represented in top management positions where they remain at 42%.  Women of color hold a mere 6.4% of the management positions in civilian law enforcement.
- Law enforcement agencies with corrections personnel report that women comprise 26.4% of all corrections positions.  Women of color hold 14% of all corrections positions.
- Women comprise 29.3% of Line Operations positions within corrections personnel, 16.2% of Supervisory positions, and a mere 8.2% of Top Command positions.  Women of color hold only 1.6% of the coveted top command positions within corrections.

## BARRIERS TO WOMEN IN POLICING

Research concludes that the single largest barrier to increasing the numbers of women in policing is the attitudes and behavior of their male colleagues. For example, national studies consistently find that discrimination and sexual harassment are pervasive in police departments and that supervisors and commanders not only tolerate such practices by others, but also are frequently perpetrators themselves. [3]  Hostile environments and systemic discrimination keep women from joining police agencies in more significant numbers and from being promoted up the ranks to policy-making positions, thus perpetuating a style of policing that is outdated, ineffective, and enormously costly to communities.

### BIASED ENTRY TESTS

- Entry exams, with their over-emphasis on upper body strength, favor men and wash out qualified women – despite studies showing that physical prowess is less related to job performance than verbal and mediation skills.  In fact, no research has shown that strength is related to an individual's ability to successfully manage a dangerous situation. [4] While discriminatory height requirements were finally discarded in the early 1970's, today's tests that over-emphasize upper body strength continue to bar highly qualified women from entering policing.

### WIDESPREAD DISCRIMINATION ON THE JOB

- Once on the job, women are frequently intimidated, harassed, and maliciously thwarted, especially as they move up the ranks. [5]  In Los Angeles, male officers formed a clandestine organization within the LAPD called "Men Against Women" whose purpose is to wage an orchestrated campaign of harassment, intimidation and criminal activity against women officers – just one example of the kind of organized harassment women experience in law enforcement.  A large number of women across the country have been driven from their jobs in law enforcement due to unpunished, unchecked, and unrelenting abuse.

### RECRUITMENT POLICIES THAT FAVOR MEN

- Law enforcement agencies continue to heavily recruit ex-military personnel and at military bases, security agencies, and male-oriented sporting events, which are all disproportionately populated by men.  Recruitment departments have not adequately intensified their efforts to attract qualified women candidates or to portray policing as a profession that welcomes women.

### OUTDATED MODEL OF POLICING

109

- Many law enforcement agencies continue to promote an outdated model of policing by rewarding tough, aggressive, even violent, behavior. This "paramilitary" style of policing results in poor community relations, increased citizen complaints, and more violent confrontations and deaths. Redefining law enforcement to a community-oriented model of policing would attract more women who are repelled by policing's trademark aggressive and authoritarian image.

# UNDER-REPRESENTATION OF WOMEN HURTS LAW ENFORCEMENT
## ESCALATING COST OF POLICE BRUTALITY

- Research indicates that women officers are not as likely as their male counterparts to be involved in the use of excessive force.[6] This suggests that increasing the number of women in police departments may reduce excessive force by police and improve police effectiveness and service to communities. Thus, the continued under-representation of women in policing is contributing to and exacerbating law enforcement's excessive force problems. The actual and potential liability for cities and states is staggering, with lawsuits due to excessive force by male law enforcement personnel costing tens of millions of dollars of taxpayer money every year.

## INEFFECTIVE RESPONSE TO VIOLENCE AGAINST WOMEN

- The under-representation of women in law enforcement also has significant implications for women in the community who are victims of domestic violence. Domestic violence is believed to be the most common yet least reported crime in the United States. These crimes account for up to 40% of all calls to police[7] and one-third of all law enforcement's time.[8] Given the extent of the problem, it is important to note that female officers are demonstrably more effective than their male counterparts in responding to crimes against women.[9] Even more critical, studies have found that up to 40% of officers commit domestic abuse themselves.[10] As a result there is a 40% chance that officers responding to a scene of a domestic violence incident may themselves be an abuser. It is therefore reasonable to speculate that the overall quality of police response to cases of violence against women may improve greatly by increasing the numbers of women in law enforcement.

## DAMAGED POLICE-COMMUNITY RELATIONS

- Women favor a community-oriented approach to policing which is rooted in strong interpersonal and communication skills and which emphasizes conflict resolution over use of force. With greater numbers of women, this highly effective model of policing will increasingly improve the public image of law enforcement agencies as well as have a positive impact on police-community relations nationwide.

## COSTLY SEXUAL HARASSMENT AND SEXUAL DISCRIMINATION LAWSUITS

- Law enforcement agencies have tolerated workplace environments that are openly hostile and discriminatory towards female employees, forcing women to bring successful lawsuits against their agencies. The ongoing serious under-representation of women in policing leads to greater numbers of incidents of sexual harassment and discrimination. Increasing the number of women and treating women equally on the job, will reduce the enormous costs resulting from widespread lawsuits.

## CERTIFICATE OF SERVICE

I, Andrew J. Ostrowski, hereby certify that I have served a true and correct copy of the

foregoing document by depositing such in the regular U.S. Mail, addressed as follows:

Jeanine C. Gismondi, Esquire
811 University Drive
State College, PA 16801-6699

Andrew J. Ostrowski
4311 North Sixth Street
Harrisburg, PA  17110
(717) 221-9500

Dated: April 14, 2002